# UNITED STATES DISTRICT COURT
## FOR THE  DISTRICT OF THE DISTRICT OF COLUMBIA

Steven Ivey,                                    )
                                                )
      Plaintiff,                            )
                                                )          Civil Action No. 07- 0748 RJL
      V.                                    )
                                                )          **RECEIVED**
HENRY PAULSON, Secretary, et al.,     )
U.S. Department of the Treasury,          )          MAY 2 9 2007
                                                )
      Defendant.                            )          NANCY MAYER WHITTINGTON, CLERK
                                                               U.S. DISTRICT COURT

## MOTION TO AMEND COMPLAINT AS PER RULE 15

1.       With the following, the plaintiff, as per Rule 15 is amending

the initial compliant with  related and updated issues.  Included is the issues

of EEOC notification for proper administrative review.

### A.  EEOC  Review / Notification

2.       With attachment A, the issues have been presented to the

EEOC as reviewed in the appeal decision.  Any new issues and allegations

that have occurred since this appeal's decision have been presented to the

EEOC on a rolling basis.  The plaintiff, Ivey, has notified the EEOC, after

waiting at least 30 days, of the intent to file the civil action herein.

Therefore, the plaintiff has exhausted his administrative review.

1

**B. Amended Complaint**

3.        The plaintiff is amending the complaint for wrongful

termination based on (1) problems of rating; (2) prohibited practices

affecting rating; (3) improper procedure; (4) discrimination issues; (5)

improper NTEU involvement allowed by the defendant; (6) perjury issues;

Regulations and rules were applied to the plaintiff but not to others,

particularly to black female of C & E as the defendant used improper

vouchers to covered up mistakes made to taxpayer's documents and to

batches of work.  These actions were later denied by the defendant in

investigations and related civil actions.

4.        From related case 04-0214, <u>Ivey v. US Dept. of the Treasury</u> ,

and  05-1147, <u>Ivey v. NTEU</u> , in DC District crated a conflict that has

resulted in recent contradiction in credulity of the defendant and NTEU, in

relation to the claims presented.

**I.  Explanation of Attachment # 4** :

5.        This document appears to be an email to Linda Ferguson,

Karen Truss and Brent Brown (various supervisors) from Robert Hall,

supervisor conversion section.  It is not dated so it is not sure when it was

written, however, since it was used in the formulation of the Treasury EOP

2

file 03-1135 in August 2002, it can not be any later than this date. The plaintiff did not receive the EOP file 02-1135 until Jan-Feb 2003 because it was improperly sent to the wrong address in August 2002, therefore, this would have been the first time that the plaintiff had any knowledge of this document. Attachment A discusses the decision as it relates to this postal delay for the plaintiff and the defendant's eagerness to blame the plaintiff. The file was done in conjunction with the compliant process of the EEOC, which was not completed until January 2004.

6.         Attachment # 4 has been used repeatedly by the defendant in it's defenses against claims of the plaintiff for violations of Title VII Civil Rights code; departmental regulatory violations, and violations to taxpayers' documents. The attachment has been used in making decisions on the validity of the plaintiff's claims from the time it was included in the EOP file until the present. Therefore, it has caused damage in a continuous basis until the present. Consequently, it involves the NTEU as a partner in the alleged racial call, which in turn results in damage to the plaintiff as paralleling that caused by the defendant.

7.         The plaintiff has denied involvement with the call from it's inception. The plaintiff has requested verification from the defendant and

3

the NTEU for Lisa Porter and Angela Strong so as to verify their roles.
(This has created a conflict in DC District's decisions for related case
04-0214, Ivey v. US Treasury, and 05-1147, Ivey v. NTEU . To date neither
of the defendants for either has supplied any affidavits and/or declaration
that substantiates the allegation of the supposed call. From Robert Hall's
testimony this call was to have occurred around March 29 or 30, 2001,
approximately one month after the plaintiff was terminated from the
IRS/ Treasury at the Chamblee, GA, tax processing center. The reason for
the plaintiff's termination as cited by the defendant was because of "poor
rating." The initial complaint list the problems with the rating system that
affected the plaintiff's rate score / performance and how these problems
were blamed on the plaintiff; the same would be true for all data
transcribers. To some degree these problems continue till the present day
affecting approximately 500 data transcribers to some degree at some level.

8.          The plaintiff had no contact with Lisa Porter or Angela Strong
while employed at the Chamblee, GA, IRS Center or since being employed
at the site. The plaintiff never talked with them nor knew of them in any
capacity while at the IRS center or otherwise. The only NTEU rep the
plaintiff ever talked to directly at the center was Doug Van Buren; which

4

was limited to the first month of employment in February 1999 concerning

complaints about Kelly Mancle, a unit manager. The plaintiff had no other

contact with Doug Van Buren until Robert Hall requested him at the

March 5, 2001 meeting as reference with attachment # 2. The plaintiff did

not request Doug Van Buren to be present as Robert Hall wrote with

attachment #3. Under the circumstances of terminating the plaintiff for

"poor" rating render the NTEU powerless as stated in attachment # 1.

Consequently, Lisa Porter and Angela Strong would not have a working

identification of the plaintiff so that they could make such a call ID of the

plaintiff. More significantly, all incoming and outgoing calls at the

IRS/Federal Processing Center are recorded/ documented so the call could

be checked according to the phone records. When first employed this was

given as a warning to employees in case they were to talk about private

issues while using the department phones.

9.        After the plaintiff was terminated he returned home to northeast

/ coastal North Carolina and some degree southeastern Virginia. Therefore,

any claims that the plaintiff made any such calls would have to be made

from this area. During the plaintiff's employment with the IRS Center he

wrote two compliant letters concerning the rating issues of the initial

5

complaint, in addition to EEOC type complaints. The first was to the Tax

Commissioner's Complaint Division in DC in November 1999. Because of

such issues as retaliation for the first letter; failure to correct the originating

problems, and more recent issues, the plaintiff wrote a second letter in

November 2000 to the Tax Commissioner, the TIGTA, the OSC, and the

oversight committee of Congress. This is what has been considered the

beginning of EEO complaints, and, once back in NC, the plaintiff continued

the process of supplying information and processing of the experiences at

the IRS/ Treasury Center of the defendant. Therefore, the EOP , TIGTA,

and OSC/MSPB processing occurred from this area for the plaintiff.

10.        Concentrating more to the contents of attachment # 4 it should

be noted that this alleged call by the NTEU occurred while the plaintiff was

in NC, no longer an employee of the defendant, at the end of March 2001.

To date neither the defendant nor the NTEU have responded to request from

Ivey for verification or support from Lisa Porter or Angela Strong, but

continuously use such false testimony and documentation as support for

dismissals and discrediting the plaintiff. The following explains the

problems with attachment # 4 on a line -by -line basis.

**Lines 1 & 2**: This represents hearsay on the part of Lisa Porter and

6

Robert Hall which amounts to gossip in order to discredit the plaintiff.

**Line 3** : The plaintiff did not make such a call to NTEU, therefore, no conversation with Angela Strong. If there was such a call it does not explain how Angela Strong would have identified the caller as the plaintiff from that of a "crank" caller.

**Line 4** : During the meeting of attachment # 2 in which Doug Van Buren was improperly present, the plaintiff told him that the defendant was trying to terminate him because of reporting the above referenced violations and that the plaintiff had done so to the above listed agencies. With this in mind, why would the plaintiff call the NTEU to say he was terminated for his beliefs ? This, also, occurred during a time when the plaintiff was contacting the EEOC and OSC . The term "beliefs" is strange because it suggest a more religious reasoning of views. There are such things as improbable character traits; for the plaintiff this would apply with the term "beliefs", equally so for talking to what would be a stranger about such "beliefs."

**Lines 5 & 6** : This question and statement for the plaintiff are highly usual because it evokes a role of Angela Strong , though a stranger to the plaintiff, a more personal familiar role to the plaintiff. It should be noted that the

7

plaintiff had come to the understanding that the NTEU was ineffective in resolving complaints before the plaintiff was terminated and understood that Doug Van Buren was not suppose to be present as with attachment # 2 meeting where he was coercing the plaintiff to sign away his rights. Consequently, this lends to much credibility to the NTEU in that approximately one month after the plaintiff's termination, he would have trusted any contact with the NTEU or think that the NTEU would do anything to assist him. All this in light of the accusation of some personal conversation about "beliefs."

The use of the racial and sexual language was intended by the defendant and the NTEU to discredit the plaintiff in order to give support to the defendant in defense of the plaintiff's claims against the Treasury. The idea of not taking orders was to provoke a defiant characteristic of the plaintiff to discredit him and negate the fact that the plaintiff refused to participate in changing taxpayers' documents, and sign false statements and with attachment # 2. Once again this was an attempt to dissuade and discredit the plaintiff.

**Lines 6 & 7**: The plaintiff, as would be reasonable for anyone to think that the NTEU president would be sitting around ready to take phone calls or

8

more particularly to meet. The plaintiff is sure these would have to be arranged for anyone. These may be possible events but not probable as a rule. As stated above the plaintiff would not have contacted the NTEU since by this date the NTEU had established a behavior of mistrust for the plaintiff.

**Line 8** : This statement signifies that the document is basically hearsay, which under **FR of Evidence § 802** means that it is not admissible in making decisions against the plaintiff as was the case for the two above listed related cases.

11.        There are many problems that are generated by attachment # 4. Though the document has been cited as having occurred at the end of March 2001 it has been used by the defendant in administrative and judicial reviews of the plaintiff's claims of MSPB whistle-blowing; EEOC Title VII employment discrimination and harassment; and civil actions  Because of this extensive use it has resulted in damage to the plaintiff on a rolling basis existing until the present date. The defendant has refused to resolve the validity or provide verification for it's inclusion in any proceedings. The responsibility of damage to the plaintiff is extensive because to perpetuate what is essentially a false record involving perjury and forged evidence

9

means that there would be  more charges than the initial charges that were

produced in March 2001 as long as it is used by the defendant without being

substantiated.  Depending of where the determination of blame falls there

are charges subornation of perjury at the very least against the defendant.

12.          The plaintiff has denied any involvement with attachment # 4

and supplied his phone record during the time in question, attachment # 6.

From this phone statement there can be seen that no calls were made for the

days that NTEU/ defendant claims.  Should there be raised a questions as to

the use of some secondary phone then it should be noted that **Line 5**  refers

to a belief.  Such a demonstrative belief and statement in its capacity as

made would not be something that would be done from a secret location so

as to hide it .  Therefore, a contradiction in terms why hide something that

apparently is being done so proudly?  Should the defendant and/or the

NTEU state that the alleged "racial" call occurred from another phone then

it should provide such proof.  It should start with the records at the

Chamblee IRS center, there would be phone records  This conclusion raises

the fact that since Angela Strong made the accusation against the plaintiff

the burden of proof rest with her, the NTEU, and the defendant.

13.          The calls to Acworth, GA, were to a co-worker, Susan Karimi.

10

The plaintiff and Susan Karimi exchanged phone numbers during employment at the center. It was normal to call her because the plaintiff and Susan did call each other over the weekends during employment and after. Julie and Donna were the only two other employees that exchanged phone numbers mutually with the plaintiff. In March of 2001, the Thursday and Friday as referenced in attachment #4, line 3, would have been the 29th and 30th. From the plaintiff's phone bill there are no calls made on the 29th and of the calls on the 30th none were to the NTEU and/or the defendant.

14.      Because Angela Strong reported that the plaintiff made this alleged call the initial questions start with her. There can be, thus, two scenarios for Angela Strong (1) that she denies the incident ( the NTEU has with attachment #5 denied involvement with the call) and (2) she can state that she confirms that the plaintiff called her at the NTEU as stated.

15.      For the first (1) scenario the burden of proof would then shift to Robert Hall for questioning. In doing so it would initially make Robert Hall and the defendant responsible for the production of this false document creating violations of perjury and forging evidence. Additionally, because there is hate speech involved, it would make these crimes hate crimes. This is, thus, an amended charge against the defendant.

11

16.        It is reasonable to conclude at this date that Robert Hall and the defendant would deny any wrong doing with attachment #4, so the burden of proof would then fall to Lisa Porter. However, Robert Hall and the defendant would be guilty, at the minimum, of perpetuating damaging unsubstantiated negative claims against the plaintiff during an investigation for violations under MSPB, the EEOC, and civil actions , because attachment # 4 was not properly verified in order to protect the plaintiff or serve the interest of justice. This result in an act of defrauding official reviews for the plaintiff's claims.

17.        For the second (2) scenario Angela Strong can state that she did report the call as given in attachment #4, but would then have the burden of proof. The NTEU has refused to supply such proof or any testimony from Angela Strong, as seen with related civil action, 05-1147, Ivey v. NTEU. The NTEU would also be contradicting itself, because for the purpose of dismissal with civil action of attachment # 5, 05-1147, the NTEU denied any involvement with attachment # 4, thus resulting in the changing of Angela Strong's story for scenario (2). The charges of hate crimes as mentioned above would then, also, apply to Lisa Porter, Angela Strong, and the NTEU.

12

18.          From this point it can be seen that there is suspicion against the

NTEU for not taking any action against the defendant for improperly

involving Lisa Porter and Angela Strong and for the attacks to the plaintiff.

This suspicion is compounded by the fact that the NTEU has refused to

provide testimony from Lisa Porter and Angela Strong, as with case

05-1147. This has created continual damage to the plaintiff up to the

present date for its use in related investigations and civil actions, resulting

in the assisting of the defendant so as to better itself with the Treasury and

prevent favored Treasury employees from disciplinary action.

19.          In considering that attachment # 4 occurred against the plaintiff

while a private citizen after employment in NC the actions of the defendant

crossed state lines so that it would affect the plaintiff's role of being a

witness for the above Treasury violations.

**II. Explanation of Attachment # 2 :**

20.          For this March 5, 2001 meeting NTEU representative, Doug

Van Buren, was improperly present. Robert Hall/ defendant is citing the

reason for recommending my termination as "poor rating." Contrary to

attachment #3 as reported by Robert Hall , the plaintiff did not request a

NTEU rep for this March 5 meeting and, in turn, did not request to "only

13

have a white steward." There were many circumstances affecting rating so

to terminate a data transcriber for rating was not a normal practice.

Therefore, why would Doug Van Buren, as the NTEU rep, encourage Ivey

to sign such a statement ? This contradicts the mission and purpose of the

NTEU and cited the involvement with of the defendant to organize improper

removal of the plaintiff.   From the above there is now raised issues of

credibility of both the defendant and the NTEU.

21.        Robert Hall left the meeting room for a period in which time the

plaintiff explained to Doug Van Buren the circumstances of violations and

complaints as listed above and that he had reported such violations.  The

plaintiff cited this as the reason for the defendant wanting to terminate him.

This did not make any difference to Doug Van Buren as he continued to

coerce the plaintiff to sign this document.  This action was organized by the

defendant.

22.        This document is not an official Treasury form as required for

filing such a report.  Robert Hall included the plaintiff's social security

number under his name.  This is a violation of the Social Security Number

Act.  It questions how Robert Hall had access to such a record of the

plaintiff and who allowed Robert Hall such access.  It is improper in

14

showing it to the NTEU rep Doug Van Buren. It should be understood that if the plaintiff had signed the letter, the plaintiff would be signing away his rights; void the complaints of violations; and incriminate himself. Therefore, Doug Van Buren was improperly present and his behavior was not in the mission of the NTEU with such coercion. At this point, when Doug Van Buren realized that the plaintiff was not going to sign the document he had to know that he was in trouble for his participation. However, the defendant has improperly perpetuated the justification of Doug Van Buren.

23.        This attachment # 2 in comparison with attachment # 4 demonstrates the repeated pattern of the NTEU in improper involvement against the plaintiff for reporting violations and refusing to participate in such violations. The defendant encouraged this behavior for its own benefit against the plaintiff. The NTEU was not acting as a Union in protection of workers when considering the list of problems with the rating system. It shows intention in that the NTEU went to the extremes to damage and encourage such issues against the plaintiff in participating with the defendant to hinder corrective action and for the interest of justice.

15

### III. Explanation of Attachment # 3 :

24.        From the collective explanations of the above, the role of

attachment # 3 has been discussed, however, it should be noted that NTEU

rep, Doug Van Buren, was improperly recommending that the plaintiff be

terminated. To note the comparison of attachment # 3 with # 2 & 4

demonstrates the NTEU's effect to discredit Ivey is a pattern of behavior

forming a negative campaign. This was given an opportunity to grow as

organized by the defendant.

25.        These incidences as explained were perpetuated by both the

defendant and the NTEU.   It should be noted that many of the

determinations should be made after the facts have been resolved. As

explained there are some minimal violations that apply and that the plaintiff

was in NC during some of the later violations.

### IV. Analysis of Attachments for Wrongful Termination :

26.        The Restructuring and Reform Act of 1998, (RRA98), was

violated in relation to the plaintiff in order to terminate his employment with

the Treasury on March 7, 2001. From the latest related case, attachment #5,

wherein the NTEU denied any involvement with attachment # 4,

demonstrates the perjury and false documentation of the defendant.

16

27.        Accusations of insubordination by employee Kelly Mancle, as

further stipulated by employee Robert Hall, were not processed according

**5 USCS § 7513**- Cause and Procedure.  Additionally,  **5 USCS § 7513**

**(b)(1),(2)&(3)** states that [the plaintiff] is entitled to 30 days advance

written notice of actions proposed against him; a reasonable time but not

less than 7 days to answer with evidence to support the answer; and to

choose to be represented.  Kelly Mancle's accusations of  February 20, 2001

are false.  Kelly Mancle stipulates accusations so as  to provoke the plaintiff

and to disguise her past violations of department and Title VII Civil Right

Code violations particularly aimed at the plaintiff.

28.        The incidences leading up to the plaintiff's termination did not

follow the procedures as outlined in the Restructuring and Reform Act of

1998 (RRA98).  In Lisa Lee's testimony as given to the EEO investigator,

she stated that Robert Hall initiated the efforts to terminate the plaintiff.

The stipulations of the RRA98 state that those individuals involved in any

compliant can not be the deciding individuals in a matter such as presented

for termination. This would mean that Robert Hall, and the participating

managers were in violation of RRA98 for said reason.  The RRA98 also

stipulates that for all violations, including those the plaintiff reported, there

17

is to be an Allegation Form filled out by the Supervisor/Manager. This was not done for any violations that the plaintiff reported or about those report February 20, 2001 by Kelly Mancle and Robert Hall. To further, the RRA98 stipulates that such matters are to be reviewed by the Central Adjudication Unit (CAU) comprising of a board wherein the Inspector General for Taxation is a member. This demonstrates that the plaintiff's termination did not follow normal procedure.

29.      This indicates that the defendant wanted to remove the plaintiff as soon as possible as well as discrediting him in an attempt to misled adjudication and the processing of the complaints filed. Letters by Robert Hall to his supervisors stipulate that the termination of the plaintiff was to be done faster than normal. The plaintiff was never given a chance to have any proper review of the accusations by Kelly Mancle, Robert Hall, or any other witnesses. These concerns suggest an excessive treatment for the claim of terminating an employee for "poor rating" as the defendant's reason for terminating the plaintiff. This generated discrimination toward the plaintiff as the improper application of rating problems were applied to the plaintiff which was in contradiction to normal practice and other employees, females and blacks.

18

30.        In <u>Shuman v. Dept. of the Treasury</u> (10/22/84 MSPB) Docket

No. SE 328410073, it was determined that when an agency demotes or

removes employee based on fewer than all components of performance

standard, the agency must show that employee's performance warranted

rating on standard as a whole. This points to other issues for terminating an

individual, such as tardiness or attitude, to suggest the rating of an

individual is to be based in it's entirety and not for one single mechanical

element. Given the list of rating/rank problems of the initial complaint the

defendant did not properly consider all aspects affecting rating as a reason

for termination.

31.        The termination of the plaintiff involved the inappropriate

presence and coercion of the union steward Doug Van Buren of the Plaintiff.

Doug Van Buren, further, contributed and recommended that the plaintiff be

terminated. However, this was not Doug Van Buren's role as a NTEU rep

nor does the NTEU have any bargaining agreement for reasons of

termination in termination for "poor rating". This further evidences the

collective action taken and encouraged against the plaintiff by the

defendant.

## V. Analysis of MSPB Decision to Wrongful Termination :

32.        For issues of prohibited practices the plaintiff did contact the

MSPB but the issues of illegal vouchers as listed in **II, B, (d)** of the initial

complaint to cover up the problem as listed in **II, A, (e)** of the initial

complaint of mistakes of C & E division was not properly reviewed. MSPB

limited their review, attachment B, to the specific prohibited practice of

checking the Presidential Donation Box, (PDB), as list in the initial

complaint under **II, B, ( c)**. Both of these issues, however, impacted the

plaintiff's rating and rank negatively.   One resulting effect was to contribute

to the plaintiff's termination.  Effectively, the defendant charging its

violations to taxpayers' documentation to the plaintiff as errors.  This

practice was applied to all of the 500 data transcribers to various degrees.

## C. Claims for Damages

33.        Under civil statutes 42 USCS § 1981, 42 USCS § 1983, 42

USCS § 1986, 42 USCS § 1988 and 42 USCS § 2000e, the plaintiff is

entitled to relief for the above listed violations.

## Attachments:

# A- EEOC Decision.
# B- MSPB Decision.

20

# 1 - Statement of Limit for NTEU bargaining involvement.

# 2 - March 5, 2001 letter of Robert Hall (with ss#).

# 3 -  Memo of Robert Hall to Linda Ferguson.

# 4 - NTEU alleged call stated by Lisa Porter and Angela Strong.

# 5 - Denial of NTEU with racial call from CA# 05-1147, <u>Ivey v. NTEU</u> .

# 6 - Ivey's phone record for March 2001.

**Certification of Service**

The attached document was sent by mail to:

Office of the Clerk
US District Court for DC
333 Constitution Ave, N.W.
Washington, DC, 20001

_May 22, 2007_
Date

Steven Ivey
Plaintiff





### U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
#### Office of Federal Operations
#### P.O. Box 19848
#### Washington, D.C. 20036

Steven G. Ivey,
Complainant,

v.

John W. Snow,
Secretary,
Department of the Treasury,
Agency.

Appeal No. 01A33016

Agency No. 02-1135

Hearing No. 110-A3-8092X

<u>DECISION</u>

Complainant filed a timely appeal with this Commission from the agency's order dated March 24, 2003, dismissing his complaint of unlawful employment discrimination in violation of Title VII of the Civil Rights Act of 1964 (Title VII), as amended, 42 U.S.C. § 2000e *et seq*. The appeal is accepted pursuant to 29 C.F.R. § 1614.405. In his complaint, complainant alleged that he was subjected to discrimination on the bases of race (Caucasian), color (white), sex (male), and reprisal for prior EEO activity when his employment was terminated during the probationary period effective March 7, 2001.

The record reveals that during the relevant time, complainant was employed as Data Transcriber, GS-356-03, at the agency's Elizabeth City, North Carolina's, Data Conversion Branch. Believing he was a victim of discrimination, complainant sought EEO counseling and subsequently filed a formal complaint on March 18, 2002. At the conclusion of the agency's investigation, complainant was informed of his right to request a hearing before an EEOC Administrative Judge (AJ) or alternatively, to receive a final decision by the agency. Complainant requested a hearing before an AJ.

On February 14, 2003, the AJ issued a decision dismissing the complaint because complainant failed to prosecute his case. The AJ found that complainant failed to appear at the February 14, 2003 hearing. The AJ found that he had mailed an Order on November 22, 2002, to the agency

*Attachment #A*

2                                              01A33016

and complainant scheduling a pre-hearing conference on February 5, 2003, with a hearing set for February 14, 2003. The AJ found that complainant failed to submit the pre-hearing conference report (including a witness list) as required by the scheduling order and did not appear at the pre-hearing conference scheduled on February 5, 2003. The AJ stated that he issued an Order to Show Cause dated February 5, 2003, ordering complainant to show cause for his failure to submit any witness list or appear at the pre-hearing conference on February 5, 2003. The AJ noted that on February 12, 2003, complainant facsimiled a request for a continuance. The AJ denied the request as untimely and not justified. The AJ said that, in his request, complainant stated that he did not receive the acknowledgment and scheduling order until the end of January 2003. The AJ found that nothing in complainant's request set forth sufficient grounds for a continuance.

In its final order the agency stated that it was fully implementing the AJ's decision dismissing the complaint pursuant to 29 C.F.R. § 1614.107(a)(7).

We find the agency's dismissal of the complaint to be improper. It is noted that the AJ has the authority to sanction a party for failure without good cause shown to fully comply with an order. 29 C.F.R. § 1614.109(f)(3). However, dismissal of a complaint by an AJ as a sanction is only appropriate in extreme circumstances, where the complainant has engaged in contumacious conduct, not simple negligence. *See Hale v. Department of Justice*, EEOC Appeal No. 01A03341 (December 8, 2000). Upon review, the Commission finds that complainant's failure to appear at the hearing, appear at the pre-hearing conference, and failure to submit a pre-hearing conference report is insufficient, under the instant circumstances, to warrant dismissal of the entire complaint. To the extent that the AJ intended to sanction complainant by dismissing the entire complaint, the Commission finds that the AJ's sanction to dismiss the complaint was improper. In the instant case, the Commission finds that the appropriate sanction is to cancel the hearing and remand the complaint to the agency for a decision without a hearing.

Dismissal of the complaint under 29 C.F.R. § 1614.107(a)(7) is inappropriate under the instant circumstances, because the investigation has apparently been completed and there is apparently sufficient information in the record to adjudicate the complaint. Therefore, we shall remand the matter to the agency so that it may issue a decision on the complaint.

The agency's decision dismissing the complaint is REVERSED and we REMAND the complaint to the agency for further processing pursuant to the Order herein.

ORDER

Within sixty calendar days from the date this decision becomes final, the agency shall take final action on the complaint in accordance with 29 C.F.R. 1614.110. A copy of the agency's final decision must be sent to the Compliance Officer referenced herein.

3                                    01A33016

## IMPLEMENTATION OF THE COMMISSION'S DECISION (K0501)

Compliance with the Commission's corrective action is mandatory. The agency shall submit its compliance report within thirty (30) calendar days of the completion of all ordered corrective action. The report shall be submitted to the Compliance Officer, Office of Federal Operations, Equal Employment Opportunity Commission, P.O. Box 19848, Washington, D.C. 20036. The agency's report must contain supporting documentation, and the agency must send a copy of all submissions to the complainant. If the agency does not comply with the Commission's order, the complainant may petition the Commission for enforcement of the order. 29 C.F.R. § 1614.503(a). The complainant also has the right to file a civil action to enforce compliance with the Commission's order prior to or following an administrative petition for enforcement. See 29 C.F.R. §§ 1614.407, 1614.408, and 29 C.F.R. § 1614.503(g). Alternatively, the complainant has the right to file a civil action on the underlying complaint in accordance with the paragraph below entitled "Right to File A Civil Action." 29 C.F.R. §§ 1614.407 and 1614.408. A civil action for enforcement or a civil action on the underlying complaint is subject to the deadline stated in 42 U.S.C. 2000e-16(c) (1994 & Supp. IV 1999). If the complainant files a civil action, the administrative processing of the complaint, including any petition for enforcement, will be terminated. See 29 C.F.R. § 1614.409.

## STATEMENT OF RIGHTS - ON APPEAL

## RECONSIDERATION (M0701)

The Commission may, in its discretion, reconsider the decision in this case if the complainant or the agency submits a written request containing arguments or evidence which tend to establish that:

1.    The appellate decision involved a clearly erroneous interpretation of material fact or law; or

2.    The appellate decision will have a substantial impact on the policies, practices, or operations of the agency.

Requests to reconsider, with supporting statement or brief, must be filed with the Office of Federal Operations (OFO) **within thirty (30) calendar days** of receipt of this decision or **within twenty (20) calendar days** of receipt of another party's timely request for reconsideration. See 29 C.F.R. § 1614.405; Equal Employment Opportunity Management Directive for 29 C.F.R. Part 1614 (EEO MD-110), 9-18 (November 9, 1999). All requests and arguments must be submitted to the Director, Office of Federal Operations, Equal Employment Opportunity Commission, P.O. Box 19848, Washington, D.C. 20036. In the absence of a legible postmark, the request to reconsider shall be deemed timely filed if it is received by mail within five days of the expiration of the applicable filing period. See 29 C.F.R. § 1614.604. The request or opposition must also include proof of service on the other party.

4                                                           01A33016

Failure to file within the time period will result in dismissal of your request for reconsideration as untimely, unless extenuating circumstances prevented the timely filing of the request. Any supporting documentation must be submitted with your request for reconsideration. The Commission will consider requests for reconsideration filed after the deadline only in very limited circumstances. *See* 29 C.F.R. § 1614.604(c).

## COMPLAINANT'S RIGHT TO FILE A CIVIL ACTION (R0900)

This is a decision requiring the agency to continue its administrative processing of your complaint. However, if you wish to file a civil action, you have the right to file such action in an appropriate United States District Court **within ninety (90) calendar days** from the date that you receive this decision. In the alternative, you may file a civil action **after one hundred and eighty (180) calendar days** of the date you filed your complaint with the agency, or filed your appeal with the Commission. If you file a civil action, you must name as the defendant in the complaint the person who is the official agency head or department head, identifying that person by his or her full name and official title. Failure to do so may result in the dismissal of your case in court. "Agency" or "department" means the national organization, and not the local office, facility or department in which you work. **Filing a civil action will terminate the administrative processing of your complaint.**

## RIGHT TO REQUEST COUNSEL (Z1199)

If you decide to file a civil action, and if you do not have or cannot afford the services of an attorney, you may request that the Court appoint an attorney to represent you and that the Court permit you to file the action without payment of fees, costs, or other security. *See* Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*; the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791, 794(c). **The grant or denial of the request is within the sole discretion of the Court.** Filing a request for an attorney does not extend your time in which to file a civil action. Both the request and the civil action must be filed within the time limits as stated in the paragraph above ("Right to File A Civil Action").

FOR THE COMMISSION:

*Carlton M. Hadden*
_____
Carlton M. Hadden, Director
Office of Federal Operations

OCT 1 4 2003
_____
Date

S.P.R. 224

as: 94 M.S.P.R. 224)

Page 5

Merit Systems Protection Board.

Steven IVEY, Appellant,

v.

DEPARTMENT OF the TREASURY, Agency.

AT-1221-02-0446-W-1.

Sept. 11, 2003.

Appellant petitioned for review of initial decision that dismissed his individual right of action (IRA) appeal for lack of jurisdiction. The Merit Systems Protection Board held that Appellant established IRA jurisdiction based on allegations that he disclosed that agency employees were being instructed to check the "Presidential Donations box" on tax returns they reviewed, and that agency official who recommended that he be terminated orally told him that he "had no business reporting anything to the OSC or the Tax Commissioner"

Petition granted; reversed and remanded.

West Headnotes

**[1] Merit Systems Protection** 62
450k62

Board has jurisdiction over an individual right of action (IRA) appeal if the appellant has exhausted his administrative remedies before the Office of Special Counsel (OSC) and makes nonfrivolous allegations that: (1) he engaged in whistleblowing activity by making a disclosure protected under the Whistleblower Protection Act (WPA); and (2) the disclosure was a contributing factor in the agency's decision to take or fail to take a "personnel action" as defined by statute. 5 U.S.C.A. § 2302(a), (b)(8).

**[2] Merit Systems Protection** 62
450k62

If an appellant establishes Board jurisdiction over an individual right of action (IRA) appeal by exhausting his administrative remedies before the Office of Special Counsel (OSC) and making the requisite nonfrivolous allegations, he has a right to a hearing on the merits of his claim.

**[3] Merit Systems Protection** 396
450k396

In order for a disclosure to be considered protected under the Whistleblower Protection Act (WPA), the employee must have had a reasonable belief that the disclosure evidenced (1) a violation of any law, rule, or regulation, or (2) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety; to establish such a reasonable belief, an appellant need not prove that the matter disclosed actually established one or more of the listed categories of wrongdoing, but he must show that the matter disclosed was one which a reasonable person in his position would believe evidenced one of the situations specified in the statute. 5 U.S.C.A. § 2302(b)(8).

**[4] Merit Systems Protection** 62
450k62

Appellant established individual right of action (IRA) jurisdiction based on allegations that he disclosed that agency employees were being instructed to check the "Presidential Donations box" on tax returns they reviewed, and that agency official who recommended that he be terminated orally told him that he "had no business reporting anything to the OSC or the Tax Commissioner"; allegations constituted nonfrivolous allegations that he made a protected disclosure, and that his disclosure was a contributing factor in the agency's decision to take a covered personnel action.

\*225 Steven Ivey, Elizabeth City, NC, pro se.

Garry Wade Klein, Atlanta, GA, for agency.

Before Susanne T. Marshall, Chairman, and Neil A.G. McPhie, Member.

**OPINION AND ORDER**

¶ 1 The appellant has filed a petition for review of the initial decision that dismissed his individual right of action (IRA) appeal for lack of jurisdiction. For the reasons stated below, we GRANT the petition for review, REVERSE the initial decision, and REMAND the appeal to the Atlanta Regional Office for further adjudication.

**BACKGROUND**

¶ 2 Effective March 7, 2001, the appellant was terminated from his GS-13 Data Transcriber position during his probationary period for failing to meet the required standards for performance in his position. Initial Appeal File (IAF), Tab 5, subtabs 4a, 4b. The agency's decision notice specified that the appellant

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Attachment #B

94 M.S.P.R. 224
(Cite as: 94 M.S.P.R. 224, *225)

had received a rating of "1" in the critical element of "quality," and the proposal notice specifically noted that the appellant had "always" received unacceptable quality ratings. *Id.*, subtabs 4a, 4c, 4d. The appellant filed a complaint with the Office of Special Counsel (OSC) alleging that his termination and low performance appraisals were in reprisal for his whistleblowing activity. IAF, Tab 1. OSC issued a letter on January 31, 2002, informing the appellant that it was closing its inquiry into the appellant's allegations and that he had a right to seek corrective action from the Board. *Id.* The appellant subsequently filed an IRA appeal. *Id.*

*226 ¶ 3 On April 11, 2002, the administrative judge ordered the appellant to file evidence and argument within 15 days of the order to prove the Board's jurisdiction over his IRA appeal according to the standard set forth in *Geyer v. Department of Justice*, 63 M.S.P.R. 13, 16-17 (1994). IAF, Tab 3. The administrative judge further ordered the appellant to identify each alleged protected disclosure, describe what type of disclosure he allegedly made, identify each personnel action that was being appealed, and describe when and how he brought each protected disclosure and personnel action to OSC's attention. *Id.* at 3-4. The administrative judge also ordered the agency to file a response on the jurisdictional issues within 25 calendar days. *Id.* at 4. In response, the agency submitted its file and motion to dismiss for lack of jurisdiction. IAF, Tab 5, subtab 1.

¶ 4 The appellant's submission in response to the April 11, 2002 order was rejected by the administrative judge for failing to follow the order's instructions, and the administrative judge again instructed the appellant to provide the requested information in an April 29, 2002 order. IAF, Tabs 6, 7. The appellant submitted a timely response to this order with an attached list of alleged disclosures, and identified the personnel actions as his termination, his low performance ratings, and "working conditions in which [he] was directly and more consistently harassed so as to constitute retaliation." IAF, Tab 10.

¶ 5 Without holding a hearing, the administrative judge issued an initial decision that dismissed the appellant's appeal for lack of jurisdiction. Initial Decision (ID) at 1-12. Applying the three-part test for Board IRA jurisdiction under *Geyer*, the administrative judge found that the appellant had met two parts of the standard: he showed that he had exhausted his remedies before OSC as to all of his disclosures, and that the agency's low performance

rating of the appellant and its termination action during the appellant's probationary period were personnel actions as defined by 5 U.S.C. § 2302(a)(2)(A). ID at 3-4. Nevertheless, the administrative judge found that the appellant had not shown by a preponderance of the evidence that he made disclosures protected under 5 U.S.C. § 2302(b)(8), and that even if he had, the appellant failed to show by preponderant evidence that his disclosures were a contributing factor in the agency's decisions to rate his performance at the lowest possible level and to terminate him during his probationary period. ID at 4-12.

¶ 6 On petition for review, the appellant challenges the administrative judge's dismissal of his IRA appeal for lack of jurisdiction. Petition For Review File, Tab 1. The agency has not responded to the petition.

## *227 ANALYSIS

[1][2] ¶ 7 In *Geyer*, the Board held that to establish the Board's jurisdiction over an IRA appeal, an appellant must *prove* by preponderant evidence that: (1) he engaged in whistleblower activity by making a disclosure protected under 5 U.S.C. § 2302(b)(8); (2) the agency took or failed to take a personnel action as defined in 5 U.S.C. § 2302(a)(2); and (3) he raised the whistleblower issue before OSC and proceedings before OSC have been exhausted. *Geyer*, 63 M.S.P.R. at 16-17. Subsequent to the issuance of the initial decision, the Board, following its reviewing court's guidance in *Yunus v. Department of Veterans Affairs*, 242 F.3d 1367 (Fed.Cir.2001), overruled the *Geyer* IRA jurisdictional test. The Board held that, to establish jurisdiction over an IRA appeal, the appellant must have exhausted his administrative remedies before OSC and must make *non-frivolous allegations* that he made disclosures protected under 5 U.S.C. § 2302(b)(8), and that the disclosures were a contributing factor in the agency's decision to take or fail to take a personnel action as defined by 5 U.S.C. § 2302(a). *Rusin v. Department of the Treasury*, 92 M.S.P.R. 298, ¶ 12 (2002); *see also Yunus*, 242 F.3d at 1371-72. If an appellant establishes Board jurisdiction over an IRA appeal by exhausting his administrative remedies before OSC and making the requisite non-frivolous allegations, he has a right to a hearing on the merits of his claim. *See Spencer v. Department of the Navy*, 327 F.3d 1354, 1356 (Fed.Cir.2003).

¶ 8 Applying this analysis, we find that the appellant has established the first element of the jurisdictional

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

94 M.S.P.R. 224
(Cite as: 94 M.S.P.R. 224, *227)

showing. As the administrative judge found, the appellant has exhausted his administrative remedies before OSC. IAF, Tab 1; ID at 3-4. The next issue is whether the appellant has made a non- frivolous allegation that his disclosures were protected under 5 U.S.C. § 2302(b)(8).

[3] ¶ 9 In order for a disclosure to be considered protected under section 2302(b)(8), the employee must have had a "reasonable belief" that the disclosure evidenced "(i) a violation of any law, rule, or regulation, or (ii) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety." 5 U.S.C. § 2302(b)(8); see Lachance v. White, 174 F.3d 1378, 1380-81 (Fed.Cir.1999), cert. denied, 528 U.S. 1153, 120 S.Ct. 1157, 145 L.Ed.2d 1069 (2000). To establish such a reasonable belief, appellant need not prove that the matter disclosed actually established one or more of the listed categories of wrongdoing, but he must show that the matter disclosed was one which a reasonable person in his position would believe evidenced one of the situations specified in 5 U.S.C. § 2302(b)(8). Huffman v. Office of Personnel Management, 92 M.S.P.R. 429, ¶ 9 (2002). The test for whether a putative whistleblower *228 had such a reasonable belief is whether a "disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee [could] reasonably conclude that the actions of the government evidence" one of the situations set out in 5 U.S.C. § 2302(b)(8). White, 174 F.3d at 1381.

[4] ¶ 10 The administrative judge considered the appellant's November 29, 1999 letter that was addressed "Dear Sir," but which contained the handwritten e-mail address of Esperanza Balandran, an agency employee in IRS Commissioner Rossotti's Complaint Processing and Analysis Group, who acknowledged receiving this letter. IAF, Tab 1; Tab 10, Ex. 1; ID at 5-6. This letter concerned the appellant's allegation of high levels of noise in his work unit, excessive meetings, disruptive behavior by co-workers, and harassment by other co-workers who allegedly hit the back of the appellant's chair as they passed his work station. IAF, Tab 10, Ex. 1. As the information in this letter does not identify any of the kinds of wrongdoing to which 5 U.S.C. § 2302(b)(8) refers, the appellant has not made a non-frivolous allegation of Board IRA jurisdiction with regard to this communication. [FN1] See Pulcini v. Social Security Administration, 83 M.S.P.R. 685, ¶ 9 (1999) (an "abuse of authority" is defined as an "arbitrary or

capricious exercise of power by a Federal official or employee that adversely affects the rights of any person or that results in personal gain or advantage to himself or to preferred other persons"), aff'd, 250 F.3d 758 (Fed.Cir.2000) (Table); Embree v. Department of the Treasury, 70 M.S.P.R. 79, 85 (1996) ("gross mismanagement" requires more than de minimis wrongdoing, does not include management decisions which are merely debatable, and does not include actions or inactions which constitute simple negligence or wrongdoing); White v. Department of the Air Force, 63 M.S.P.R. 90, 95 (1994) (for purposes of 5 U.S.C. § 2302(b)(8), "gross mismanagement" is defined as management action or inaction which creates a substantial risk of significant adverse impact upon the agency's ability to accomplish its mission).

> FN1. The administrative judge identified 18 documents that the appellant indicated were previously submitted to OSC, but did not consider 15 of these documents because five were communications from OSC to the appellant, four were communications to the appellant from other parties, one was merely a Postal Service form documenting that one of the appellant's letters was delivered, and five were dated after the effective date of the appellant's termination. IAF, Tab 10, Exs. 2, 4, 6-9, 10-18. As these communications, on their face, are not protected under 5 U.S.C. § 2302(b)(8), we find that the appellant has failed to make a non-frivolous allegation that he made disclosures protected under 5 U.S.C. § 2302(b)(8) with regard to these communications.

¶ 11 Similarly, a January 26, 2001 letter addressed to Nicole Birch, U.S. Department of Justice, Criminal Section-Civil Rights Division, which identified an alleged incident of an unnamed "driver who ran *229 [the appellant] off the road," and a second alleged incident which "involved being stalked in a department store during the holidays," does not constitute a protected disclosure under 5 U.S.C. § 2302(b)(8). The appellant admitted that the allegations did not concern government employees, but were raised solely because of the appellant's belief "that these incidences may be related to [his] experiences at the IRS because these two people were black and seemed to exhibit the type of behavior [the appellant] experienced at the IRS." IAF, Tab 11 at 2. As the appellant's allegations of wrongdoing on the part of non- government employees do not implicate the government's interests and good name, the January 26, 2001 letter is not a protected disclosure

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

94 M.S.P.R. 224
(Cite as: 94 M.S.P.R. 224, *229)

under 5 U.S.C. § 2302(b)(8). *See Arauz v. Department of Justice*, 89 M.S.P.R. 529, ¶ 7 (2001).

¶ 12 The administrative judge also considered a November 1, 2000 letter, apparently sent to Ms. Balandran, which reiterates the appellant's claim of alleged harassment by co-workers and management-allowed disruptive behavior directed at the appellant. IAF, Tab 10, Ex. 3. The misconduct alleged in this part of the letter would not, however, constitute the kind of wrongdoing referenced in 5 U.S.C. § 2302(b)(8). Instead, it appears to consist of simple rudeness, such as interruptions and bumping into the back of the appellant's chair. *Id.* The November 2000 letter also refers to employees who allegedly were allowed to work for the agency and the Postal Service at the same time, to his failure to receive some of his mail, to his receipt of mail that had been opened, and to the assignment of more "audit codes" to the north side of Atlanta than to the south side, an alleged disparity the appellant believed was motivated by racial and economic reasons. The appellant's assertions regarding these matters are vague, and the appellant has not explained how any of them could be regarded as protected under 5 U.S.C. § 2302(b)(8).

¶ 13 The November 1, 2000 letter also alleged that agency employees were being instructed to check the "Presidential Donations box" on tax returns they reviewed. IAF, Tab 10, Ex. 3. The appellant alleged further that he made oral communications regarding this matter, although the identity of the persons to whom this communication was made is unclear. IAF, Tab 10. Although the appellant has not cited any specific law, rule, or regulation that these alleged disclosures violated, the disclosure relating to the altering of tax returns could reasonably be regarded as violating regulatory, if not statutory, provisions. Moreover, any doubt or ambiguity as to whether the appellant has made a non-frivolous allegation of a reasonable belief should be resolved in favor of affording the appellant a hearing. *Huffman*, 92 M.S.P.R. 429, ¶ 13. Accordingly, we find that the appellant has made a non-frivolous allegation that a disinterested observer with knowledge of the information the appellant disclosed *230 about agency employees' being instructed to check the "Presidential Donations box" on tax returns could reasonably believe that these actions violated "any law, rule, or regulation" under 5 U.S.C. § 2302(b)(8).

¶ 14 We also find that the appellant has made a non-frivolous allegation that his disclosures were a contributing factor in the agency's decisions to take covered personnel actions. Specifically, the appellant alleged that Robert Hall, Chief, Section III-B, Data Conversion Branch, who recommended on March 5, 2001 that the appellant be terminated, orally told him that he "had no business reporting anything to the OSC or the Tax Commissioner." IAF, Tab 6, subtab 4c; Tab 11 at 2. The allegation, if true, could indicate that Mr. Hall was aware of the appellant's disclosures to Commissioner Rossotti, including the November 1, 2000 letter containing the allegation relating to the altering of tax returns, and that Mr. Hall acted within such time that a reasonable person could find that the disclosure contributed to the personnel actions. *See Rusin*, 92 M.S.P.R. 298, ¶ 13.

¶ 15 For the reasons stated above, we conclude that the appellant has exhausted his OSC remedy and has made non-frivolous allegations that he engaged in protected whistleblowing that contributed to covered personnel actions taken against him. Accordingly, the test for establishing the Board's IRA jurisdiction has been met, and the appellant is entitled to a hearing on the merits of his claim. [FN2]

FN2. We note that, in the initial decision, the administrative judge found that, if the standard under *Yunus* applied, the Board would have jurisdiction over his IRA appeal, but that the appeal would be dismissed for failure to state a claim upon which relief can be granted. ID at 2 n. 5. However, once Board jurisdiction over an IRA appeal is established, the Board is required to provide an employee with a hearing on the merits. *See Spencer v. Department of the Navy*, 327 F.3d 1354, 1356 (Fed.Cir.2003).

### ORDER

¶ 16 The initial decision, which held that the appeal is not within the Board's jurisdiction, is REVERSED. The appeal is REMANDED to the Atlanta Regional Office for further adjudication consistent with this Opinion and Order.

FOR THE BOARD:

Bentley M. Roberts, Jr.

Washington, D.C.

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Agency-Wide Shared Services

As an employee, the appellant was covered by the collective bargaining agreement between the National Treasury Employees Union (NTEU) and Internal Revenue Service (IRS), however this agreement does not cover the termination action being appealed.

Cordially,

Yvonne Woods
Workforce Relations Consultant

Attachment #1

March 5, 2001, 2001

Steve Ivey

Steve:

This is a recap of the meeting I had with you in my office the week before last . You returned to duty February 20th at 6 p.m.  You were instructed to report to the Data Conversion Conference Room at 6:30 p.m. for Refresher Training.

Kelly Mancle was the instructor for this class.  Ms. Mancle made sure everyone had the proper supplies and materials that were needed for the class.  According to Ms. Mancle, you continued to read a book and not pay attention thoughout the class.  At one point, you got up and left and were gone for 35 minutes.

When I was made aware of this I instructed Ms. Mancle to have you report to my office.  She told you to do this and you disappeared again.  After about 10 minutes you came to my office.

You explained to me that you were a returning operator and that you didn't feel the need to sit in the class.  You also told me that in the past you had encountered problems dealing with Ms. Mancle and you thought she picked on you and singled you out.  I explained to you how important  the Refresher Class is,  and that I found it hard to believe that she was picking on you in front of the other employees.

At this point the class was almost over.  You and I agreed that since you were not feeling well, you would go home and report to work the following evening.

Steve, as I explained to you last week, you are in class for a reason.  Reading your book, not paying attention in class and leaving the classroom is unacceptable behavior, and will not be tolerated.  According to the Rules of Conduct this is insubordination.  Your latest Quarterly shows you are rated a "1" in Quality, and a "3" in Quantity.  Your Courtesy Review from last week, showed you had 4 documents in error, out of 10.  The purpose of the Refresher Class is to help reduce your error rate.

This is your third season, and you have always had an unacceptable quality rate.  You are still on probation.  After considering the facts that you have a very low accuracy rate and that you chose not to participate in the refresher course I have decided to recommend that your employment be terminated.

Chief, Section III-B
Data Conversion Branch

Employee Sign and Date
*employee refused to sign*
3/5/01

*Attachment #2*

Linda:

I discussed this case with you last week. This employee is the one who is rated a "1" in Quality and walked out of the training class because he thinks Kelly picks on him in front of the class.

He has had a high error rate since he returned this year. In fact, you can see that his quality never was very good and it continues to drop.

Doug Van Buren and I met with the employee for an hour tonight. Doug encouraged him to resign three times, but he refused. Doug told me that he thinks we should proceed to remove this employee as soon as possible. Betty Burris agrees with that.

I would like to expedite this if possible.

Thanks
Robert

He's also the one who wanted to only have a white union steward represent him.

Attachment #3

RECEIVED
MAR 06 2001
LR/ER Section II

Hall Robert M

To:      Ferguson Linda C; Truss Karen D; Brown Brent E

Subject: Re: Steve Ivey

I had an interesting conversation tonight with Lisa Porter (NTEU Rep) concerning Steve Ivey.

He called the union office either Thursday or Friday and spoke to Angela Strong. He told her he was terminated because of his beliefs. She asked him what his beliefs were. He told her that he did not intend to take orders from any nigger or faggot. He asked to speak / meet with the president of the union.

This is all that we know so far, but I wanted to make you aware of what I heard.

*Robert Maupin Hall*

*Chief, Section I - B*

*Data Conversion Branch*

770-455-2528

Attachment #4

*July 25, 2006*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STEVEN IVEY, )
)
Plaintiff, )
)
v. ) No. 1:05CV01147
)
NATIONAL TREASURY EMPLOYEES UNION, )
)
Defendant. )

## DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION TO DISMISS

### INTRODUCTION

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, defendant National Treasury Employees Union (NTEU) hereby submits this memorandum in support of its motion to dismiss the complaint in this action filed *pro se* by plaintiff Steven Ivey. Because the specific allegations in the four-page complaint are unclear and undeveloped, NTEU is unsure of the factual and legal nature of the claims against it. Accordingly, this memorandum addresses each statutory provision cited in the complaint to demonstrate that, *if* a claim is being brought pursuant to that statute, it should be dismissed.

It is, however, clear from the allegations in the complaint that this action arises solely in connection with Ivey's removal from his federal job with the Internal Revenue Service (IRS) on March 7, 2001. NTEU is the exclusive bargaining representative

1                                   *Attachment #5*

with his removal.[1]  Because Ivey's claims all concern NTEU's
representation of him in connection with his removal, they
"amount to nothing more than an allegation that NTEU breached
[its] duty of fair representation."  Buesgens v. Coates, 2006
U.S. Dist. LEXIS 27383, *9 (D.D.C., May 9, 2006) (dismissing for
lack of jurisdiction former federal employee's claims that union
violated Title VII in representing him).[2]  His exclusive remedy
for such an allegation lies under Chapter 71 of the CSRA, and
this Court, therefore, has no jurisdiction to consider his
claims.

A union that is the exclusive representative of a
bargaining unit of federal employees has a duty to represent all
bargaining unit employees in a fair manner, without
discrimination and without regard to union membership.  See 5
U.S.C. § 7114(a)(1).  A charge that a union has acted
arbitrarily or in bad faith to the detriment of a member amounts
to a claim that the union breached its duty of fair
representation.  See National Fed'n of Fed. Employees, Local

---

[1] NTEU denies the factual allegations contained in the complaint,
but for purposes of considering NTEU's motion to dismiss, the
Court is required, of course, to "construe the complaint in a
light most favorable to the plaintiff and must accept as true
all reasonable factual inferences drawn from well-pleaded
factual allegations."  Herron v. Veneman, 305 F. Supp. 2d 64, 70
(D.D.C. 2004).  As shown, dismissal is appropriate under that
standard.

[2] A copy of the Buesgens decision is attached.



# Your AT&T Statement

**April 29, 2001**

 **AT&T**

#BWNCJFM

STEVE IVEY

Customer #   7810■■■■4804
Page 1 of 4

Customer Service:    1 800 224-5610
Call Collect:              706 644-0524
Text Phone (TTY):    1 800 855-2880

---

| Summary of charges | |
|---|---|
| Previous balance ..................................................... | - 5.60 |
| Payments ................................................................. | .0.00 |
| **Credit balance as of Apr 29** ................................. | **- $5.60** |
| AT&T One Rate ® College Plan .............................. | .20.60 |
| Other charges and credits ..................................... | .5.40 |
| Taxes and surcharges ........................................... | .0.87 |
| **Current charges** ................................................. | **$26.87** |

| **Total amount due** | **$21.27** |
|---|---|

| **Date due** | **May 27, 2001** |
|---|---|

 *Have you heard*
There's more to your AT&T bill than just charges! You'll also find helpful information on services, products and calling plans.
Continued ▶

**Continues on back**

---

| Detach and return with payment | |
|---|---|

Please write your customer number on your check or money order made payable to AT&T. Do not send cash. Do not staple this portion to your payment. Thank you.

| **Total amount due** | **$21.27** |
|---|---|
| **Date due** | **May 27, 2001** |

Amount enclosed:    $ [          ]

AT&T DBC
PO BOX 8226
AURORA IL 60572-8226

 **AT&T**

STEVE IVEY
April 29, 2001

Customer # 7810 ■■■ 4804

☐  **Moving?** Check the box and print new address on back.

*Attachment #6*

Customer Service: 1 800 224-5610
Call Collect: 706 644-0524
Text Phone (TTY): 1 800 855-2880

April 29, 2001
Customer # 7810 ████████ 4804
Page 3 of 4



## AT&T One Rate® College Plan

| Description | Amount |
|---|---|
| Calling Card Calls | 20.60 |
| **Total AT&T One Rate (R) College Plan** | **20.60** |

| | Date | Time | Where | Number called | Type | Rate | Min | Amount |
|---|---|---|---|---|---|---|---|---|
| 1. | Mar21 | 12:38pm | ████ | ████ | Station | N/Wknd | 1 | 0.20 |
| 2. | Mar21 | 12:39pm | ████ | ████ | Station | N/Wknd | 1 | 0.20 |
| 3. | Mar21 | 12:40pm | ████ | ████ | Station | N/Wknd | 2 | 0.40 |
| 4. | Mar21 | 12:43pm | ████ | ████ | Station | N/Wknd | 1 | 0.20 |
| 5. | Mar21 | 02:13pm | ████ | ████ | Station | N/Wknd | 1 | 0.20 |
| 6. | Mar26 | 04:15pm | ████ | ████ | Station | N/Wknd | 1 | 0.20 |
| 7. | Mar26 | 04:29pm | ████ | ████ | Station | N/Wknd | 4 | 0.80 |
| 8. | Mar26 | 04:37pm | ████ | ████ | Station | N/Wknd | 1 | 0.20 |
| 9. | Mar30 | 03:11pm | CHESAPEAKE VA 757████ Called From ████ VA 757 | | Station | N/Wknd | 1 | 0.20 |
| 10. | Mar30 | 03:12pm | CHESAPEAKE VA 757 Called From ████ VA 757 | | Station | N/Wknd | 1 | 0.20 |
| 11. | Mar30 | 03:18pm | PORTSMOUTH VA 757 Called From ████ VA 757 | ████ | Station | N/Wknd | 1 | 0.20 |
| 12. | Mar31 | 04:40pm | ACWORTH GA 770 966-████ Called From ████ VA 757 | | Station | N/Wknd | 1 | 0.20 |
| 13. | Mar31 | 04:41pm | ACWORTH GA 770 966-████ Called From ████ VA 757 | | Station | N/Wknd | 40 | 8.00 |
| 14. | Apr03 | 02:32pm | ████ | ████ | Station | N/Wknd | 6 | 1.20 |
| 15. | Apr03 | 03:28pm | ████ | ████ | Station | N/Wknd | 2 | 0.40 |
| 16. | Apr03 | 03:31pm | ████ | ████ | Station | N/Wknd | 1 | 0.20 |
| 17. | Apr03 | 03:33pm | ████ | ████ | Station | N/Wknd | 1 | 0.20 |
| 18. | Apr03 | 03:34pm | ████ | ████ | Station | N/Wknd | 2 | 0.40 |
| 19. | Apr03 | 03:36pm | ████ | ████ | Station | N/Wknd | 1 | 0.20 |
| 20. | Apr03 | 04:35pm | ████ | ████ | Station | N/Wknd | 20 | 4.00 |
| 21. | Apr04 | 08:35pm | ████ | ████ | Station | N/Wknd | 8 | 1.60 |
| 22. | Apr04 | 08:43pm | ████ | ████ | Station | N/Wknd | 4 | 0.80 |
| 23. | Apr19 | 09:04pm | ████ | ████ | Station | N/Wknd | 2 | 0.40 |

**Continues on back**