**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

RECEIVED

DEC - 3 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | |
|---|---|
| Steven Ivey, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| V. | ) |
| | ) |
| HENRY PAULSON, Secretary, et al., | ) |
| U.S. Department of the Treasury, | ) |
| | ) |
| Defendant. | ) |

CA. No. 07- 0748 *EGS*

## PLAINTIFF'S MOTION FOR CHANGE OF VENUE AND REPLY TO DEFENDANT'S MOTION FOR DISMISSAL

*(Note: Attachments A, B, and 1-6 are from previous attachments with the complaints. The remaining attachments beginning with # 7 attached for the present motion .)*

### I. INTRODUCTION:

1.          The following reply is the plaintiff's response to the defendant's Motion to Dismiss, under Rule 12, for lack of jurisdiction, or, alternatively, because of being barred by res judicata and collateral estoppel. The defendant, further, stipulates that the claims should have been raised in the N. GA. District and not DC District.

2.          The plaintiff contends that the DC District is proper venue for the claims as filed, however, in the event that the Court should decide otherwise, the plaintiff request, with the included Motion for Change of Venue, that the present case be transferred to proper venue.

1

## II. STATEMENT OF CASE AND FACTS/EVIDENCE:

### A. Statement of Case:

3.          The approximately 500 data transcribers are the catch all to the IRS

Tax processing system.  They were required to fix and resolve all the mistakes prior to

entering a tax return into program systems before most of the agency can retrieve such

documentation for whatever the purpose.  These circumstances  were not the assigned

duties and requirements of the job of data transcriber.  The plaintiff was employed as a

data transcriber.  For the IRS/Treasury to ignore the problems in evaluating the

rating and ranking system is to ignore their role through their work.  Similarly, the

IRS/Treasury has failed to correct such problems but instead has chosen to perpetuate

misconduct and illegal activities.  What this points to is that the trust placed into these

entities has been violated for the purposes of escaping justice and more specifically, to

harm the plaintiff to void any claims to resolve the violations for all.  The general

characteristic of the rating and rank system is "garbage in, garbage out."

4.          The defendant has not sufficiently, resolved the use of the improper

encouraging of the National Treasury Employees Union, NTEU, representative, Doug

Van Buren, attachment # 2, for the plaintiff to sign a false document not only is a

violation of the plaintiff's Fifth Amendment Rights, but against the duty of the job as data

transcriber, attachment # 7, both contributing to the failure in the proper resolve of the

rating and ranking problems. The use of the NTEU is a smoke screen so as to deflect

attention away from the plaintiff's complaints, part of which are the problems of the

rating system, or those circumstances that had resulting affects to the rating system, listed

2

in the originating complaint. The fault of the defendant is in the <u>combined</u> action with the NTEU against the plaintiff, and failure to make corrections to the rating and ranking system.

5.          The defendant, at times, with the involvement of the NTEU, has attempted to insulate itself from any fault in any administrative and judicial proceedings by perpetuating lies and false records. More significantly, to the present case is the defendant, and the NTEU, are committed to spreading hate speech and hate crimes, attachment # 4, when it should have been spending the time identifying and correcting the problems with the rating and ranking system for data transcribers.   With <u>Burlington Industries, Inc v. Ellerth,</u> 118 S. Ct. 2257 (1998) and <u>Faragher v. City of Boca Raton,</u> 118 S. Ct. 2275 (1998), the Supreme Court set 2 principles (1) employer is responsible for acts of supervisors ; (2) employees should be encouraged to prevent harassment and employees should be encouraged to avoid or limit the harm from harassment; thus, these action in turn would have ensured a more accurate and fair rating and ranking determination for data transcribers.

**B: Facts/Evidence:**

(a) The IRS attorney Wade Klein during the MSPB administrative proceedings, cited Doug Van Buren as stating that the plaintiff made white supremacy comments but has not supplied testimony in support of such (attachments # 5 & # 8). This lie was perpetuated in the DC jurisdiction.

(b) Attachment # 4 was falsely made and projected onto the plaintiff. The NTEU in

3

related case 05-1147, <u>Ivey v. NTEU</u>, DC District, has denied any involvement with the document and with fact 1 above. However, in the present case the defendant has denied that he was the sole creator of the document. This creates a conflict and issues of credibility for the defendant. There have been no incidences of the plaintiff having said, or been involved, with any racial comments or acts, before or after, the complaint process with employment of the defendant. Any cited incidence of the defendants and/or the NTEU have not been substantiated by any of the witnesses, in fact the testimonies conflict later denials. This document and it's related harm to the plaintiff were done to undermine administrative reviews and investigations in the jurisdiction of DC.

(c) Attachment # 4 was perpetuated toward the plaintiff after employment with the defendant while a private in eastern North Carolina. This raises jurisdiction conflicts.

(d) Attachment #9 is one of the computer print outs used in the scoring processing of the rating and ranking system for the plaintiff as a data transcribers from the defendant's EOP file 02-1135. This refers to the batch work in which the defendant cites errors of the plaintiff to specific batches of work. The errors cited point to the documents and batches of work that contain the violations of changing taxpayers' documents; irregularities in work distribution, the mistakes of prior document handlers; and other listed rating problems from the originating complaint. This scoring program is the product of the defendant's DC offices and under it's direct regulatory program monitoring. Therefore, any corrections or changes have to be made under the approval and implementation of the DC offices of the defendant.

(e) The regulation and rules for the rating and ranking system are determined by the DC

4

offices of the defendant. Under the rules used to terminate the plaintiff the defendant did not differentiate between new hires in their duration of employment v. length of employment of existing employees; only that there is a one year probationary period for new hires. The defendant had no rule to distinguish between a 11.5 month employee and that of a 4 month employee. This and similar rating and regulation rules as formulated in the defendant's DC offices and only applied, not regulated, in the IRS tax processing center.

(f) The defendant subjected the plaintiff to work interruptions in order to (1) solicit illegal activities, such as changing taxpayers' documents; (2) participating in the misappropriation of federal funds to assisting the retention of favored employees, (3) for monies in concern family crisis and emergencies; and (4) for different parties which included sexually oriented parties. These interruptions and soliciting of illegal acts, affect a data transcribers rating and subsequent ranking. The defendant has turned a blind eye in it's duty for correcting all of these acts, for the benefit of prevailing in any administrative remedies and to improperly mislead the Courts in the DC District, particularly when the sexually oriented parties solicit for illegal activity. Thus, the defendant has a fact pattern of soliciting for illegal activity starting with the changing of taxpayers documents that affect the performance of data transcribers.

(g) The defendant from the DC offices has failed to take corrective action for the associated incidences of hate speech, lies, and false records, made by a handful of employees used to prop up its defenses. This includes the improper use of documentation involving individuals without there consent or any of the false material used for evidence

5

in support of defenses, such as attachment # 4. Consequently, the defendant is protecting a handful of employees all of which have lied and participated to some degree, in their job duties, testimonies, and false documentation, at the sacrifice of proper rating and ranking of many other data transcribers, and, the trust and integrity the public puts in the IRS/US Treasury. These circumstances appear in the defendant's EOP file 02-1135 and the TIGTA file.

(h) Attachment # 14 is the plaintiff's interrogatories in response to the Treasury EOP file, 02-1135. This testimony references the discrepancies and contradictions of the witnesses and documentation formulating file 02-1135. This file was done under the DC jurisdiction, thus, any lies and false records were perpetrated in the DC District.

(i) Personnel in the DC offices of the defendant are responsible for the decision to not take corrective action against those handful of employees who have committed perjury and forged evidence, such as with the Treasury EOP file 02-1135 in order to avoid accountability for the rating and ranking system.

(i) The defendant's exhibit # 1 of Wade Klein from it's Motion to Dismiss when compared to related case 05-1095, Ivey v. Dept. of the Treasury , DC District, demonstrates that the defendant mislead the Court for this FOIA/PA related case. This is because the FOIA/PA documents and records were stated by the defendant as not having been in the Atlanta, GA, but now with exhibit #1 the defendant states that they are in Atlanta, GA, area. In the previous related FOIA/PA case the defendant changed the location of the records from DC, to GA, to UT, and to CA.

(k) The defendant's exhibit #2, with it's Motion to Dismiss, is a prior case was filed

6

before receiving the TIGTA file, attachment # 12 , in December 2005. Such case was dismissed prior to the denials in related case <u>Ivey v. NTEU</u> , 05-1147, DC District, of the NTEU denial involvement with attachment # 4, and, the denials in the present case concerning the lies of the defendant from stating that attachment # 4 is correct for the NTEU, therefore, the forging of evidence with the use of hate speech was fully realized for such case.

(l) Attachment # 12 , the TIGTA file was backdated to make it appear as if the defendant made the investigation at the require time, March 2001. The file date May 2001 was formulated under the jurisdiction of DC.

(m) Attachment # 13 are the interrogatories of the plaintiff in response to the testimonies of the witnesses and issues used in the TIGTA file, attachment # 12.

(n) The mistakes in the manuals that needed to be corrected, as referenced in attachment # 2, were written in the defendant's DC offices. Which raises two issues (1) why the defendant would have hundreds of data transcribers making $12 -14 / hour correct the mistakes made in the defendant's DC office where they were written; and (2) that the defendant's DC office perpetuated the mistakes in the manuals to the data transcribers at the tax processing center. The first issues concerns cost effectiveness and the second for mistakes from incorrect manuals, both perpetuated onto data transcribers.

(o) The defendant has made no complaints of the plaintiff being a liar with any of the allegations in complaints, during the administrative processing, or during any litigation, even as the plaintiff has cited areas of lies and false records of the defendant. The documents and records related to the plaintiff's reported violations could be easily

7

checked to show were lies are. This is under the DC jurisdiction of the defendant.

(p) The defendant in it's Motion for Dismissal did not resolve the location of the offices responsible for taking corrective actions for any violations such as lies and false records. It did not state DC was incorrect for such resolve. It is reasonable for the plaintiff to conclude that since in prior filing of complaints, decisions in administrative negotiations; formulation of regulations for the rating and ranking; and/or the contact employees for resolve of problems with any part of the IRS/Treasury system, was not in the DC District. Otherwise, what the defendant would be saying is that the regional tax processing center made all the IRS/Treasury rules for rating and ranking. What the defendant is now saying is that the part is controlling and making the decisions for the whole, the Chamblee, GA, tax processing center is making the rules for the DC offices.

(q) Because of attachment # 1, and defendant's claim that the plaintiff was terminated for rating issues, demonstrates that Doug Van Buren had, no NTEU nor IRS/Treasury justification for being involved, even more particularly to encouraging resignation.

(r) Neither, the defendant, nor the NTEU, et al. informed the plaintiff of the appeal rights to the FLRA. This is significant because the NTEU has cited the FLRA as "exclusive remedy" for any resolve of NTEU violations. This means that the NTEU participated in the actions against the plaintiff but did not inform the plaintiff of the right to appeal to the FLRA, contrary to the requirement of the IRS/Treasury to inform the plaintiff of EEOC and MSPB appeal rights.

(s) The plaintiff was told by Esperanza Balahandran of the Tax Commissioner's office in DC that the complaints as filed would be related to the Chamblee, GA, tax processing

8

center for further processing. However, the Chamblee, GA, center stated they had no knowledge that any complaints were forwarded to them, therefore, no prior knowledge of the plaintiff's complaints during termination processing. Because human resources was to be kept aware of such complaints there is generated a contradiction of who is lying, the DC office or the Chamblee, GA, tax center? The defendant's Motion for dismissal did not resolve this contradiction for establishing lack of jurisdiction. This lie has prevented proper adjudication of the rating and ranking problems.

(t) In the MSPB testimony that was given for a hearing on December 15, 2003, the witnesses Cedric Swain and Winda Daniels gave false testimony. Cedric Swain stated that he routinely terminated 50 data transcribers per year, which is a contradiction compared to the Treasury EOP file, 02-1135, which only cited the termination of 6 data transcribers over a 3 year period. Winda Daniels lied in stating that she did not have any knowledge on vouchers used to cover up mistakes of prior employees handling the tax documents prior to a data transcriber, which generated many delays for a data transcribers and reduced rating scores. (This lie was to cover up the problems created for a data transcriber in having to correct the mistakes of other employees instead of going the source of the problem.)

(u) Because the defendant has failed to take corrective action concerning lies and false documents such as attachment # 4, and discussed in the interrogatories, attachments # 13 and 14, the plaintiff filed a complaint with the DOJ in the DC District, attachment # 10, on the 10/13/07. The complaint includes the issues of hate speech, hate crimes , the ability to use of the employee ID to track wrong-doing to the documents but wasn't

9

utilized; the tracking of social security numbers; and issues reflecting badly on the rating and ranking system.

(v) As can be seen with attachment # 10 to the DOJ, the defendant can check the rooster of social security numbers to find employees that were working for the IRS and the US postal service at the same time as was one of the prohibited practices reported by the plaintiff. The defendant with attachment # 2 used the plaintiff's social security number inappropriately but failed to run the check for a prohibited practice of working at two federal agencies at one time. The accountability for such action rest with the personnel in the DC offices of the defendant.

(w) The defendant did not differentiate between past lies and more recent lies and, subsequently, how each types affect to what degree the claims of the present case. The resolve of these are the responsibility and duty of the personnel in the DC office of the defendant because those were the deciding individuals.

( x) The defendant did not list any jurisdiction problems or objections in it's preliminary report of the present case when submitted on 9/27/07, as not being the DC District.

(y) The defendant only cites in it's Motion for Dismissal that the proper venue would be N.GA. District failing to recognize, that attachment # 4 and other false testimonies, were projected onto the plaintiff as a private residence of eastern North Carolina. This raises debate of proper jurisdiction as opposed to N. GA. District but the defendant did not resolve such.

(z) For the participation of the NTEU in the any involvement with the rating and ranking problems, the termination of the plaintiff, and the testimonies such as attachment # 4,

10

neither the defendant, nor the NTEU informed the plaintiff of the administrative remedy

of the FLRA as 'exclusive remedy' for the NTEU, as was the normal procedure with the

notification of the EEOC and MSPB processes.

## C: Analysis of Case and Facts/Evidence:

6.          Mutual understanding between employer and employee can create property

interest in continued government employment, even in absence of written contract or

statutory protection for purposes of due process of Fifth Amendment; Wehner v. Lavi ,

(1977, App DC) 183 US App DC 328, 562 F 2d 1276. The defendant did not normally as

a rule terminate data transcribers for "poor rating" because the problems and inaccuracies

of the rating and ranking system were widely understood to be no fault of a data

transcriber. However, in doing so the defendant is denying through the failing to

recognize the rating problems; failing to correct the rating problems; failing to seek

accountability to those employees perpetuating lies and false records; and failing to

follow proper removal procedures when such, implication of liberty interest is within

meaning of Fifth Amendment. Perry v. FBI  (1985 CAT Ill, 759 F 2d 1271, ALR Fed.

563). Thus, the resulting claims of Fifth Amendment violations for the present case. The

defendant did not terminate employees for the rating scale, because as the standards are

set and regulated by the DC offices, the defendant did not make consistent updates and

monitoring of the rating and ranking system as is the DC office responsibility. At a

regional site such as the Chamblee, GA, tax processing center, the applications of the

regulations would be in question not the formulation of the regulations. The defendant in

stating what it's cites as proper jurisdiction did not distinguish between the national and

11

regional circumstances affecting the rating system. For example, with attachment # 14,

P. 10, ¶ 1, there is a discussion about a lie told by Robert Hall in that he said he gave the

plaintiff a "courtesy" review and two weeks grace period. However, this is not true as the

date stipulate in using the calendar of attachment # 11. This signifies a regional mistake,

but the rating criteria is a DC regulation projected onto the Chamblee, GA, tax processing

center.

7.        The, decision with regards to particular performance standard may not be

taken as direction to freeze standard into place, rather, agencies are obligated to review

existing standards and change them as evaluation techniques improve and experience

gained. Weirauch v Department of the Army , (1986, CA FC) 782 F 2d 1560. The

defendant in the DC offices set the standards and are responsible for the correction and

changes to accommodate the changes as the defendant made changes in the processing of

the tax documents such as those listed in the plaintiff's originating complaint and the

facts/evidence above. The regional tax processing center only implement the scoring

regulations in programming. These changes were reflected in the pay scale, incentive

pay, and grade scale of the data transcribers, to various degrees depending on exposure,

wherein it is the responsibility of defendant in the DC offices to make adjustments and

corrections for fairness.

8.        Allegations of wrongful dissemination of information harmful to

reputation of former governmental employee combined with denial of re-employment in

government job states compensable due process violation. Bastel v. Federal Aviation

Administration (1984, App DC 223 US App DC 297, 725 F 2d 1403). With attachment

# 4, in particular, the defendant perpetuated hate speech onto the plaintiff in the
commission of lies and false records, which was done under the DC jurisdiction in the
Treasury EOP file, 02-1135. This attachment # 4 was then used to defraud the DC
District US Court for the purpose of evading proper adjudication in related cases. Even
after having been informed of such a gross error, the defendant has refused to seek
accountability and take corrective action to the point that the plaintiff had to file a
grievance with the DOJ in the DC District, attachment # 10. The defendant further fails
to recognize that this attachment was projected onto the plaintiff as a private citizen in
NC, after employment with the defendant, thus raising issues of jurisdiction for issues
raised in the document as eastern NC. The resulting effect, further, demonstrates a denial
of due process towards the plaintiff that was perpetuated in the DC District, because,
critical comments contained in the confidential personnel files, not subject to public
disclosure cannot infringe on individual's liberty interest. Hewitt v. Garlicky (1986, CA9
Wash.) 794 F 2d 1373, 1 BNA IER Vas 753, such infringement was generated through
the DC office of the defendant and used under the jurisdiction of DC for administrative
and judicial adjudication.

9.        Requirements of due process limit court's exercise of its inherent power to
dismiss action when party has willfully deceived court and engaged in conduct utterly
inconsistent with orderly administrative of justice, and dismissal is permissible sanction
only when deception relates to matters in controversy, and because dismissal is harsh
penalty, it should be imposed only in extreme circumstances; Wyle v R.J. Reynolds
Industries, Inc. (1983, CA 9 Cal) 709 F2d 585, 36 FR Serv 2d 1539. The defendant has

with intention and malice perpetuated in the DC jurisdiction lies and false documents for
the purpose of evade proper adjudication of the circumstances and problems of the rating
system, attachments # 4, 12, 13 and 14, therefore, the plaintiff's claims for the present
case are suitable in DC District.

10.        The Treasury EOP file 02-1135, is to voluminous for inclusion in this
reply but the plaintiff's interrogatories, attachment # 14, in their entirety discuss the
problems and harm created towards the plaintiff form the testimonies of the witnesses and
included records. The TIGTA file, attachment # 12, and the accompanying
interrogatories of the plaintiff, attachment # 13, describe the contradictory testimonies as
used for the decisions under the DC jurisdiction. The TIGTA file makes references to the
testimonies of the witnesses as used for the Treasury EOP file, 02-1135, which was
completed in August 2002, however, the TIGTA file was supposed to have been
completed in March 2001. Thus, the TIGTA file was back dated, a false record, then
used in decision making in the DC District for administrative and judicial proceedings.
These misleading records and testimonies were used and not corrected by the defendant
in order to prevent proper resolve of the claims in that the rating and ranking system are
flawed and biased towards a data transcriber and used as such to terminate the plaintiff.
For each error cited by the defendant that the defendant uses to give a defense of "poor
rating" on any documents referenced, that error points to the same document that
contains a violation to taxpayers' documents; improper prior handlers; or work
interruptions as stipulated by the plaintiff. What the defendant is trying to do is have it
both ways, in that it only wants any review of the documents to look at the errors for

14

giving the plaintiff a "poor" rating, but not for the violation generating those rating
errors, even though the can be one and the same. Attachment # 9 represents the program
coding that cites the error of a data transcribers, this points to the violations as reported by
the plaintiff against the documents.

11.         The following resulting reasons establish proper jurisdiction as the
DC District, (1) the defendant has submitted false records and documents to
investigations of administrative agencies in the DC District; (2) the rating and ranking
system is devised in the DC offices of the defendant, not the local IRS Tax Processing
center, this includes all scoring regulations, data entry manuals, corrections, and program
coding; (3) the defendant has perpetuated lies in the DC District Court for the purposes of
evading proper adjudication in related cases; (4) there are unresolved issues of lies as to
the Tax Commissioner's office in DC verses the regional tax center regarding how the
proper handling of the plaintiff's complaints of the listed rating/ranking problems were
done; (5) the defendant through the DC office is neglecting the responsibility of
correcting the problems with the lies and false records; (6) the defendant from the DC
offices has not called the plaintiff a liar for any reported allegations or made direct
searches of records which could have easily proven such, thus, benefiting the defendant;
(7) the defendant is responsible for the accountability of the illegal solicitations of the tax
processing center once it was informed of such; and (8) by not correcting the rating
scoring for the mistakes and improper work of prior document handlers, the data
transcriber was being required to do their job without credit or compensation,
additionally, though ironically, contributing to the plaintiff being terminated. All of

15

theses reasons are contradictory to the data transcribers job duties as listed in
attachment # 7.

12.          The preponderance of the above facts/evidence and analysis points to the
repeated pattern of not addressing lies, whether orally or written, from the defendant
when it is the defendant's duty to do so as provide correct and fair rating/ranking system
to the data transcribers of the tax processing center. The formulation, regulations, and
changes to the rating system is the assigned duty of the defendant in the DC offices.
Though the implementation of the rating and ranking regulations were the duty of the tax
processing center where the plaintiff worked, such center can only be reviewed for
improper implementation of the code.  The regulations concerning the plaintiff's
reporting of prohibited practices, such as those reported to the MSPB, exhibit # B,
stipulate to human resources, that no personnel action was to be taken against the plaintiff
until the reported prohibited practices had been reviewed. The Tax Commissioner's
office in DC told the plaintiff that any complaints had been forwarded to the tax center,
but the regional tax center did not claim to have any knowledge of such forwarding of the
complaints.  Therefore, it has not been resolved which is lying, the tax commissioner's
office or the regional tax center for human resources.  The above discussed lies and false
records were generated under the jurisdiction of DC and perpetuated from such district, in
the Treasury EOP file and TIGTA file.  Those discrepancies and contradictions have not
been resolved by the DC office of the defendant, but have been used in judicial
proceeding in the DC District US Court.  The defendant has used such lies and false
records to divert attention away form the problems of the rating and ranking system.  The

16

DC offices of the defendant is responsible for the correction of the problems of the rating and ranking system and the formulation of any rule regarding the rating and ranking system used at the regional tax processing center. Therefore, DC District is proper jurisdiction for the adjudication of the plaintiff's claims.

### III. PLAINTIFF'S REPLY TO DEFENDANT'S MOTION TO DISMISS:

*(Unless otherwise noted the pages and paragraphs refer to the defendant's given Motion for Dismissal.)*

### A. Under Statement of Case:

13. -P. 3 - Attachment # 4 involves the originating outside of a part, but that part acting upon the whole, and it's lies perpetuated in DC District through the investigations; administrative remedies, and judicial proceedings; going past the Chamblee, GA, Tax Processing Center, to eastern NC and then in DC District. This was similar to the originating alterations and violations revealed starting in 1999 to taxpayers documents which occurred across state lines from FL, GA, and SC. The defendant failed to recognize such issues.

14. - P. 3 - In contrast to this section, a preponderance of evidence demonstrates that the Court has subject matter jurisdiction for the present case, because (1) the defendant has lied to DC District in related cases; (2) with defendants' exhibit #1 from Garry Wade Klein, the defendant is demonstrating that it continues to lie to DC District because if the statement that the records are in the Atlanta, GA., area then the defendant lied in related case for FOIA/PA request in DC District 05-1095 when it said the record were not in the Atlanta, GA area, but where in DC, UT and CA; (3) the Esperanza Balahandran in the

17

Tax Commissioner's office in DC District told the plaintiff that the initial complaints where sent to the Chamblee, GA., Tax Processing Center but that was denied by the Chamblee, GA., tax center or the Tax Commissioner's Office in DC District is lying; (4) the investigations which produced the attachments to the originating compliant from the Treasury EOP file 02-1135, were done under the DC District jurisdiction; (5) because there is a question as to the jurisdiction of actions of the attachments having been perpetuated against the plaintiff after employment with the defendant in the jurisdiction of eastern North Carolina; (6) there is a question of responsibility of the TIGTA and the Treasury to take proper corrective action for any and all issues of perjury and false records created for the purpose of undermining justice in the DC District; (7) since the defendant in the DC District has failed to take corrective action the lies and false records, having been informed as such, are not being given due process; (8) the defendant made no dispute as to the Court's proper jurisdiction in its preliminary report, dated September 27, 2007, to the Court; (9) attachment # 4 is hate speech in the commission of hate crimes, perjury and false records submitted to DC District investigators, administrative reviews, and judicial proceedings; (10) the rating and ranking criteria and scale; including manuals and computer programming, are determined by the DC Office of the defendant and not by the individual Chamblee, GA, tax processing center, thus, DC District is proper jurisdiction for the plaintiff's claims of problematic rating and ranking scoring; and (11) the defendant has not resolved the contradictory testimonies of the witnesses for the TIGTA file and the EOP file that were given under the jurisdiction of the DC District.

18

15. - P. 4, ¶ 3,the defendant describes the plaintiff as a frequent filer, however, had the plaintiff not followed his course of action the lies of the defendant would not have come to realization because the defendant is not taking responsibility for the circumstances.

16. - P. 5, ¶ 1, the lies of the defendant have undermined previous litigation, as can now be seen as the defendant's strategy; that of deceit. From the attachments provided herein it can be seen that the defendant has had a history of lying to and about the plaintiff in any issues raised whether as an employee or a private citizen, in pursuit of the initial claims and any residual claims.

17. - P. 5, ¶ 1,  the three consolidated cases as reference in this paragraph did not include the violations as filed by the plaintiff.  They were actually for each cases (1) harassment; (2) First and Fifth Amendment violation occurring during employment; and (3) discrimination based on gender and race.

18. - P. 5, ¶ 1, the case of libel and slander in Middle District of Florida was dismissed for reasons of jurisdiction.  The issues have not been resolved, some of which are after the fact claims of the initial filings.

19. - P. 5, ¶ 1,  in the MSPB case for the Federal Circuit one concerned one issues in relation to the plaintiff's termination as the reason, as discussed above.  It did not have the later back dated TIGTA file containing further claims and lies.  It was decided without the later evidence gained through FIOA/PA request of the related cases.  What it does raise is how the rating and ranking system was scored which was not fully adjudicated and in fact the plaintiff was prevented from discussing and reviewing the problems with the rating system for the MSPB hearing.  The circumstance in that proceeding is that, you

19

can lead a horse to water but you can't make it drink. Additionally, IRS attorney Wade
Klein lied as to remarks attributed to NTEU, representative, Doug Van Buren, in that the
plaintiff made white supremacy remarks. Both of these issues prevent proper resolve of
the rating and ranking problems.

20. - P. 5, ¶ 2, the plaintiff's related case against the NTEU as referenced by the
defendant has a pending Rule 60 reconsideration of the plaintiff. One reason for the
original dismissal of this case was that the administrative remedy of the FLRA had not
been done. In this case the citing of the FLRA as "exclusive remedy" did not the
establish the FLRA as the administrative agency for resolve of the combined actions of
the NTEU and the defendant. It did not resolve the FLRA as the official resolve of
attachment # 4 while the plaintiff was a resident of NC no longer employed with the
defendant.

**B. Under Argument:**

21. - P. 6, ¶ 2, passage ending on P.7, ¶ 1, the defendant argues the use of the statutes
cited in the originating complaint, however, since the Motion for Dismissal was filed
after the plaintiff filed the initial disclosure report, the defendant has not included the
statutes from Item #2 of that report in the argument. The references to the Rehabilitation
Act are unnecessary since the plaintiff is not disabled, this is an oversight, this would
refer as well to PP. 9-11 as unnecessary. This can be omitted.

22. - P. 7, ¶ 2, the defendant cites the use of qualified or sovereign immunity as
protection against the plaintiff's claims, however, "allegations of wrongful dissemination
of information harmful to reputation of former governmental employee combined with

20

denial of re-employment in government job states compensable due process violation;"

Bastel v. Federal Aviation Administration (1984, App DC 223 US App DC 297, 725 F 2d

1403). This can be seen as occurring for the plaintiff when applied in consideration of

attachment # 4, as well as the contradictory denials of the defendant and the NTEU with

attachment # 4, for demonstration of a due process violation of the defendant towards

the plaintiff. The cases as cited by the defendant from P. 7, ¶ 2 to P. 8, ¶ 1, do not

resolve the harm to the plaintiff and the residual claims, from the combined campaign of

the defendant and the NTEU. Though the plaintiff's Motion for Joinder of the NTEU

was denied it does not excuse the defendant of any action with the NTEU. As in the

plaintiff's ' Reply to Opposition for Joinder' the listed cases with the defendant concerns,

particularly, areas of immunity from Constitutional claims, Bivens Tort. As the with the

defendant's listed cases listed on P. 7, Bivens v. Six Unknown Named Agents: Fed.

Bureau of Narcotics , 403 US 388, 91 S. Ct. 1999, 29 L ED 2d 619 (1971), used as a

defense would not apply to the combined campaign of the with the NTEU. The

defendant can not grant sovereign immunity to the NTEU for resolve of claims,

particularly, with Fifth Amendment claims because the NTEU is a private entity, not a

governmental agency. The defendant would have to show justifiable resolve of it's

partnership with the NTEU against the plaintiff. In any other proceedings this has not

been resolved or could not have been resolved until both the defendant and the NTEU,

separately or together weighed in on the serious issues of hate speech and hate crimes of

attachment # 4 and residual actions, with the IRS attorney Wade Klein, attachments

# 5 & 8. Thus, the combined actions of the defendant and the the NTEU does not qualify

21

under sovereign immunity, otherwise, the defendant would be using the listed cases to avoid accountability for such actions.  The NTEU has relied on unresolved lies to escape accountability in their related case with the plaintiff.  Neither the defendant, nor the NTEU, informed the plaintiff of the administrative remedy of the FLRA for such a combined campaign as is required for the EEOC and the MSPB in matter under their jurisdiction.. These facts, in conjunction with Bastel v. Federal Aviation Administration (1984, App DC 223 US App DC 297, 725 F 2d 1403), from above, demonstrates that the defendant would have to resolve the underlining circumstances, because collectively the failure to take corrective action, but instead to perpetuate such damaging lies and false records against the plaintiff, undermines the judicial process.  This improper use of attachment # 4 and other similar false evidence would not bar the suit of the plaintiff, because when [motion]  to deny  [ such Bivens action], is not barred by qualified immunity, the  bad faith interference with witnesses compromising [plaintiff's] due process right to present witnesses, as with attachment # 4, means suit is not barred by res judicata, judicial estoppel, or statutes of limitations; Heller v. Plane , LS, et al, (1990, DC FL) 66 AFTR 2d 90-5746  F  Supp 1553.  This later circumstance was not readily available to the plaintiff in prior claims, thus plaintiff could not had raised such perjury issues of the reveal in present case in any prior case.

23. - P. 8, ¶ 2, refers to the uses of 42 USC §§ 1981, 1983, 1986, and 1988 in the plaintiff's complaint. Because the claims involve different acts of the defendant which have a resulting effect on the rating and ranking system used against  the plaintiff and  the processing of the claims, the use of such statutes is necessary.  With attachment # 4 and

22

the residual effects of such, an employee's 42 USCS § 1981 claim of hostile working environment will not be [dismissed] where his deposition suggest repeated use of terms "nigger" and "taco" by fellow employees, and that on one occasion, when racial slurs were reported , supervisor told him to "forget it", because while not overwhelming, employee's assertions are sufficient to suggest possibility of pervasive racial harassment. Blanco v Hallmark Cards, Inc. (1987, DC Kan) 681 F Supp 692, 45 BNA FEP Cas 1485, 44 CCH EPD 37514. From this can be seen a relative support for denial of dismissal as well as the claims as filed.

24.         Similarly, for job in progress interruptions the soliciting for parties, particularly, sexually oriented parties, demonstrates a residual of. allegations of sexual harassment [which are] actionable under 42 USCS § 1983 as violation of Equal Protection Clause. Noland v. McAdoo (1994, CA 10 Okla) 39 F3d 269, 66 BNA FEP Cas 221, 65 CCH EPD ¶ 43391. The plaintiff's originating complaint involves due process violations for equal protection of the law.

25.         In addition, 42 USCS § 1983 is for the purpose of redress for Constitutional issues, here the plaintiff's claims of Fifth Amendment Rights; and for the failure of the defendant in proceeding improperly with the NTEU the use of 42 USCS § 1986 is needed because the actions of neglect or prevent conspiracy of harm can be seen from the combined actions as discussed above.

**C. Under Rehabilitation Act** : *(Omit)*

23

### D. Under Res Judicata and Collateral Estoppel :

#### 1. Res Judicata:

26. - P. 11, ¶ 3, the defendant states the plaintiff's claims are barred by res judicata from the adjudication of the claims for the present case in referencing Apotex, Inc, v. Food and Drug Admin., 393 F 3d 210, 217-18 (DC Cir. 2004). However, with (1) McLaughlin v. Bradlee , 803 F 2d 1197, 1204 (DC Cir 1986), it is decided that res judicata prevents, "the onerous task of re-litigating issues that have already been decided in a full and fair proceeding," and with (2) Bastel v. Federal Aviation Administration  (1984, App DC 223 US App DC 297, 725 F 2d 1403), DC Circuit decided that, " allegations of wrongful dissemination of information harmful to reputation of former governmental employee combined with denial of re-employment in government job states compensable due process violation," from these two cases there is demonstrated that in consideration of attachment # 4, and other issues, as discussed above, a denial of due process to the plaintiff and the undermining of judicial adjudication by the defendant, has occurred against the plaintiff which is contradictory to, 'full and fair proceedings.'

27.          The plaintiff could have not raised the issues of the denials of the present case nor with the related case Ivey v. NTEU  for  the other prior related case, until the defendant and the NTEU had weighed in on attachment # 4, which is now resulting in the conflicting determinations of the cases surrounding the use of  evidence based in lies, and a reporting of such to the DOJ, attachment # 10. Otherwise, if what the defendant claims in that the plaintiff had raised such issues before, then the Court previously would have known about the lies and forged evidence surrounding hate speech, thus, hate acts of

attachment # 4, and still granted dismissal in such a case properly ? Is the defendant

implying that this circumstance occurred ?   What is revealed now is that the defendant's

strategy was to deny the plaintiff due process by perpetuating lies and false records, then

apply res judicata and collateral estoppel to prevent any corrections and avoid being held

accountable for any claims.  As with the need to address the issues with the DOJ,

attachment # 10, the defendant is continuing in the refusal to take corrective measure

regarding the lies and false records, thus, creating later issues of discrimination, after

employment with the defendant, because they are protecting those individuals who have

lied and wrote the false records. Therefore, the plaintiff's claims are not barred by

res judicata, because the defendant did not resolve the lies and false records, as discussed

above, and in the interrogatories of the plaintiff, attachments # 13 and 14, which are

relative to the present claims.

### 2. Collateral Estoppel:

28. - P. 14, ¶ 2, the defendant cites issues preclusion, collateral estoppel, as barring the

plaintiff's claims in the present case.  Just as in the discussion of res judicata above,

collateral estoppel points to the fact that the present denials of attachment # 4 and the

residual uses of such accusations, attachments # 5 and 8, were not issues in prior decision

making.  Given the comparison of the plaintiff's interrogatories # 13 and 14, in addition

to those of  MSPB testimonies, (not include herein because they are audio testimonies),

there are salient lies and false records perpetuated against the plaintiff for the purposes of

undermining the judicial adjudication of the related prior cases.  In the three elements

necessary for collateral estoppel as cited by the defendant there are discrepancies, for

25

(1) the defendant has not, in any prior litigation dealt with the rating and ranking issues as present in the present case, in the DC District or other district; for (2) the issues of the rating and ranking system have not been determined in any prior case nor stated particularly as such by the defendant; and for (3) considering the lies, contradictory testimonies, and false records as discussed above, the defendant did not stated that it had dealt with such and resolved such in any prior case or which were or were not, by assigning dates. The defendant is attempting, as the plaintiff is claiming with the above, to deny the plaintiff due process for the rating and ranking claims which contributed to the plaintiff's wrongful termination.

29.        Defendants exhibit # 2 is the plaintiff's prior filing of wrongful termination, however, this case was not fully adjudicated. The plaintiff waited on the Court to issues a scheduling order but instead the Court dismisses for failure to prosecute. Thus, the claim of wrongful termination did not meet criteria (2) for collateral estoppel. Additionally, the lies and false records producing credibility issues of the defendant presented for the present case were not fully realized in the prior litigation, nor could they have been. What the defendant is, also, attempting to perpetuate is that there is a one time limit to the use of a claim such as Fifth Amendment. For instance, prior litigation of the Fifth Amendment claims focused on a period when the plaintiff was employed with the defendant, not in the later, after the fact issues of evidence such as attachment #4, and the backdating and newer issues of the TIGTA file, attachment # 12. These are, thus, not inline with the criteria of collateral estoppel.

30.        The plaintiff did not receive attachment # 12 until December 2005 which

26

means that it was after the prior related cases were filed and determinations were made.
This means that criteria of collateral estoppel cited by the defendant was not met, because
the issues of the TIGTA file as they relate to prior issues could not have been done in
fully and fairly adjudicated; <u>McLaughlin v. Bradlee</u> , 803 F 2d 1197, 1204 (DC Cir 1986).
The fact that  age discrimination was revealed from the TIGTA file and such claim was
filed later in case 06-2706,  demonstrates that many other issues such as age
discrimination, lies, and contradictory testimonies, reviewed in attachments # 13 and 14,
could not have be available for the prior adjudication of relevant case.  As those issues
relate to the rating and ranking claims of the present case, the criteria of collateral
estoppel, and similarly for res judicata, has not been met.

## IV. MOTION FOR CHANGE OF VENUE

31.             The jurisdiction for the present case as discussed above is in DC District.
However, there have been issues raised as to proper jurisdiction as being either in Eastern
NC District or N. GA. District.  This is because the entangling of the claims as generated
and/or perpetuated in these other districts, fails to match criteria (1) for proper venue as
cited by the defendant's Motion to Dismiss, P. 16, ¶ 1, or resolve proper jurisdiction.
The main determination of the rating and ranking system are in the DC offices of the
defendant, and the failure to correct the underlining lies and false records lies in
association with such determinations, is in the responsibility of the defendant in the
DC offices.  These records as indicated from the attachments and discussion of the
plaintiff's Reply to Defendant's Motion to Dismiss are in the DC District.  Since there are
questions raised as to proper jurisdiction, the plaintiff is requesting that should proper

jurisdiction not be the DC District, then the case should be transferred to such appropriate jurisdiction. To assist in the proper resolve in the determination of jurisdiction the plaintiff is willing to forego jurisdiction as the Eastern NC District, if the defendant is willing to forego jurisdiction as N. GA District, thereby settling on DC District as jurisdiction.

32.          Additionally, Rule 12 for dismissal is not Rule 56 for summary judgment, however, dismissing the present case on Rule 12 without review of affidavits and evidence that can be gained in discovering so as clarify and resolve the contradictions raised with attachments # 2, 3, 4, 5, 8, 9, 10, 12, 13, and 14,  would be treating the present request for dismissal under Rule 12 as a dismissal of summary judgment as Rule 56, without 'full and fair' adjudication for Rule 56. Because there are now issues of the defendant's credibility, dismissal as any thing close to, summary judgment is inappropriate when central issue in controversy turns on credibility of moving party, Transway Finance Co. v. Gershon  (1982, ED NY) 92 FRD 777, as has been discussed in the plaintiff's reply to defendant's Motion for Dismissal. From the plaintiff's reply to dismissal, summary judgment is inappropriate if there remains genuine issue as to any material fact. Gavin v. Peoples Natural Gas Co.  (1980, CA3 Pa) 613 F2d, which can be seen from the plaintiff in discussing many different issues of the material facts, in particular examples, the fact that neither the defendant, nor the NTEU, informed the plaintiff of the administrative remedy of the FLRA, and, the unresolved accounting and correction of the solicitation of illegal activities.   The defendant has not resolved these issues, nor any others as raised and supported from the plaintiff, in the Motion for

28

Dismissal as per Rule 12. Therefore, the parties would need to reply to such issues for

proper dismissal under Rule 56, which would be more appropriate at a later date, after

discovery, which would be depriving the plaintiff of due process, if the case was not

transferred should the Court decide proper venue is not the DC District.

## V. CONCLUSION:

33.              For the above discussions and reasons the proper venue for the present

case is DC District.  The issues raised for dismissal for the defendant citing res judicata

and collateral estoppel as discussed above are inappropriate for the present case.

Additionally, because there are issues raised as to proper jurisdiction, the plaintiff, with

his Motion for Change of Venue, request that the case be transferred to the appropriate

District rather than dismissed.  Consequently, the defendant's Motion for Dismissal

should be denied.

**Attachments:** *(A, B, and 1-6 are previous attachments with the complaints. The remaining attachments are for the present motion.)*

# A- EEOC Decision.
# B- MSPB Decision.
# 1 - Statement of Limit for NTEU bargaining involvement.
# 2 - March 5, 2001 letter of Robert Hall (with ss#).
# 3 - Memo of Robert Hall to Linda Ferguson.
# 4 - NTEU alleged call stated by Lisa Porter and Angela Strong.
# 5 - Denial of NTEU with racial call from CA# 05-1147, <u>Ivey v. NTEU</u> .
# 6 - Ivey's phone record for March 2001. # 7- Data Transcribers job duties.
 # 8 - Request for NTEU involvement from Wade Klein.
 # 9 - Defendant's program print analysis for logging errors to the plaintiff.
#10 - Charge letter to the DOJ.
#11 - Calendar for February, March, and April 2001.
#12 - TIGTA file dated May 1, 2001 for testimony from March 2001.
#13 - Interrogatories of Steven Ivey in response to TIGTA file.
#14 - Interrogatories of Steven Ivey in response to Treasury EOP file 02-1135.

## Certification of Service

The attached document was sent by mail to:

Office of the Clerk
US District Court for DC
333 Constitution Ave, N.W.
Washington, DC, 20001

And by regular mail to:

Jeffery Taylor/Robin Meriweather
Department of the Justice
555 Fourth St., NW
Washington, DC, 20530


_11-30-07_
Date

Steven Ivey
Plaintiff

SPD No. 92182N

**INTERNAL REVENUE SERVICE
STANDARD POSITION DESCRIPTION**

**Classification Title:**     Data Transcriber
**Classification:**           GS-356-3
**Organizational Title:**     Data Transcriber

Remarks: 9/29/1999 SPD corrected to annotate career ladder.

I certify this is an accurate statement of the major duties and responsibilities of this position and its organizational relationships, and that the position is necessary to carry out government functions for which I am responsible. This certification is made with the knowledge that this information is to be used for statutory purposes relating to appointment and payment of public funds, and that false or misleading statements may constitute violations of such statutes or their implementing regulations.

_____
Signature of Immediate Supervisor

_____
Date

_____
Title
*************************************
(This position is one grade level below the full working level of GS-4, SPD #92183N as described in this SPD. This position does not meet the full intent of mental demands found at the full working level.)

**INTRODUCTION:**

The employee performs original entry or supplemental data capture for a wide variety of tax documents/forms from images, paper, and/or other sources.

**DUTIES:**

Transcribes and/or key verifies a wide variety of taxpayer prepared tax returns, related schedules, and/or documents.

Identifies missing, incorrect, and unrecognizable data and takes appropriate course of action to resolve errors, or refers to others for correction.

Performs other duties as assigned.

**KNOWLEDGE:**

Detailed knowledge of a variety of correction modes, procedures, and status messages to perform data capture.

Knowledge of the characteristics of a wide range of documents/forms to associate with program controls and transcribing procedures.

Knowledge of the operating features of equipment to use in transcribing data.

**LEVEL OF DIFFICULTY:**

General guidance is provided for ongoing assignments and specific instructions are provided on new, difficult, and unusual assignments. The employee enters and verifies the accuracy of data which requires interpreting and applying an extensive body of established procedures to a wide variety of complicated assignments. Completed work is subject to normal quality review procedures. Work is performed in an office setting and good eye-hand coordination and finger dexterity are required.

**ASSIGNMENT:**

The purpose of the work is to capture data from a variety of source documents into the tax processing system. The work affects the quality and efficiency of completed products and services to the taxpayer.

**COMMUNICATIONS:**

*Attachment #7*

Steven Ivey
7611 S. OBT, # 278
Orlando, FL, 32809

Wade Klein/IRS
Ste. 640, Stop 180-R
401 W. Peachtree Street, NW
Atlanta, GA, 30308-3539

OCT 5, 2007

Ref: MSPB case AT-1221-02-0446-B-1

Dear Wade Klein/IRS,

      In reference to the above MSPB case between myself and the IRS/Treasury, you referred to evidence from Doug Van Buren as to me having made "white supremacy" remarks and/or documentation to such for the proceedings and subsequent decisions.   I am requesting that you supply me with said evidence.  In related case 04-0214, <u>Ivey v. US Dept. of the Treasury</u> , DC District, there was no such evidence as referenced by you in any of the researched documents of the IRS/Treasury turn over to me.

      Should you fail to turn over such evidence I will file a misconduct charge against you, initially with the Atlanta Bar Association, and other relative entities.  It will, further, be reflected in the on going litigation with the IRS/Treasury and the NTEU.

      Sincerely,

      Steven Ivey

*Attachment #8*

INDIVIDUAL PERFORMANCE SUMMARY REPORT
Period Covered: 04/01/1999 to 03/31/2000

RUN DATE: 05/03/2000
PAGE:    3043

ORG:  35306
NAME: IVEY S G
SSN:  2

EMPLOYEE CLASS: SEASONAL
GRADE/STEP: 03/01
DAYS ON PLAN: 63

RATING LEVELS
STANDARD SCORES:
TIME/WEIGHT SCORE:
RATING:

|  |  | QUALITY |  |  |  |
|---|---|---|---|---|---|
| (2) 80.0 | (3) 100.0 | (4) 130.0 | (5) 148.0 |  |  |
|  |  | 102.612 |  |  |  |
|  |  | 3 |  |  |  |

|  |  | QUANTITY |  |  |
|---|---|---|---|---|
| (2) 70.0 | (3) 90.0 | (4) 120.0 | (5) 140.0 |  |
|  |  |  | 84.908 |  |
|  |  |  | 2 |  |

| ORG | FUN | PROG | GR | QTR | VOLUME | HOURS | DOCS PER HOUR | BASE POINT | EFFECTIVE NESS | TIME WEIGHT | TIME WT EFFEC | QUALITY PROGRAM CLUSTER | COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 35 | 231 | 11100 | 03 | 200003 | 958 | 17.2 | 55.7 | 64.0 |  |  |  | NONE | NO STD |
| 35 | 231 | 11110 | 03 | 200003 | 329 | 13.8 | 23.8 |  |  |  |  | QPC--HQW | LRN CURVE |
| 35 | 231 | 11700 | 03 | 199906 | 304 | 3.1 | 98.1 | 142.6 |  |  |  | QPC--HQW | LRN CURVE |
| 35 | 231 | 11710 | 03 | 199906 | 4637 | 31.0 | 149.6 |  |  |  |  | NONE | NO STD |
| 35 | 231 | 43110 | 03 | 200003 | 410 | 18.4 | 22.3 | 23.7 | 94.0 | 0.055 | 5.198 | QPC090-93 | QPC REVD |
| 35 | 231 | 43110 | 03 | 200003 | 1173 | 40.8 | 28.8 | 23.7 |  |  |  | QPC090-93 | LRN CURVE |
| 35 | 231 | 43210 | 03 | 200003 | 75 | 3.2 | 23.4 | 20.1 |  |  |  | QPC084-87 | LRN CURVE |
| 35 | 231 | 43220 | 03 | 199906 | 212 | 14.8 | 14.3 | 28.5 | 50.3 | 0.044 | 2.235 | QPC--HQW | HQW |
| 35 | 231 | 43220 | 03 | 199906 | 564 | 35.2 | 16.0 | 28.5 |  |  |  | QPC--HQW | LRN CURVE |
| 35 | 231 | 43220 | 03 | 199909 | 128 | 7.3 | 17.5 |  |  |  |  | NONE | NO STD |
| 35 | 231 | 44110 | 03 | 200003 | 1497 | 48.6 | 30.8 | 31.8 | 96.9 | 0.146 | 14.145 | QPC095-97 | QPC REVD |
| 35 | 231 | 44110 | 03 | 200003 | 560 | 20.8 | 26.9 | 31.8 |  |  |  | QPC095-97 | LRN CURVE |
| 35 | 231 | 44700 | 03 | 199906 | 6122 | 31.0 | 197.5 |  |  |  |  | NONE | LRN CURVE |
| 35 | 231 | 44700 | 03 | 199906 | 154 | 1.0 | 154.0 |  |  |  |  | NONE | NO STD |
| 35 | 231 | 47130 | 03 | 199906 | 9290 | 209.7 | 44.3 | 53.7 | 82.5 | 0.630 | 51.983 | QPC093-95 | QPC REVD |
| 35 | 231 | 47130 | 03 | 200003 | 174 | 7.3 | 23.8 | 51.6 | 46.2 | 0.022 | 1.013 | QPC090-93 | QPC REVD |
| 35 | 231 | 47138 | 03 | 199906 | 10 | 0.5 | 20.0 |  |  |  |  | NONE | NO STD |
| 35 | 231 | 47139 | 03 | 199906 | 158 | 3.8 | 41.6 |  |  |  |  | NONE | NO STD |
| 35 | 231 | 47140 | 03 | 199906 | 1575 | 34.0 | 46.3 | 45.8 | 101.1 | 0.102 | 10.333 | QPC093-95 | QPC REVD |
| 35 | 231 | 47140 | 03 | 199906 | 1614 | 35.8 | 45.1 | 45.8 |  |  |  | QPC093-95 | LRN CURVE |

EMPLOYEE TIME/WEIGHT EFFECTIVENESS:    84.908

Attachment #9

Steven Ivey
7611 S. O.B.T., #278
Orlando, Fl,    32809
757-560-9485

Criminal Section
Civil Rights Division
Dept. of Justice
PO Box 66018
Washington, DC, 20035-6018

10/13/07

Dear DOJ/Criminal Division,

On October 9, 2007, I mailed to your office a listing of violations of perjury, subornation of perjury, and related civil Rights deprivation charges against the IRS/Treasury. The following offers, further, explanation as to those charges, in addition to others, concerning areas of hate speech in the commission of hate crimes; inaccuracies in records; and Privacy issues of myself and other IRS/Treasury employees.

**I. Related Previous Charges:**

During my employment with the IRS/Treasury I reported to the Tax Commissioner and the TIGTA, that there were employees working at the IRS Tax Center in Chamblee, GA, who at the same time were working for the US Postal Service. This is against department rules for both agencies and the OPM. The IRS/Treasury has failed to properly review this charge, even though it could check social security numbers with their records and/or those of the US Postal Service. This remains an unresolved issue.

Exhibits A and B, (attached), were part of the Treasury EOP file 02-1135. The signature of Exhibit A is not mine. It is forged. It was used by the IRS/Treasury to mislead adjudication of any claims or charges against the IRS/Treasury. The second set of script, not in the spaces provided on exhibit B are not mine. This second set is forged as well. The use of it is similar to that of exhibit A, but I am not sure why it is mixed with the legitimate signature.

Exhibit K, is the TIGTA file associated with my reported violations and prohibited practices of the IRS/Treasury. The initial problem with this TIGTA file is that is was back dated, making it appear to have been formulated during a proper timeframe. It make reference to affidavits from witnesses of the Treasury EOP file, 02-1135, that were dated August 2002, however, the TIGTA file was completed in May 2001. This

1

*Attachment #10*

means that the TIGTA is citing affidavits that were not made until 15 months later. This represents forged evidence as used by the IRS/Treasury in order to improperly influence adjudication. Exhibit L are my Interrogatories of the TIGTA file, it offers explanation for the inaccuracies as reported herein and in my previous October 9, 2007 to the DOJ.

## II. Hate Speech and Hate Crimes; Related Charges:

Concentrating more to the contents of exhibit C, the alleged accusation of the NTEU and IRS/Treasury and exhibit D, my March 2001 phone record, it should be noted that this alleged call by the NTEU occurred while I was a private resident in NC, no longer an employee of the IRS/Treasury, at the end of March 2001. To date neither the IRS/Treasury nor the NTEU have responded to request from myself for verification or support from Robert Hall, Lisa Porter or Angela Strong, but continuously use such false testimony and documentation as support for administrative and judicial adjudication by discrediting myself. The following explains the problems with exhibit C on a line -by - line basis.

**Lines 1 & 2**: This represents hearsay on the part of Lisa Porter and Robert Hall which amounts to gossip in order to discredit the myself.

**Line 3** : The I did not make such a call to NTEU, therefore, no conversation with Angela Strong. If there was such a call it does not explain how Angela Strong would have identified the caller as myself from that of a "crank" caller.

**Line 4** : During a March 5, 2001, meeting with Robert Hall/IRS in which Doug Van Buren / NTEU was improperly present, the I told him that the IRS/Treasury was trying to terminate me because of reporting violations and prohibited practices, and that I had done so to the above various agencies. With this in mind, why would I call the NTEU to say he was terminated for my beliefs ? This, also, occurred during a time when the I was contacting the EEOC and OSC . The term "beliefs" is strange because it suggest a more religious reasoning of views. There are such things as improbable character traits; for the myself this would apply with the term "beliefs", equally so for talking to what would be a stranger about such "beliefs."

**Lines 5 & 6** : This question and statement for myself are highly usual because it evokes a role of Angela Strong , though a stranger to the myself, a more personal familiar role to me. It should be noted that I had come to the understanding that the NTEU was ineffective in resolving complaints before I was terminated and understood that Doug Van Buren was not suppose to be present, as is confirmed in exhibit F, in a March 5, 2001, meeting where he was coercing me to sign away my rights. Consequently, this lends to much credibility to the NTEU in that approximately one month after I was terminated, I would have trusted any contact with the NTEU or think that the NTEU would do anything to assist me. All this in light of the accusation of some personal conversation about "beliefs."

2

The use of the racial and sexual language was intended by the IRS/Treasury and the NTEU to discredit me in order to give support to the IRS/Treasury in defense of the my claims against the IRS/Treasury. The idea of not taking orders was to provoke a defiant characteristic of the myself to discredit me and negate the fact that the I refused to

participate in changing taxpayers' documents, department violations, and sign false statements. Once again this was an attempt to dissuade and discredit myself.

**Lines 6 & 7:** I, as would be reasonable for anyone to think that the NTEU president would be sitting around ready to take phone calls or more particularly to meet. I am sure these would have to be arranged for anyone. These may be possible events but not probable as a rule. As stated above, I would not have contacted the NTEU since by this date the NTEU had established a behavior of mistrust for myself.

There is substantial questioning as to why would Robert Hall use two NTEU representatives to create a lie, when both could state he were lying. It should be, further, noted that Robert Hall only made direct contact with one of the NTEU representatives, and the other as stating the hate speech was secondary. This results in a conspiring against me between the IRS/Treasury and the NTEU, to interfere in the pursuit of adjudication remedies.

Exhibit E as part of the Treasury EOP file demonstrates that Robert Hall perpetuated hate speech and accusations towards me, because this scripted comment was not made as indicated in the middle of the page. The perpetuation of false racial accusations and the supposed existence of hate speech was done by Wade Klein/IRS as in exhibit G, P. 2, item F. Neither of these accusations have been verified by any substantial support, even though such request have been made. This represents hate speech used in the commission of perjury and subornation of perjury, thus, making use of the document a hate crime.

Within exhibit K and L there is the reference to sexual harassment claims in which an unidentified "gay" male solicited me for a themed "gay" party. This incident went undisciplined and there was no report made, even though such a solicitation is that of soliciting me for what is immoral and illegal activity. The definition of "gay" activities involves immoral and illegal activities that characterize the nature of "gay" oriented activities, therefore, I was solicited for such immoral and illegal activities as an employee . The IRS/Treasury was soliciting for immoral and illegal activities but has not recognized this as such and has impeded adjudication for such issues.

The last paycheck I received also contained an inference to the number symbol for "white supremacy" brotherhood, "666", as insinuated towards me; which had to be mathematically alter from my actual hours worked to reach the "666" amount. Exhibit H shows the electronic deposit for the "666.16" amount. Additionally, the cent

3

value of "16" was my employee log in ID as listed in the ID list, exhibit I, supplied in the EOP file 02-1135. I was not allowed to calculate or sign my last time sheet. The following demonstrates how the pay is calculated and why the '666" is inaccurate:

The pay period starts on Sunday, ending Saturday. Check pay period was for two week periods. For the last two weeks I was not late nor did I leave early. Any remaining sick leave time is lost once employment is severed and all vacation pay would come separately as a separate check, (these are in a increments of 4 hours when earned and used).

|  | **YEAR** (with cost of living increases) | | |
|---|---|---|---|
|  | '99 | '00 | '01 |
| **Per Hour Rates For:** | | | |
| Wage: | 10.24 | 10.60 | 10.97 |
| Sunday Night Differential : | 3.57 | 3.71 | 3.82 |
| Evening / Night : | 1. 024 | 1.06 | 1.097 |
| Vacation & Sick Leave : | 10.24 | 10.60 | 10.97 |

Deduction Factor ( federal tax, state, FICA) Accumulated : 0.2478

These figures result in a total for a week total in 2001 as the following for a 40 hour week:

```
40  Regular hours            >>   40 @ 10.97  = 438.80
8   Sunday Night Differentials >>   8 @  3.82  =  30.56
32  Night Differential       >>   32 @ 1.097 =  35.10
              Gross Week Total            =  504.46

- Minus Deduction Factor ( 0.2478 x Gross)   = 125.01
              Net Week Pay                  379.45
```

For a two week period using the above values would result in a two week net pay of :          758.92

During the two week pay period leading up to the my Wednesday, March 7, 2001 termination would mean a 40 hour work week plus a Sunday, Monday, use of a sick/vacation day for Tuesday for the next week which would give the following totals:
First week total :                          = 379.45

4

Second Week total

| | | | | | | |
|---|---|---|---|---|---|---|
| 16 | Regular hours | >> | 16 @ 10.97 | = | 175.52 |
| 8 | Sunday Night Differentials >> | | 8 @ 3.82 | = | 30.56 |
| 8 | Night Differential | >> | 8 @ 1.097 | = | 8.78 |
| 8 | Vacation / Sick | >> | 8 @ 10.97 | = | 87.76 |

| | | |
|---|---|---|
| Gross Week Total | = | 302.62 |
| - Minus Deduction Factor ( 0.2478 x Gross) | = | 74.99 |
| Net Week Pay | = | 227.63 |

For the last paycheck the total would then be
379.46 + 227.63                                      = 607.09

4 hours of vacation / sick pay would add  33.01 ;
8 hours of an additional pay would add 72.62 ;
But even if these were added to the 607.09 total it would not yield a total of  666.16 as
claimed by the defendant.

      This paycheck value was altered to perpetuate a hate speech commentary
towards me, as well as demonstrating how extensive the IRS/Treasury has gone in acting
against myself.

## III. Privacy Issues:

      In the above referenced March 5, 2001, meeting between myself, Robert
Hall/IRS and Doug Van Buren/NTEU; Robert Hall improperly used my social security
number which in showing it to the NTEU violated my Rights to Privacy.  In addition to
my social security number, may age/birth date was pirated by Pam Blackburn as
discussed in exhibit K in her testimony.  These two incidences point to, besides Privacy
Rights, issues of ID theft.  The IRS/Treasury has not properly investigated and has
hindered adjudication of resolve.  The violation to my Privacy was, additionally, done
when the IRS/Treasury went into my locked work station just prior to my termination and
took journal notes from my personal items.

      There were Privacy violations to other IRS/Treasury employees, Jennifer
Smith, Susan Karimi, Lisa Porter, and Angela Strong.   In the case of Jennifer Smith,
documentation from her file was used in by the  testimony of witness Kelly Mancle
improperly, for the EOP file 02-1135.  Robert Hall from exhibit J, as part of the EOP file,
used Susan Karimi without verification or her consent to perpetuate negative
characteristics of myself.  The IRS/Treasury has not verified or offered any support from
Susan Karimi when requested.  As discussed above for exhibit C, Lisa Porter and Angela
Strong were used in hate speech in the commission of hate crimes without any affidavits

5

or substantial verification.   The improper violation of these individuals were used to improperly  mislead adjudication of my claims and charges against the IRS/Treasury.

## IV.  Conclusion

I am requesting the DOJ investigate the above and the previous October 9, 2007, issues.  Should you need further information or evidence I can be reached at the above address and number.

Sincerely,


Steven Ivey


## List of Exhibits:

A.  Expectation Form dated 3/30/99.
B.  Expectation Form dated 4/13/00.
C.  E-Mail/Memo of Robert Hall's testimony as part of the EOP file 02-1135.
D.  Phone record for Steven Ivey for March 2001.
E.  Memo of Robert Hall to Linda Ferguson as part of EOP file 02-1135.
F.  NTEU bargaining agreement statement.
G.  Pre-hearing statement of the Treasury for MSPB of Doug Van Buren .
H.  Bank statement of plaintiff for last deposit of 666.16.
I.   Employee ID numbers listing the plaintiff's number as 16.
J.   Email of Robert Hall citing Susan Karimi as part of EOP file 02-1135.
K.  TIGTA investigation file
L.  Interrogatories of Steven Ivey in response to the TIGTA file.

6

## February 2001

| S | M | T | W | H | F | S |
|---|---|---|---|---|---|---|
|   |   |   |   | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 |   |   |   |

## March 2001

| S | M | T | W | H | F | S |
|---|---|---|---|---|---|---|
|   |   |   |   | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |

## April 2001

| S | M | T | W | H | F | S |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 |   |   |   |   |   |

Attachment #11

MAY. -01 01(TUE) 09:00     DIRECTOR OFFICE     P. 05/31
FEB-15-2003  14:07

# COMPLAINT REFERRAL MEMORANDUM
### (Response Required)

**1. Address of Receiving Official**

National Director, Commissioner's Complaint Processing and
Analysis Group
1111 Constitution Avenue, NW    Room 6617
Washington, DC 20224

**2. Date Forwarded:** DEC 2 0 2000

**3. Date Report DUE to TIGTA** JUN 2 0 2001

**4. TIGTA Complaint Referral Number**

C200007764

**5. IRS Number**

**6. "1203" Violation Alleged:** ☐ Yes ☒ No

**7. Complaint Title or Name of Employee (Subject)**

CONFIDENTIAL COMPLAINANT

**8. Position, Series and Grade**

**9. Office (Headquarters)**

**10. Post of Duty**

**11. Remarks**

**12. Name, Signature, Title and Telephone Number of TIGTA Official**

Karen J. Parker, Assistant Special Agent-in-Charge
Complaint Management Division (202) 927-7187 fax (202) 927-7018

**13. Address of the TIGTA Office Referring Complaint**

Complaint Management Division
Post Office Box 589
Ben Franklin Station
Washington, DC 20044-0589

**14. Name, Signature and Title of Receiving Official**

Cristen J Wickman  CCPAG

**15. Date Received** 1/5/01

**16. Administrative Action(s) Taken and Effective Date(s) Proposed:**

A. ☐ Clearance Letter Issued
B. ☒ Closed – No Action Taken
C. ☐ Oral or Written Reprimand/Admonishment
D. ☐ Suspension/Reduction in Grade
E. ☐ Removed/Terminated
F. ☐ Employee Resigned Prior to Adjudication
G. ☐ Returned – TIGTA agreed to Investigate
H. ☐ Other (Explain in Item 18)

Effective date(s) _____

Block 22 available for additional comments

**17. Contact Person and Telephone Number**

T. O'Brien  (770) 455-2214
Field Director, Submission Processing

**18. Other Information**

**19. Name, Signature, Title and Telephone Number of Returning Official**

T. O'Brien, Field Director, ATSPC  (770) 455-2214

**20. Date Returned to TIGTA**

MAY - 1 2001

Form 2070 (Rev 01/2000)

Treasury Inspector General for Tax Administration

Attachment #12

GAT. -01  01 (TOD)  09:00

<u>Report of Inquiry</u>

**ECMS Control Number: 0101-4SVJPLCJ**

**TIGTA Form 2070 Control Number: C200007764**

**Official Conducting Inquiry:**

**Name:** Kathleen Bushnell
**Position/Grade:** Chief, Research & Perfection Branch, GS-14
**Organization:** Submission Processing Post Processing Division  W:CAS:SP:AT
**Phone:** 678-530-5301
**Fax:** 678-530-5305

**Scope and Results of the Inquiry**

**1. <u>Scope</u>:**

An anonymous Complainant wrote a follow up letter to a previous complaint to the Commissioner. The previous complaint was for the period of 1/99 to 7/99, and the Complainant was identified in the Commissioner's response dated 2/9/00. The Complainant wrote a follow up letter dated 11/1/2000 to provide additional information regarding the original issues, as well as to provide new issues. The Complainant's follow up letter is many handwritten pages containing a few new issues, as well as reiterations of the issues contained in the first complaint. The issues were: Rude/Unprofessional Conduct by other co-workers and managers; noisy work area; and allegations that employees were editing tax returns and checking the "Presidential Donation Box" when the taxpayer did not fill it in. The Complainant alleges that employees were putting more "audit codes" on returns if the taxpayer lived on the north side of Atlanta as opposed to the south side of Atlanta. He also alleges that he was given most of the illegible documents to work, which affected his promotions and the amount of money he earned. The Complainant states he received an invitation to a "gay pride party" from a coworker who was somehow led to believe that he would participate in such an activity.

**2. <u>Findings</u>:**

Individual interviews were conducted with all managers mentioned in the complaint with the exception of those identified only by initials such as "DD," or "SW." Linda Ferguson, Chief Data Conversion Branch, was interviewed to help identify the individuals named in the letter and their current positions, as well as to clarify Data Conversion work processes. Linda clarified that the Data Conversion Branch does not have a Code and Edit Unit, where, according to the complainant, employees were editing the Presidential Donation Box. The employees in Data Conversion are measured employees who earn

Report Of Inquiry                    2              ECMS # 0101-4SVJPLCJ

incentive pay based on performance. These employees key-in data from returns, they do not write on the returns. The complainant stated that employees were selectively applying audit codes to taxpayers living on the north side of Atlanta versus the south side of Atlanta based on their social and economic differences. I was provided a sheet listing of Document Perfection Codes. If Document Perfection Branch indicated an audit code in the bottom right corner of a Form 1040, then the Data Conversion employees are required to key it in. Failure to do so would be considered an error if it were part of the quality review sample. Neither Data Conversion employees nor their managers know what the audit codes mean. I asked to see a batch of returns to determine if they could be batched for north and south Atlanta. The returns were from all over Georgia and Florida. The Complainant stated that he was given work that was illegible. Linda Ferguson explained that the work comes to them already in batches, and that the managers do not separate or go through the batches. Returns are batched in the Receipt & Control Branch. Linda Ferguson was asked if employees complained about the noise level. She said not that she was aware of, but if they did, the managers addressed it individually or in unit meetings. I asked if employees addressed this in Town Hall Meetings or in Survey 2000 Meetings; she did not recall noise as an issue. Linda said that branch employees are given an Expectations Package each year, and that they also view a video that discusses noise issues and the rules against having food in the work area and requiring that drinks be in a covered cup. All employees sign their Expectations Package, and a copy is placed in their Employee Personnel Folder. The complainant alleges that employees intentionally spilled drinks and ate food in the work area. Instances where these rules are broken are addressed individually. Linda also explained that Data Conversion employees do not use colored pens/pencils, and they don't write on the returns. They are only keying in the data. They are measured and on incentive pay; they don't have time to edit returns. Linda called Terri Hales, Manager of Team 1, on the day-shift to provide me with the Document Perfection Codes. She also explained that the employees in Data Conversion would key in either a 1 or a 2 for the Presidential Election Box. If the box is marked on the return, the employees are required to key it in. I asked Terri if she had seen returns batched and coded with specific audit codes for north and south Atlanta. Terri stated that she has seen batches of returns from a specific area of Georgia or Florida during peak season when a tax preparer sends all of his returns in one box and they are batched together. Linda suggested I interview the following managers:

Pam Blackburn, Perm Night-Shift Section Chief
Robert Hall, Expansion Night-Shift Section Chief
Judy Jordan, Expansion Section Chief, (currently on detail to Recruitment)
Winda Daniels, Expansion Night-Shift Seasonal Manager 1999 and 2000
Lisa Lee, Expansion Night-Shift Manager
Kelly Mancle, Expansion Night Manager

**Interview Pam Blackburn 3/15/01 at 6:30 p.m.**

I explained the allegations and that the Complainant requested to remain anonymous. I referred to the individual as a "she". Pam asked why I thought it was a "she." I said I

MAY. -01 01 (TUE) 09:56    ~~NTUD DIRECTOR OFFICE~~

Report Of Inquiry                    3            ECMS # 0101-4SVJPLCJ

wasn't sure. Pam stated it was a "he" and the individual was Steve Ivey as these were the same issues that Steve brought up in another allegation. She stated he was terminated during his probationary period last week. He had worked for 9 ½ months and had performance issues and was not making rates. When he was terminated, he stated it was all a conspiracy against him because he was "white." He accused management of manipulating his TEPS when he wasn't doing well, saying that he was a math major and knew management had manipulated the TEPS. I asked Pam if she was aware of an invitation given to an "individual" to attend a "gay pride party." She said, "Yes, the invitation also mentioned it was a naked pool party and that an employee named ███████████ had given out the invitations. She said Robert Hall, Expansion Night-Shift Section Chief, had addressed this with ███████████ and counseled him. ██████ was very apologetic and said that he really believed Steve Ivey was "gay," and that was why he gave him an invitation. He had also given an invitation to others in the Section. I asked Pam if she was aware of the issues the Complainant raised regarding the noise level during the first year (1/99 to 7/99), when he was in Kelly Mancle and Winda Daniels Units. She was aware of it and also that he had called Judy Jordan, another Section Chief. Judy had addressed it and spoke to his manager, Winda Daniels. Pam said that she was his Section Chief last year. She further stated that Kelly Mancle, Winda Daniels, and Judy Jordan wrote affidavits to address a list of concerns that he had raised previously. Pam stated that she had the manager address the entire unit regarding the noise level. Pam also said she addressed noise levels in Section meetings with her managers and would ask all managers to tell employees to keep the noise level down.

I asked Pam if Data Conversion employees have pens to mark up the returns. She replied, "No, they do not mark the returns." Regarding the Presidential Election Boxes, only Code and Edit in the Document Perfection Branch codes/marks returns in "red" pens. Employees in Data Conversion are mandated to key in required items on the return.

I asked Pam how the work was distributed. She explained that the leads and managers bring the carts to the work area and the employees get their own work. Employees sign out batches, working from left to right off the carts. The sign-out sheet record is kept on top of the cart. She said there is no way that the Complainant was given batches that were illegible. He could have picked up a batch that had returns that were not legible, just as any other employee working from the cart could.

Pam suggested that I talk with Kelly Mancle as she was the Post Training coordinator this year. Pam said that the Complainant read a book and would not participate in class and was counseled regarding this matter. I asked if he signed memos when he was counseled, but she said he always refused to sign them.

Per Pam, these are the exact same issues that he (Steve Ivey) presented before. Pam also stated that because of being furloughed each year, his 1-year probationary period was delayed. He had worked 9 ½ months when told he would be terminated during his

Report Of Inquiry                4              ECMS # 0101-4SVJPLCJ

probationary period because he was not performing.  He was told he could resign, but he refused and was terminated.  Pam also stated this individual is 40 + years old.

I asked Pam whom else I should interview.  She recommended the following:

Kelly Mancle, Expansion Manager
Judy Jordan, Section Chief
Winda Daniels, Expansion Manager
Robert Hall, Expansion Section Chief
Lisa Lee, Expansion Manager.

**Interview with Robert Hall, Night Expansion Section Chief 3/15/01 at 7:10 p.m. (Robert Hall replaced Judy Jordan as Section Chief, as Judy is currently on a detail).**

I asked Robert if he recalled a conversation with a unit manager (page 6 of the letter dated 11/1/00) regarding a conversation relating to a return where the math looked correct but was not and if he observed anyone looking at him during the conversation. Robert does not recall the conversation.  I asked if Winda Daniels was one of his managers.  He stated that she was.  I asked if he was aware of a complaint by an employee that employees and managers were bumping the back of his chair intentionally.  Robert was not aware of this, but said that Winda Daniels might be aware of it.  I asked if Robert received complaints on the noise level.  He said he did not receive any direct complaints from anyone.  However, as a Section Chief, he would walk around on the floor if it got noisy.  He said that as a new Section Chief, he was on the floor often.  I asked if he knew if someone was given an invitation to a "gay pride party."  He said he did and that the person who gave the invitation ▨▨▨▨▨ works in his Section.  The manager, Kelly Mancle, counseled ▨▨▨▨▨▨▨ and told him not to do it again. ▨▨▨▨▨▨▨▨ had said he didn't think it would offend anyone. Robert said that the invitation also had something to do with a pool party and naked people and that it was given to both straight and gay employees.

Robert stated that he thought the Complainant was the same individual who was fired last week.  Someone from Labor Relations/NTEU attended the meeting to terminate Steve Ivey and he brought up all of the stuff mentioned as issues in the complaint letter; i.e., managers and employees bumping his chair etc.  He (Steve Ivey) also admitted in this meeting that "he got his own work off the carts."  He was being fired for performance issues in not meeting the TEPS base points.  He brought up the fact that he received work that was not legible.

I asked Robert if he addressed the noise level issues.  He said he did address the noise issue during unit meetings and that he also walked around the units much of the time.

Report Of Inquiry                         5                ECMS # 0101-4SVJPLCJ

**Interview with Judy Jordan 3/15/01 7:50 p.m.(Judy is currently detailed to Personnel)**

I went over the allegations in the Complainant's letter with Judy. Judy stated these were the same issues than an individual brought up before, and she had to write an affidavit.

I asked Judy, "Did you get complaints regarding the noise level in the units and, if so, what did you do about it?" She said a young man spoke to her in the hallway about the noise level, and she told him she would address it. She addressed it with the manager and lead, Winda Daniels and Joyce Holmes. He told Judy that both the manager and lead promoted the noise level as well as the employees. Judy stated that they both have outgoing personalities with their employees. She reminded them that they had new hires and needed to address the noise level. After this incident, Judy said she was more visible herself within the Section, walking around and observing. Judy stated that, as she recalls, Winda Daniels' Unit of seasonal employees had some of the best rates on the night-shift. She also felt that if everything were not going well, the unit would not be performing as well as it was. Judy said she is aware they offered to move this male employee within the Unit. He did move elsewhere in the Unit and did not request to be moved out of the Unit. I asked if anyone else was complaining of the noise issues. She said it was only this one male individual. Judy said she also recalled a conversation with him when she explained that she, too, moved to another seat in the unit when she first came to work because the noise bothered her. I asked if anyone brought to her attention that other employees and the manager/lead were mimicking an employee; i.e., coughing when he/she coughed? She said that no one had brought that to her attention. Judy recalled that after the first season, when this individual had basic training he was assigned to manager Kelly Mancle, temporarily, and that Winda Daniels was an instructor in the class. She recalls that the unit was split up again after training, and that he was then assigned to manager Winda Daniels. Judy said that Winda's mother passed away that season, and that the lead, Joyce Holmes, acted as unit manager.

I asked if Judy was aware of employees checking off the Presidential Election Box when the taxpayer left it blank. She said that if an entry were not legible, the data entry clerks would use pencil above or beside the entry to indicate to Quality Reviewers how they saw something; i.e., a 3 for an 8. She never saw anyone writing in the box themselves. Employees were on production and incentive pay and did not have time for writing on a return.

I asked Judy who her Managers were.

Lyn Goble
Diane Maddex
Winda Daniels
Sheila Smith
Michelle Carter

Report Of Inquiry                               6                    ECMS # 0101-4SVJPLCJ

Naomi Kirschi
Kelly Mancle (Kelly was the Post Instructor)

Judy worked a Tour of Duty from 2:00 p.m. to 10:30 p.m. so that she could bring information from the day-shift and transition to the night-shift. The night-shift employees started coming in at 6:00 p.m.

I asked Judy if she was aware of an invitation to a "gay pride party." She said she was not. Judy did not work on the night-shift last filing season.

I asked Judy about the work distribution. She said the employees take it off the cart themselves, and batches are taken from left to right. Employees are not allowed to skip batches, and they are required to sign the batches out from a sheet on the cart.

I asked Judy about the units wasting time for baby showers and other parties as this was one of the complaints. She said the employees did this during their dinner and breaks, and that participation was strictly voluntary. She said she had to respond to the Complainant's previous letter, and that he (Steve Ivey) also felt the "Filing Season Kick Off" was a waste of government time. Again, participation was voluntary; no one was forced to attend.

I asked Judy whom else I should interview:

Winda Daniels, Seasonal Expansion Manager
Joyce Holmes, Lead and also Acting Manager for Winda Daniels.

I asked Judy if she ever observed this individual that complained about the noise ever talking back to any of the individuals making the noise? She had not and she did make a point to be visible in the unit during the period 1/99 to 7/99 when she was a Section Chief on the night-shift. Last year, she was strictly on day -shift.

I asked Judy if the majority of the employees meet standards and make incentive pay and she said, "Yes".

**Interview with Kelly Mancle 3/15/01 8:30 p.m.**

I provided Kelly with an overview of the allegations in the Complainant's letter.

Kelly stated she was a Seasonal Expansion Manager. I asked if she had employees that complained of the noise. She said lots of people complained about the noise and she would discuss it in unit meetings. She also would go out on the floor and walk around and "cover her ears" meaning "keep the noise down." She stated she had an overflow unit with people in the unit, plus employees in a side unit.

I asked if she heard about an invitation given out to attend a "gay pride party." She said she had and that the person that gave it out had given it to other employees as well.

She thought the Complainant had gone to Lisa Lee, the manager last year, and complained.

Kelly stated she was assigned to do Refresher training and trained 95% of the seasonal employees. During this last class in February 2001, she had one class with 12 people in it, including Steve Ivey. He sat off by himself in the corner while refresher was taught. Kelly gave out supplies to everyone and he continued to read a book and ignore Kelly. Refresher Training started at 6:30 p.m. and she asked all of those waiting for the class to start to go to Lisa Lee to get their password and to sign on the system. The SA (Systems Administrator), James Nisewonger, was there to help them. Then she started the class and welcomed everyone back and explained they were now W & I. She told the class, generally, that they needed to pay attention as they had exercises to do and to put other reading items away. They did the exercises and he continued to read his book, ignoring her. She went up to him and said we are on page 5, problem 7 and he continued to read his own book. He then got up and left the room at 7:00 p.m. and didn't return until 7:35 p.m. It was not break or dinner time; he just left. Later, Kelly discovered he had gone to his manager, Lisa Lee, and told her he didn't need to attend the refresher training. Kelly informed Robert Hall, Section Chief. Steve Ivey returned to class, but continued to read his book. Kelly continued with Refresher and had the employees make pen and ink changes in their IRMs. She kept going and he continued to read his book with his IRM open. She went up to him and asked, "Are you going to participate? We are on page 125, and you need to make the corrections." About 10 – 15 minutes later, he left again. Kelly went to tell Robert Hall that he continued to read. She returned to class and told Mr. Ivey that Robert Hall wanted to see him. He left and went outdoors. Robert saw him 15 minutes later, and he went to Lisa Lee's unit and was going to sit in the unit. Mr. Ivey told Kelly that she had singled him out and she was "racist." Kelly said, all I wanted was for him to get trained. He ended up asking to go home that night, sick. The next day, he returned but she understands he wasn't meeting rates. Kelly was concerned by his remark. She hadn't done anything to him. The night he was terminated, Pam Blackburn told her to stay out of sight. Kelly was nervous when he was removed from the building because she was afraid he would blame her.

I asked Kelly if she knew that he was a math major. She did not.

### Interview Winda Daniels 3/16/01 at 10:30 a.m. (Winda is currently working in Complaince Division I-85 Building)

Provided overview to Winda of complaints by the anonymous Complainant.

I asked if she recalled anyone making complaints regarding the noise level in the unit. She said she had and that she addressed it in a unit meeting attended by everyone, not just one person. She discussed the noise and their surroundings and that they all needed to be aware of the noise and to keep it down.

Report Of Inquiry                    8              ECMS # 0101-4SVJPLCJ

I asked if she was aware of any mimicking going on. She asked what mimicking was. I explained that the complainant stated that if he/she coughed, then others in the unit coughed. She was not aware of this.

I read the issues regarding Winda and the Post Office and that he said someone was reading the mail coming to his personal mailbox (page 5 of the letter). I also asked if she recalled a discussion regarding IRS employees who worked for the Post Office as well, since he alleges that is how someone was getting and then making Winda aware of things in his mail. His letter states that he sees IRS employees come to work in Post Office uniforms, so he knows it is happening. Winda said that the IRS has postal employees on site in the Receipt & Control area, but they actually work for the Post Office, not the IRS. She said that maybe those are the "IRS" employees the Complainant has seen in postal uniforms.

Winda said that Judy Jordan was her Section Chief and she went to Judy to see how to handle some of the issues that this individual brought up to her. They asked him if he wanted to move to another seat in the unit. She said that the people that bumped him weren't doing it intentionally, and that he would prop his feet up and lean back in his chair so they couldn't get by. She explained to him that he needed to pull his chair in and not prop his feet up. She said that he was assigned to Kelly Mancle for a few weeks the first year, and then they were split up and he was assigned to her. When he started complaining about things, they offered to move him to another spot in the unit. She said she addressed his issues as a whole in an all unit meeting so she didn't single anyone out. She told them all to be considerate of others--no singing, no whistling, and if they had stomach problems; i.e., burping and gas, they needed to get up and go to the rest room. She asked that they be considerate of their neighbors since everyone was in close quarters, and to please get up and move if they had a bodily function problem.

The second year, this individual was moved to Lisa Lee's unit. I asked Winda if she was aware of an invitation to attend a "gay pride party." She said it was an open invitation to everyone, and she heard the manager had counseled the person who gave out the invitation.

I asked Winda about the distribution of work to employees. She said the managers and leads don't distribute the work. The employees take it themselves off the carts. She said Steve Ivey only worked Forms 1040, not Forms 941. I asked what his TEPS rating was. Winda thought he had a "2" rating, but said I could check with the Section.

I asked about employees marking the returns. Winda said that Data Conversion employees only key in. If there is not a full field of information, they code it 610-action code and it will kick out.

I asked Winda how was the unit doing overall. She said Pam Blackburn kept that data as she kept data on the section.

...unreadable faded line...

Report Of Inquiry                    9                ECMS # 0101-4SVJPLCJ

I asked if she observed people sabotaging the equipment intentionally; i.e., spilling drinks on keyboards and eating food. Winda said she had a meeting regarding the furniture and equipment as the units all got new furniture. All employees were told there could be no soda and no styrofoam cups. If employees have a drink, it must have a screw on cover and a straw. Also, employees may not sit, stand, or prop their feet on the furniture.

Winda said Judy Jordan did meet with her to inform her that someone had complained about the noise in the unit, and she had a meeting with everyone in the unit on this issue. She said Steve Ivey approached both Judy Jordan and Pam Blackburn about the noise in the unit. Winda said they both informed her, and she explained that she had a unit meeting and told everyone that they needed to "respect one another."

I asked if she had counseled the Complainant on his ratings. She said, yes, and that she had explained to him what he needed to do to improve. Winda said that he sat on the back row where people passing him were talking and walking back and forth coming down the aisle when they went on break, etc. Also, the carts were kept near him and employees had to go behind him to get and sign out their work. She asked the employees to stop taking the aisle next to him and to use the main aisle. Winda said the Complainant never wanted anyone walking behind him and he would bring this up. She said she explained to him that there are so many people in the service center that people did have to walk behind him. She said that because he propped up his feet and leaned back, employees bumped his chair when going behind him to sign out work as there was not a lot of space. She asked him not to prop up his feet. She offered to move him and he did move and sat by himself next to a pole where there were no other terminals around him. However, there were people behind him that would unintentionally hit his chair when getting by.

I asked Winda if she was aware of a complaint about baby showers and parties that were held in the unit that wasted time. Winda said participation in these events was voluntary during employees' own time for breaks and dinner, and that she had explained to Steve Ivey that he did not have to participate. His complaint was also about birthday celebrations and employees asking for money. These activities were also voluntary, and he did not have to participate.

I asked Winda if she knew of an ▓▓▓▓ that burped and passed gas. She said she did and that she verbally addressed the unit as well as ▓▓▓▓ individually. She told them that it was a close area and that they needed to leave and go to the restroom if they felt a problem coming on. She said it was OK to just leave for that purpose.

I asked Winda if she recalls anyone asking for time off for school. She said she did recall the Complainant asking. She said she went to the Section Chief and inquired, but it was a branch decision that no one would be granted time off because it was peak season. Winda said she did explain the exception that if someone was in the Army Reserves, the IRS was required to release them. I asked Winda whom else I should interview, and she recommended Joyce Holmes.

Report Of Inquiry                              10                    ECMS # 0101-4SVJPLCJ

**Interview with Joyce Holmes, 3/19/01 8:40 p.m. (Lead in Winda Daniels' Unit 1/99)**

I provided an overview of the allegations to Joyce. Joyce also acted as Manager during the 1/99 to 7/99 period during the first complaint.

I asked Joyce if she was aware of any problems that were reported regarding employees marking the return box for the Presidential Election. She said she was not and that employees in the unit are required to only "key-in" the data already on the return.

I asked if she was aware of any problems the Complainant had about his seat being bumped. She said he sat on an end seat in the last row. She does not recall him specifically coming to her and complaining about this, but he may have gone to Winda Daniels.

I asked if she recalls a complaint on someone making mimicking noises; i.e., coughing when the Complainant coughed. Joyce did not recall this as a problem or complaint. She said that there is a lady in the unit that has bad allergies and coughs all the time. Even if someone puts hand cream on, she is sensitive to the smell. She is aware that employees have complained about her coughing all of the time and maybe this was who he thought was mimicking him.

Joyce Holmes was not a lead in the Complainant's unit in filing season 2000. I asked if she had any idea who the complainant might be based on the issues. She said it is Steve Ivey as these were the same issues that everyone was interviewed on previously.

I asked if Joyce was aware of anyone complaining about the noise level in the unit. She said the only complaints were about earphones that were turned up high enough to be heard by people sitting next to one another. She recalls that an employee named ███████ sat next to Steve for a while, and that they would both complain about each other's earphones. If ███████ turned hers up high, then Steve would do the same and they would both complain to Winda Daniels. She said that Steve never came to her, personally. He would go to the manager, Winda Daniels, and Winda would counsel them. She said she thinks the Complainant also told Judy Jordan about this issue.

I asked Joyce about the work distribution in the unit as the complainant stated he was given work that was not legible, which affected his performance. Joyce said that the work is brought over in carts from the control unit. Each employee gets their own work off the cart working left to right and then signs the work out on a sheet on top of the cart. The work varies--sometimes they work only 1040EZ's, sometimes 1040A's or 1040's. The Complainant may sometimes get work that is not legible, but so would everyone else.

I asked if Joyce ever received a complaint about employees having baby showers and birthday parties. She said she did not receive any complaints from him, directly.

Report Of Inquiry                    11           ECMS # 0101-4SVJPLCJ

However, Joyce stated that all the employees were told showers and birthday parties were voluntary, and that they had to use their two breaks or lunch period for the party; they were not given additional time.

I asked if she was aware of any employees intentionally spilling drinks on the computers and keyboards, or whether employees had food in the unit. Joyce stated that employees had to follow strict rules concerning liquids in the unit. Drinks could not be in a cafeteria cup or a McDonalds cup, but had to be in spill proof cups only. This was addressed in the Expectation Meetings. The only food that was allowed was hard candy. If the unit had a "goodie day," it had to be held in the cafeteria and not in the unit.

Joyce stated that Steve rarely talked to anyone and was always by himself. I asked if he was offered the opportunity to move his seat. She said that he was moved at the end of the season and sat next to a pole. She said employees had complained that he was leaning back in his chair when they went by him; and they probably were unintentionally bumping his chair because it was a tight area. Joyce said he stayed to himself and never really had conversations with anyone that she is aware of.

I asked if she was aware if ████████ had burping/bodily function problems. Joyce said she recalls that if ████████ burped, then the Complainant would burp, thereby adding to the problem. She said she knows Winda counseled them both.

Joyce stated that she sat a row over from the Complainant, but had little direct contact with him. If Winda was out, Joyce passed out the time sheets, etc., but he was not complaining to her.

**Interview with Lisa Lee, Manager 3/22/01 6:00 p.m.**

I provided an overview of the Complainant's issues.

I asked Lisa what unit she had in Filing Season 2000. She stated that she had Team 3. I asked if she recalls anyone complaining of noise in the unit. Lisa said that several people complained of noise, not in her unit but coming from the unit next to her's belonging to Carlett Reese. I asked her what she did in response to those complaints. She said she spoke with the manager and lead in the unit making the noise. Lisa said there were just a few disruptive employees and their manager spoke to them.

I asked Lisa if she recalls anyone complaining that employees were mimicking him/her. She said she did not. I asked if anyone complained about employees burping and making other bodily noises. She stated, "No."

I asked Lisa if anyone told her that employees were filling in the Presidential Election Box on taxpayer returns. She said, "No." Lisa said she used to work in Code & Edit where this is checked to see if it is coded, and that employees hardly looked at it. I asked how long ago she worked in Code & Edit and she responded that it was 15 years

MAY.-01 01(TUE) 09:59          ATUC .TRUUTUK UFTIUE                    TUI  U TUU ZZUL              T. UTT

Report Of Inquiry                          12                    ECMS # 0101-4SVJPLCJ

ago. I asked Lisa if she heard any discussions on taxpayer returns being given audit codes if they lived on the north side of Atlanta versus the south side of Atlanta. She said she had not and that it is rare that you see audit codes on the returns. If you do see them in Data Conversion, you are required to pick them up and input into the computer.

I asked how the unit's production rates were, overall. Lisa said there was a wide range, some very good and some very bad, as she had a mix of new hires and returnees.

I asked Lisa how she distributed the work as the individual complained that he/she received work that was not legible. Lisa said she doesn't distribute the work and that no work is directly handed out to employees. The carts are pulled into the unit and the employees get and sign out their own work, working left to right off the cart. It is the "luck of the draw" concerning the legibility of the work.

I asked Lisa if anyone ever complained about a coworker's radio headset being too loud. She replied that no one complained.

I asked if she recalls anyone upset that they had received an invitation to a "gay pride party." She said yes, she was off that evening and her lead, Regina Mayfield, called her at home as the person receiving the invitation was very upset. The next day when Lisa returned, she spoke to the manager of ▇▇▇▇▇▇▇▇ the person who gave the invitation. I asked her whom the employee was in her unit who complained about this. She said it was Steve Ivey. She said that when this happened, it was close to furlough time and Steve Ivey and▇▇▇▇▇▇ were both ▇▇▇▇▇▇ ▇▇▇▇▇▇ I asked if she spoke to Steve Ivey about the incident. She said she had and that Steve Ivey told her he did not know why▇▇▇▇ ▇▇▇thought he would be interested in attending a gay cookout and that he was most offended that▇▇▇▇ ▇▇▇▇ thought he was gay. Steve Ivey gave Lisa the invitation to a Gay Pride Pool Party. She recalled that it was near a holiday and that directions were provided. Lisa took the invitation to Pam Blackburn and they made a copy of it. I asked if she knew if ▇▇▇▇▇▇▇▇ was counseled. She replied that she thought the Section Chief and his Manager had done that. I asked Lisa if she was aware if anyone else received an invitation. She was not. I asked if she knew if▇▇▇▇▇▇▇▇▇▇▇ ever apologized to Steve Ivey. She is not sure because they were all▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇

I asked if Lisa recalled anyone complaining about someone bumping his/her chair. She said she recalled that it was Steve Ivey and that it was early in the season. She offered to move him and he agreed and moved to another seat. She said he had complained when he sat in the last row of the unit and the people facing him were from Carlett's Unit. Steve Ivey requested that a partition screen be placed between him and the other unit. She told him she would look into it. Lisa stated that when he was on break, the Complainant would prop his feet up on a footrest and lean back in his chair. She is not sure if he had a physical problem, but he would also stand up to key-in and prop one foot up on a drawer. I asked if he complained about back problems. Lisa said he did not. She said he never left his desk for lunch or breaks and would just sit there and

Report Of Inquiry                    13                    ECMS # 0101-4SVJPLCJ

read a book while leaning back in his chair. She didn't notice whether he ate at his desk, but doesn't recall seeing him eating.   Lisa stated that he sat on the end away from her desk.  Lisa also added she kept the carts of work near her desk and the employees had to come up to get it.

I asked Lisa why she thought Steve Ivey was placed in her unit.  She stated that Pam Blackburn, the Section Chief, felt the move would be good after the first letter complaining about Winda Daniels and the problems he had with her.  She also felt it was because she was a "white manager."  She said that her unit is not into having parties and that, as she recalls, they had one baby shower that year and attendance was voluntary.  Also, she said that she and the lead, Regina, are not loud and boisterous like Winda Daniels and Joyce Holmes, who are loud and outgoing.

Lisa stated that she would look into any complaint issues he mentioned, i.e.; noise, and then have a unit meeting and reiterate that employees had all signed the Expectations Package and needed to keep the noise down.

I asked Lisa if her unit worked a part-time or a full-time shift.  She answered that it was full-time from 6:00 p.m. to 2:30 a.m., and that she did not have any part-time employees.

I asked if she had observed if Steve Ivey had contact with the Code & Edit Unit as the Complainant mentioned Code & Edit regarding the Presidential Election Box and also audit codes for the north side of Atlanta. Lisa stated that there is a wall between Data Conversion Branch and the Error Correction Unit, which is before the Code & Edit Unit. She said she never observed Steve talking with anyone as he kept to himself.

I asked why Steve Ivey was recently terminated during his probationary period.  Lisa stated that his quantity was OK, but he was not meeting Quality standards and was insubordinate.  I asked if she participated in his termination and whether she was in the room when he was told.  She said she had not participated, and that Robert Hall, Section Chief, handled it with a Union Steward, Doug VanBuren.  She is not sure if Labor Relations was in the room.  They did give Mr. Ivey the option of resigning.  She said he didn't resign and, per Doug Van Buren, showed no emotion.

I asked Lisa if the Complainant talked to many people.  She said no, last year there was an empty seat beside him so he was away from people.  She said he did speak with another employee ████████████ that she thinks came through training with him.

Lisa offered the following:  Last year he made a drastic change in his appearance.  He shaved his head and would wear a baseball hat.  This year, he grew a long pointed goatee, and still wore the baseball hat with the shaved head.

I asked how he was when he returned this filing season 2001?  Lisa said that Steve Ivey looked at management as beneath him.  He was very condescending and would question her answers.  She didn't think he liked a woman for a boss.  He took

MAY.-01 01(TUE) 09:40    KIUE IKUJTUR UIIIUE    ...    ...

instructions or directions only as a "suggestion," i.e.; she would explain the errors he made in Quality and he would shrug it off.

I asked if she was aware he was a math major. Lisa was not aware of this.

I asked if he complained about baby showers in the unit. She said he had never complained, but she only recalls having one shower last year and she didn't organize it.

I asked Lisa if she knew if drinks were intentionally spilled to damage the key boards, or if she observed or received any complaints about eating food in the work area. She said that it was not a problem last year. She said a few employees would eat potato chips and, if they were caught, she would counsel them and reiterate the Expectation Package policy on no food in the Unit.

I asked if there was a problem this year with a refresher class the Complainant attended when he returned. She said yes, Robert Hall was looking for him. Steve Ivey showed up at Lisa Lee's desk asking what he could do. Lisa told him to see Kelly Mancel because she is supposed to tell him what to do as she was teaching refresher training to all the new returnees. She said Steve ignored her and left early, stating he had surgery and was on medication and that he was going home and would try again tomorrow. I asked if he complained about the Refresher Class. Lisa said yes, he thought it was disorganized and he didn't need to attend as he knew it all. The students were supposed to get their passwords that evening, but he didn't get his. Lisa recalls that when his first samples were pulled for Quality, he had 6 out of 10 errors and she thought, "and you didn't need to attend refresher?"

Lisa said that last year the Complainant made comments to her that when he was in Winda Daniels' Unit in 1999, his mail from his Post Office Box was being opened. Also, after he started working for the IRS, he thought someone was following him, he was "tailed," and people were opening his mail. Lisa told him she would relay it to her Section Chief.

I asked if Lisa if she knew someone named ███████ She replied that yes, she knew ███████████ who is a very loud lady who still works in Carlett's Unit.

I asked if Lisa knew if overtime was abused. The Complainant stated that people worked overtime, but didn't put in all the hours reported, or else they disrupted the work area when they were supposedly working, and yet their managers recorded their overtime. Lisa stated that seasonal part-time employees do work overtime, but they must be fully successful. Steve was not fully successful and did not work overtime. Overtime is worked from 2:30 a.m. to 4:30 a.m., and no baby showers or parties are ever held during overtime. The Complainant stated that managers are allowing employees to fool around and have parties during overtime. Lisa said she works overtime and when she does, she is sitting in the Unit with the employees working. When a manager is with them, they are all quiet and working. She also said the Sections and Branches are always looking for good production numbers during

Report Of Inquiry                    15              ECMS # 0101-4SVJPLCJ

overtime; and if they aren't meeting them, they are informed. Lisa did state that
sometimes employees are waiting for rides or making up time and are still around when
others are working overtime in the unit late at night. It is possible these are the
employees the Complainant saw and he assumed they were supposed to be working
when the reality was they were probably waiting for a ride from someone.

As we were finishing, Lisa stated that Steve Ivey brought in an article about
Commissioner Rossotti and wanted her to hang it up. She said that it was a good
article that she thought was from New Yorker magazine. She said that Steve liked
business things.

## Conclusions/Recommendations:

Employee incidents as stated above are normally handled by discussing them in an all
employee unit meeting; and if problems continue regarding noise, distractions, bodily
functions, they are addressed individually. After interviewing managers, leads and
Section Chiefs, everyone said the same thing. All unit meetings were held and
employees were counseled, individually, when needed. As in the example of the
invitation for the "gay pride party," the responsible individual was counseled. The noise
and bodily function problems were addressed in unit meetings, as well by counseling
▓▓▓▓▓▓ individually. The individual, whether it was this anonymous Complainant or
Steve Ivey, was told not to prop up their feet and lean back in their chair. The employee
that was complaining was offered the opportunity to move. The employees in the Data
Conversion Branch do not make pen and ink changes to returns and are required to key
in the data exactly as it appears. I have confirmed with the Branch Chief there is no
Code and Edit Unit in the Data Conversion Branch. I did not interview employees in
Document Perfection Branch as the Complainant is discussing issues he saw or heard
while in Data Conversion Branch. Employees are not assigned work directly. The
managers who were interviewed all stated that employees get their own work off the
carts, left to right, and sign their names for the batch they are taking on the sign out
sheet. The Complainant stated that he was given work that was not legible on purpose.
The managers interviewed on the work distribution indicate that this is not true as
employees take their own work. Work is not batched by geographic location with audit
codes higher for the north or south side of the city of Atlanta. Based on the example of
work that the Branch Chief provided to me, the work was from all over the Southeast in
Georgia and Florida. The employees do not even know what the audit criteria codes
that Document Perfection employees place on the returns mean. They are only
required to input the data if there is a code in the bottom right hand corner. I don't
believe that this anonymous Complainant has provided any conclusive evidence on this
issue.

The allegations of harassment and manipulation of tax return information has not been
substantiated in my investigation.

Everyone I interviewed immediately identified the Complainant as Steve Ivey even
though he requested to remain anonymous because he was the only one who raised

these issues to management and then stated the same in a written complaint. Also, everyone I interviewed was aware that the first letter of complaint was from Steve Ivey because they all had to provide affidavits in response to the allegations. Therefore, they know that he is the Complainant who wrote the letter that is the subject of this investigation since it contains additional information about the same allegations.

**Recommendations:** This employee no longer works for the IRS. He was terminated during his probationary period two weeks ago. I was told by Robert Hall, Section Chief, that he tried to bring up the same issues in the complaint, i.e., someone was bumping his chair, etc., when he was terminated. I don't feel it is necessary to spend additional time on these allegations as they are unsubstantiated and interviews with his managers indicate that he caused a lot of these problems himself. For example, the managers all said he leaned back in his chair and propped his feet up, causing employees trying to get by him to accidentally bump his seat. Why the Complainant thought the IRS hired postal employees who wore their postal uniforms to work is inconclusive. The Post Office maintains postal employees on site for deliveries of mail to the IRS, and the employees are seen around the building. The employees in Data Conversion do not mark the returns for the Presidential Election Box; they are only required to key in the data if the boxes are checked. This is also true for any audit codes on the return. Management did address the noise, food, and drink issues through group meetings or individual counseling sessions. My recommendation is that we close the case as the issues are de minimus. Management did respond to his complaints by discussing them at unit meetings, moving him to another seat, and counseling individuals such as the employee responsible for the gay pride party invitation.

## 4. Disposition

I have concluded my investigation and find that management did take appropriate action. I recommend that no further action be taken. The employee is no longer employed at the IRS as of mid March 2001.

## 5. Location of the Case File:

All materials related to this matter will be maintained in the Labor Relations Office at the Atlanta Submission Processing Center, 4800 Buford Highway, Chamblee, GA, 30341.

## 6. Cross reference numbers

Alerts #2001-6611

## INTERROGATORIES OF STEVEN IVEY FOR THE TIGTA FILE

I, Steven Ivey, the plaintiff, pro se, pursuant to the provisions of **28 U.S.C. § 1746**, declare as follows:

*(For the following questions it is suggested to read the passages referenced by the question then to review the answers as based on the numbered lines.)*

**1. Are there any discrepancies with the TIGTA file under Scope and Findings, pp. 1-2 ? Explain.**

**Page 1:**

      Yes, it is not very accurate in that it does not cover all issues as reported in the two letters that I wrote, nor have they been in proper perspective. Lines 4-7; the second letter did cover similar complaints to the initial letter but this TIGTA file trivializes the issues. Therefore, the fact is that the compounding effects of the repetitive actions of the issues were overlooked, especially, considering that the same types of harassment continued in a different unit by the same type of individuals the next tax season. One other significant issue is that there are more listed prohibited practices under MSPB regulations reported in the second letter.

      From lines 7-16, there is a sketchy listing of the issues in the complaint. Copies of these two letters, written in November 1999 and November 2000, are in the Treasury EOP file 02-1135, and it would be better to review them from there than for the issues to re-list here. However, to clarify inaccuracies in these , (1) there was no significant differentiation as to which employees were changing what and how as was listed in the two letters, some were from employees handling the returns before a data transcriber received them in batch work; (2) the excessive audit codes were on more returns in north than south Atlanta, but this practice existed for others areas of the states that the IRS center processed, which were FL, GA, and SC; in knowing the difference for the Atlanta area and other Atlantic shoreline communities I saw a pattern; (3) Line 12-13, states that I was given most of the illegible documents, I think they were routed to the newbies, so they would have been others, otherwise it would be more of a discrimination issues, either way it does affect a data transcribers rating/rank; and (4) the issue of the "gay" invitation concerns sexual harassment and needs more detail of the incident, but it does demonstrate the repetitive pattern of after having been warn not to solicit for anything, but then to go to such extremes to violate those warnings and rule.

      Beginning under "Findings", Lines 17-18, the initials "DD" & "SW" were identifiers I used for the part time data transcribers causing harassment and disturbances during the 2000 tax season, as explained in the second letter. This points to a problem with the EOP file, as well, in which interviewing employees was restricted to managers

*Attachment #3*

and supervisors, not the people causing the harm; it is further limited from the blacken areas of the file. Lines 21-23, list the checking of the presidential donation box, PDB, as being done by data transcribers in my letter, this is inaccurate. They may have been for some, but the prior branch of Code & Edit, or whoever, were more likely where this occurred. The particular area that drew my attention to this problem as the targeting of two CPA firms in Hialeah, FL, which appears to mainly have Hispanic clients. However, wherever it did occur it does not resolve why a data transcriber was charged an error if they did not enter the illegal checking of the PDB in the program even though a violation to taxpayers.

**Page 2**:

P. 2, lines 1-9; this is not an accurate assessment of how the audit codes were applied and enter into the program. Some of the audit codes could or would be know to data transcriber from trouble-shooting mistakes or because of work experience. It is not their required job specifics to know, but, for example, if a certain audit code is always near a specific deduction then it is that deductions "red flag." These codes are not "top secret." Lines 9-11, it is inaccurate because SC was left off as the service area for the center, just GA & FL listed.

P. 2, lines 11-14, the batches of work are on carts according to which type of returns they are 1040, 1040A, & 1040EZ. Different data transcribers are assigned to work on the different types, *(types are referred to as programs for the computer input)*. Newbies worked on 1040EZ mainly. During the first tax season at the center I worked on 1040EZs, then later some 1040As. This meant that, specifically, 1040EZs were routed to in Winda Daniel's unit, to me, Dina Mingo, and one other, unknown black male; in which we three went through the two week training sessions. This meant that the cart with the 1040EZs were earmarked for us. Winda Daniels was particular in keeping these batches of work for us three. Later the unknown black male would miss nights at work leading into periods of time off. Dina later worked on other programs so that left me to these questionable 1040EZs. Normally, the day shift would work on the cart as well, but at times this did not happen. This is why I stated that specific types of batch work was routed to me. The Receipt & Control Branch is where the sorting of the returns occurred which would then be were some of the problems with putting serial numbers on the returns occurred, therefore, meaning batches of work containing more or less than 100 returns per batch. This meant the problem was passed to data transcribers in the Conversion Branch and correcting them meant a resulting reduction rate scale. This is because it took more time to correct these in the program which had to be done while logged into the program with the time meter running. So instead of what might be 100/hour for a rating it could be reduced to 50/hour or less. Because of the time associated here Winda Daniel and other unit managers printed up "time off vouchers" that a transcriber would get depending on how many mistakes they encountered in a batch of work. These vouchers would range from 15 minutes to 1 hour off. In saving up these

2

vouchers for a week I could end up getting almost one night off from work with pay. However, this practice is improper, this is a governmental agency, it is almost like printing money. These vouchers were to essentially to protest in particular a unknown black female doing these errors in Receipt & Control Branch. This black female sat just to my right during initial training. Denise and I noticed that she was working in this area because she did not pass the qualifier to work as a data transcriber. When I was hired at the center they stated that if you did not pass to work as a data transcriber then you could work as a clerk. However, the position this black female was working was not the clerk position referenced. This position was one you had to work up to and then after the probation period. So this black female was preferentially treated then protected improperly with vouchers when she made mistakes, frequently. If the agencies states they were proper with the placement of this black female it shows discrimination for what happened to me in termination, I was not given the opportunity to become a clerk. Additionally, the IRS was being restructured during this time, which meant that certain position would not be needed, even transcribers, but they were going to retrain them for other jobs.

This is also how the grouping of "Jennifers" from SC, GA, & FL were grouped in the respective batches. This grouping meant that there would be 15 or more Jennifers in a batch of 100 which is statistically improbable in repeated batches without some manipulation. Why would this be done? I have no idea why this was done or if it was being routed to me for some reason. It is just weird, but point to the fact that excessive waste of time would occur in order to arrange them in groups. This is like the pattern of Angela-s. From Winda Daniel's unit to Lisa Lee's unit there was always some black female named Angela causing problems and disturbances. One Angela sitting beside me was telling me that her mother worked for the FL state government and that she regularly took time from work improperly but was paid for it. Then there was the Angela that followed me off the IRS property and drove aggressively so that I could not pass her; Julie was a witness. This particular Angela was part of harassment while at work in Winda Daniel's unit. Then there is the Angela Strong of the NTEU that states I made some racial call, after I was home in NC. These are like stalking effects.

Lines 14-17, Linda Ferguson had to know about complaints of noise not only from my initial letter in November 1999 but from other employees. The issues of radios and CD players being too loud or the accompanying of singing with the music disturbed more than the area close the noise. When you consider employees trying to talk over this, then the level of noise rises considerably. Linda Ferguson would have been part of the managers meeting to review such noise, because of complaints such as my letters. I was not the only person to complain about the noise. Like with many of the issues, they evolved into more of a problem for the failure to recognize their effects to the work environment. Different managers rationalized the noise but overlooked the fact that there was a mirror side to the data conversion branch in the building; I believe it is the Corrections Branch. Each of the sides had approximately the same number of employees,

3

250 +, but the opposite side never had the noise levels even remotely close to that of Conversion branch; it was even what I would consider quiet for that many workers. So for any complaints of noise was not unreasonable.

Lines 18-23, Linda Ferguson's assessment of the work expectations is not accurate. This explanation is a general statement. Later, after I was terminated it was revealed that these Expectation Meetings/Packages were to have been done prior to starting work initially and, if done each year, would then be done on the first day a data transcriber returned. However, in the EOP file containing the signed verification sheets for the expectations the dates are for the end of March each year, not at the beginning in January. The first one of these for myself in 1999 contained a forged signature for of mine. I believe this is because, as I stated during prior processing of claims against the agency, I did not receive any notice that a data transcriber would be terminated for "poor" rating. This failure to provide such work requirements would have fallen to Kelly Mancle, because I was initially in her unit first after training. I think because of the later EOP file, perhaps even the TIGTA file, the agency had to show that my personnel file was up to requirements of the OPM which with the forged signature and wrong time period shows that it was not.

Lines 22-23, the more specific comments of Linda Ferguson are very limiting concerning drinks and food in and around the computer equipment. Because of the repeated pattern to solicit for parties and have them on the property, there was food and drink, carried and passed around. Many of the managers have claimed that these solicitations and parties were done during the breaks, two 15 minutes breaks & one 30 minute dinner. All the solicitations that I received were done during work in progress times; no one followed me to the bathroom on a break or were in there to solicit for such parties as baby showers; pot luck dinners; or family emergencies. They had these parties set up in the cafeteria, but these spilled over into the work area; given the numbers of people involved and if it were something such as a birthday party or baby shower, 30 minutes was not even close to being able to start and finish. It is reasonable to conclude that is would need set up time and breakdown time; much more than a 30 minute period or even an hour if you added all the breaks. On the surface it can be easily understood why the managers would not say these parties were inappropriate because they benefited from the parties by receiving food from each party. Given the number of such events this was/is a considerable beneficial. The remark about the colored pens/pencils might well be the rule where data transcribers do not mark on returns; but I was told of the practice by Angela, Dina Mingo, Charles, Nicole, and other unknown employees that you can change the tax return to match a mistake you make in the program. The difference here is that if you made a mistake in the program you would have to go back to correct it, thus taking more time and reducing rating, verses simply changing the tax return.

Lines 25-26, here is a statement that shows the contradiction in rating for evaluation in work performance and the resulting rank. As I have said rating is time

4

relative so any interruptions affect rating. This is where Linda Ferguson points to this fact herself. So why not corrections to troublesome employees ? Why the failure to correct properly any behavior effecting a transcribers rating? Why no attention of this issue when I was terminated for what was considered the supposed results of "poor" rating ? Any of the rating system problems would affect most any data transcriber to a degree in ratio to the issues encountered. Some more, some less, and with some issues for all, even if they are not aware of the problems.

Lines 26-33, this explanation from Terri Hales, a day time unit manager, is very general for resolve of the PDB violation. Once again, it is a narrow review in order to restrict the audit code issue to just the Atlanta area. As far as how tax prepares sends in the tax returns I would not know; but ever how sent in, they would be routed according to type of return, and is seems reasonable that HR Block would send in all three types of forms were a specialized CPA firm would send in only business returns.

## 2. What are the discrepancies with Pam Blackburn's testimony on pages 3-4 ? Explain.

### Page 3:

At line 1 it can be seen that Pam Blackburn was familiar with the claims that were in the first letter, November 1999, but if Pam Blackburn contends that the second letter is more of the same the very least is that the there would be a compounding effect to myself. Why would Pam Blackburn overlook this fact? Why did Kathleen Bushnell fail to explore that fact ? It is as if it is ok to repeatedly abuse something.

Lines 3-4, I work over almost 11 months over a 3 year period, not 9 ½ as Pam contends. Other, than the problems surrounding rating I am not sure what other "performance issues" Pam means.

Lines 4-7, these statements of Pam are false. I never said any of those things especially. I never talked to Pam and could not point her out of a crowd of three. She is either making these up or needs to name who said them to her. I did , as with EEOC, file discrimination claims. There may be a conspiratory effort behind any allegations reported but I never said such in this way. For the racial call between the agency and the union there would obviously be some conspiracy efforts. As far as the references to me being a math major, that was remarked by Robert Hall. Robert Hall as reported in the second complaint letter insinuated  to other managers that "my taxes only looked mathematically correct." This I understood to be a reference to me cheating on my taxes and that I use math skills to do so. This remark is a prohibited practice and one of intimidation under Title VII code of Civil Rights. Questioning whether managers and/or leads were giving proper scores was a suspicion among the data transcribers, because they are not present when the changing of the returns are done.  It is unfair to singularly pin that solely on one

5

data transcriber. One of the mathematical manipulations that did occur was to my last paycheck as explained in exhibit X, question #2, (attached), in which the IRS made the amount to be 666.16. The 666 should be understood, then consideration to the fact that 16 was my employee number to send a message.

Lines 7-14, concerns the issue of sexual harassment. Before working at the IRS Center I did not know of anyone that worked at the center. During employment, I only knew of a few people mostly because we went through training together. These were Julie, Donna, and Denise. Susan Karimi I met while in Winda Daniels unit later and because of my textbooks she asked about school then told me her daughter was having trouble with calculus. Susan had started at the center the prior year. I did not know this "gay guy"; he was from Kelly Mancle's unit, the agency has refused to supply me with his identity even in other proceeding so that I can take a deposition from him. Initially I thought his envelope/card was some of the typical solicitations. Regina Mayfield, the lead, allowed him to give the invitation to me which was against the rules; other data transcribers are only allowed in their units. Regina and the part time unit manager, who's name I do not know, knew what was going on they had a some foreknowledge of what was happening. They treated it as a means to ridicule. The "gay guy" even called the part time unit manager to tell her to given me more information on this party. During my employment at the center in the evenings there were only about 10 other white males in the conversion branch and at some point and time they were all labeled and ridiculed as "gay." The NTEU/Treasury "racial call" as reported used the term "faggot" in referencing a manager or supervisor. The only one this could have applied to was Robert Hall, because he was the only male during this period who had any such position. This, also, question why Robert Hall would be lying in that "racial call." It, further, begs the question as to why if Robert Hall made up the "racial call" story that he would have used Lisa Porter directly, but Angela Strong indirectly. This is because why, if someone were to lie they would use two people knowing that both could call him the liar. Therefore, if Robert Hall were the one guilty of perjury and falsifying evidence with this "racial call" he would be calling himself a "faggot." Consequently, this points more to Lisa Porter possibly indirectly calling him a "faggot" and using me to complete the manipulation; maybe trying to kill two birds with one stone., labeling Robert Hall as "faggot" and me as a racist.

Lines 14-23; this is more discussion of the noise levels, but, significant to these lines is the fact that Pam Blackburn, at lines 18-19, stated that there were affidavits made. Meaning some investigation prior to March 2001, when I was terminated. The referenced affidavits were cited as being from Kelly Mancle, Winda Daniel, and Judy Jordan. I questioned the agency as to what affidavits these are. I was informed by the agency that they are the ones from the Treasury EOP file, 02-1135. However, these were done in July-August 2002. The TIGTA file, here, was done in March 2001, with the latest filing date by Kathleen Bushnell on May 1, 2001, as seen on the Memorandum page. How can the agency have made affidavits or knowledge of them if they never occurred until 1 ½

6

years later? This questions when the TIGTA file was actually completed. Otherwise, the TIGTA file is backdated so that the agency had the appearance of making the required Privacy Act files properly and investigation files, when I requested them in a FOIA/PA request in DC District. I never received the TIGTA file until December 2005.

Lines 24-28; since Pam Blackburn was not my unit manager she would not be where I saw the red markings or those transcribers who told me it was ok to do so. Pam Blackburn to my knowledge had in her unit the faster typist. Denise and Julie were in her unit, and when we talked about the differences in return we processed they had the more legible return particularly with the IRS printed labels.

Lines 29-34; once again Pam was not with the units I worked. As previously, explained I did received segregated work , as did others. With this there was a resulting effects to rating; Pam shows that there was different degrees to which the rating problems affected different transcribers.

Lines 35-38; the incident in reference here is that of February 20, 2001 when I returned after furlough and went to an update meeting. It is suspicious within this TIGTA file that there are such details missing from the questions and answers. Mostly here with Pam's testimony, it is just lose remarks thrown together. It was a normal option for employees to read, it was done from the start in training, and continued. Pam was not involved with the incident between Kelly Mancle and myself at this update meeting. The last sentence is very telling, because it begs the question of the previously mention forged signature of a work expectations form which Kelly Mancle did not do properly for entry into personnel files. This is a means of covering the tracks that created the forgery, because I never refused to sign anything until the March 5, 2001 meeting with Robert Hall, and with the improper presence of the NTEU, coercing me to sign away my Rights, and to void reported violations to taxpayers documents. Therefore, Pam Blackburn's embellishing here in that I always refused to sign forms is substantially misleading.

Lines 39-41; this is more of a rehash of Pam's testimony.

**Page 4:**

Line 1-2; why would I resign ? The agency was doing wrong not me, they wanted to discredit me. The fact that Pam stated my age questions how she would have known such information that was restricted to Human Resources. I never at any time told anyone at the center my age, birth date, or social security number, no vital statistics I never do on a job-period. I never talked to Pam, so how and why did she make such a reference as if she had instant recall of one transcriber from approximately 500 data transcribers for a vital statistics ?

7

**3. What are the discrepancies with Robert Hall's testimony on page 4 ? Explain**.

Lines 4- 7; in regards to the Robert Hall not knowing the remarks of a return only looking mathematically correct as explained above, it would be understandable that he would not admit it was him.

Lines 8-10; the hitting of the back of my chair by employees was done in both Winda Daniel's and Lisa Lee's units. I did report such to these unit managers as it occurred but they did little to stop or take any corrective action. Winda Daniel actually said to me that, "what did [I] want her to do about it because those people were grown, she could not do anything about it." The hitting of the back of my chair was so bad one night that two security guards had to stand behind the row of workstations to monitor these people. This points to one reason for going off the property for corrective action. In Lisa Lee's unit one unknown black female had to go out of her way to hit my chair and Lisa Lee just said that when she talked with this person she said they were accidents. It is as if these people were going to do things repeatedly till they caused damage and harm.

Lines 11-14; this is just more comments on the noise levels.

Lines 14-19; Robert Hall is not accurate about his details of the "gay" guy and the invitation. For one thing, it was not given to straight and "gay" as I knew it. This "gay" guy gave it to guys he stated "thought" were "gay." In the inclusion of evidence there is the copy of Cindy Crawford's picture I carried on my school binder I did not know this person, he does not know me. It was not a straight/gay tolerance meeting. It was more sexual oriented. What is missed here in the handling of the incident is the difference in straight versus "gay" sexual harassment. With solicitation of "gay" oriented sexual harassment there is the solicitation of immoral and illegal activities. "Gay" by definition only involves such activities, whereas, straight may involve such activities depending on the nature of the harassment but not as a rule. Look at adultery that my be insinuated, it does not have the same stigma. The agency, here specifically, Robert Hall is glossing over this fact. This trivializes this "gay" guy's behavior. This solicitation did interrupt work in progress, as approved by Regina Mayfield, the lead.

Lines 20-26; in these lines it can be seen that Robert Hall states that during the March 5, 2001 meeting, with Doug Van Buren, NTEU, present, I did explained the EEOC violations and prohibited practices that are in the letters. This was prior to being terminated on March 7, 2001. Robert Hall stated in the MSPB December 15, 2003, hearing that he had no knowledge of any reported violations whether from me or from the letters. This TIGTA file was not available to me until December 2005 but now makes a difference in the decision of MSPB in showing that all evidence was not submitted by the agency at the time or that it may not have been formulated until need for FOIA/PA requirements.

8

**4. What are the discrepancies with Judy Jordan's testimony on pages 5-6 ? Explain**.

**Page 5:**

Lines 1-3; Judy Jordan makes reference here to having written affidavits before March 2001, but these have not been produced when I requested them, but was told they are from the EOP file 1 1.2 years later.

Lines 4- 11: I did speak with Judy Jordan about the noise but her basic view was that it was like that when she was a data transcriber and that nobody wanted to be the bad guy in stopping the noise. I would describe her behavior towards the noise problem as complacint. I as said previously, the other side, Corrections, did not have such levels of noise, so to curb the noise is not an impossible task.

Lines 12- 14; this statement is contradictory to me having a "poor" rating because I was in this unit, unless I was bringing down the curve. But it does point to another issue about rating/rank scoring that is not clarified. This issues is that there is a difference between a transcriber that continuously works during their shift and one that stops frequently in order to commit disturbing behavior. For the first transcriber, he would be logged into the system nearly all the required shift. The second one would log out of the system when they took longer breaks; planned for parties; harassed someone; or other improper work practices. This means that, though the second may have a "good" rating, they would enter into the computer system less returns than one who continuously work but would have a decent rating. This is like the race of toutise and hare, except instead of slow v. fast, it is 800 returns a night v. 500. The rating scale determination do not calculate this difference. This is another reason why I would never have thought of the rating as an issue to terminate a transcriber.

Lines 19-21; this referenced problem of mimicking was disturbing and it was more specifically from the Angela in Winda Daniel's unit. Her behavior was like a little child when they mock or mimic an adult. Even after I moved away from her she somehow would come near me a mimic what I had done during the work sessions. How she did this even though she could not see me during the work session I do not know without some help. This Angela, as others stated, had some mental problems. This was the Angela who followed me off the parking lot to do aggressive driving towards me on Buford Hwy.

Lines 29-31; Judy Jordan would not have seen the changing of the documents on the many documents that is was done to randomly. It is still not clear where it was being done.

9

**Page 6**:

Lines 9-14; Judy Jordan was not always around to monitor all activities that were intrusive to the scoring process. All solicitations that I experienced were done during work in progress times. As previously explained, even the time frame for the parties would overflow into work sessions. For Judy Jordan to testify as to how I would feel about the "Kick Off" meetings when she describer herself as limited to me is inaccurate. I never knew these meetings were voluntary, others, questioned whether they had to go to these meetings as I did. Given the explanation of the tourtise v. hare, above, it would mean that I could enter in more returns, but I was told I had to go to the meetings instead.

Line 19-20; this is a good point here because I did receive an incentice check after the 2000 tax season which meant that I had made rating above the require standard. This is contradictory to evaluation of me having a "poor" rating.

**5. What are the discrepancies with Kelly Mancle's testimony on pages 6-7 ? Explain.**

Kathleen Bushnell and Kelly Mancle made no reference to the missing affidavit for Kelly Mancle. Many people had complained about Kelly Mancle. I initially complained that she had behavior that was discriminatory towards me and suggested, then, later requested that I be moved to another unit. During a dinner break one evening, I was talking with Julie and Donna in the cafeteria about the problems with Kelly Mancle. Julie and Donna said that Pam Blackburn had told them that Kelly Mancle was a lesbian. This was why she had problems in her unit. Thinking this just gossip, I made a remark to the negative as it a being legitimate reason. They said yes. Then two black females came to the table and Julie and Donna ask them to tell me if it was how they had said; these two females said yes, it was. During one unit meeting Kelly Mancle said to the transcribers that, " she did not care how many people complained about her, because they would just move her to the other side, where she wanted to be anyway, because she did not want to be a unit manager." This shows that she had this idea that she could get away with doing any thing wrong. In past work environments, people would refer to someone like Kelly as an instigator, because of more clinical definitions these days, she would be referred to as a sociopath. She made comments during MSPB proceedings that she did not know why I would include her in many of the claims I have reported when she was only my manager for about one month. She, (1) initially generated discriminated against me; (2) she would come into Winda Daniel and Lisa Lee's units and be intimidating and menacing towards me; (3) she is relative to the sexual harassment; (4) she was involved in my termination; and (5) she has committed perjury towards me. This is what sociopath do, they violate then deny, with no conscious effects. A resulting impression I have of her is that she was a manager because other black females wanted her in the job even though she did not seem qualified. This is another aspect of a sociopath in that others fail to see their harm from the problems they cause and /or that they cause problems. Another clue

10

to this is that a sociopath often disguises their actions by having people believe they are virtuous, beyond fault. Kelly Mancle in her EOP file makes unsolicited comments about being a single mother. With this comment she wants to gain empathy, therefore, making people conclude that how could an single mother commit such bad acts ?  On February 20, 2001, when I went to Robert Hall, after Kelly Mancle had complain about me and abused me in the update meeting, I told him about Kelly Mancle's intimidation behavior in the class and that I had contacted the OSC, TIGTA, etc. about such actions at the center. In reply, Robert Hall told me that, "he knew Kelly Mancle for a long time, and was a friend of his, and that she could not have done all the things [I ]said she did." He also said that. " I had no right to go off the center to anywhere to complain."  But, these comments show that Robert Hall had the impression that Kelly Mancle could do no wrong, which is a sign in others of an effect of a sociopath. This also gives credence to Kelly wanting validation for her actions, as a sociopath wants, by having me complain to the IRS, EEOC and MSPB but be removed from fault. This is just like an instigator who causes trouble, then denies involvement through an innocent act, but watches the resulting trouble between others, without regret.

From this was created a sociopathic behavior that is a trait of the work environment at the IRS center which can be seen in the fact pattern that they altered taxpayers documents; the rating system; and supporting documentation, then denied such. There has been no regrets or attempts to resolve or correct any of these actions.

Lines 21-26;  Kelly Mancle contradicts other comments from managers about the noise level because she said many transcribers complained about the noise, though others said there hardly, if, any complaints. At line 25, the comment that Kelly, "covered her ears" meaning "keep the noise down," demonstrates the way she felt employees should perceive her. When you are working on a batch of work you have to focus on the tax return then to the PC screen, repeatedly;  you have to keep in mind that you are working to avoid errors. So Kelly Mancle has this attitude that when she was around all other thing stop and focus on her. In the February 20th update meeting she attributed the effects of appendectomy surgery I had to insubordination, for ignoring her. In addition, I guess she expected for people to she her walking around and know what she meant in gestures. Most people would just ssshhh people, at least it is saying something. Why didn't she just go to the people making the noise and have them tone it down or stop. Her view is that if she stands with her hands over her ears, her job is done. There was never a fear of telling me not to do something so I can not figure this behavior.

Lines 27-28, & P. 7, lines 1-2;  Kelly Mancle's remarks about the "gay" guy giving the invitation is strange because this person was in her unit. She was even reported as talking to him about the invitation. Robert Hall said Kelly Mancle had questioned him, but she is not definitive about her role with the incident. Who are these other people who received the invitation ?  No names have ever been given.

11

**Page 7:**

Because lines 3- 31 discusses Kelly Mancle's version of what happened when I returned to work February 20, 2001, it would be better for my explanation of these lines if I first describe what <u>actually</u> happened. I started back to work on the 20th even though I was originally suppose to be there for the first week of February. The reason for the delay was that the night before I was going to leave for Atlanta I had to have emergency appendectomy surgery. When I did arrived the evening of the 20th I had to go to security for my badge, then all returning transcribers had to wait to be escorted to their units. I was lead to Lisa Lee's unit. She told me that I had to go to a "meeting." I asked what meeting it was; she said," it was about the EEOC." I asked," is it a yearly EEOC meeting," she said "yes." I said "you mean they do that every year," she said, "yes." Because of the complaint letters and the fact that we did not have yearly EEOC meetings, I was suspicious about this "EEOC" meeting, so I asked her, "why would there be EEOC meetings every year for people who should know about EEO regulations." She did not reply. She pointed me to a conference room facing the Conversion Branch area, so I went to the room.

The room had two tables positioned to form a "T." Because of the residual effects of the surgery and with the associated smell, I tried to sit away from anyone. I also had to have a regular size towel under my t-shirt and pants to collect the drainage, I could not fasten my jean my abdomen was swollen. This towel had to be rotated and changed periodically. People trickled in, which totaled about ten, the room was not very large. When Kelly Mancle came into the room to say that it was an update meeting, I knew something was up, because Lisa Lee said it was EEOC meeting, and with Kelly Mancle, to whom I had previously complained about, meant trouble. And it was. Kelly Mancle started to brow beat me in generating intimidation.

Kelly Mancle placed a stack of manual on the table an said to pass them back. There were not enough of them so some people had to share. This was significant to me because of the drainage smell from the surgery no one would want to share with me, so I wanted to have one to myself. I did sit to one end of this "T" shape with a black male and female sharing a manual to my left on the other side of the "T" shape. Then Kelly Mancle walked in and out of the room repeatedly. Staying gone for various length of times. I just read while I we waited. Reading was a normal practice for such periods of time. When Kelly Mancle started the class she said it was a review of how tax returns are entered into the programs and making manual, IRM, corrections. At different times I had to leave the room to change the towel and dressings from the surgery, and one time for medicine, which was in my car, along with another dry towel. Not sure how long each time it was but it varied.

Kelly took offense to me leaving the room but never asked why, or said anything until afterwards when she said it was insubordination along with reading. It was not

12

anything out of the ordinary as people could generally leave to go to the bathroom or whatever. One of the times when I sat back down, Kelly Mancle came over to me and said that I needed to put my book away and make the corrections in the manual. The book I was reading was not in front of me but over to the side, she just made an assumption that I was reading instead of making corrections to make me look bad, or accuse me of insubordination. The corrections in the manual have a ripple effect in that if you change one line then it is transferred down so many other lines. I would make all the changes at one time, where as Kelly went down line by line. This gave me chance to change the towel. After Kelly told me to put my book away, I did not say anything to her. She walked back to the front of the class, seemed mad, then stormed out of the room. At this point I had enough of this behavior, and did not want anymore abuse from her, so I gathered my stuff and went to Lisa Lee's unit.

When in Lisa Lee's unit, I asked her where I was to sit? She left and when she came back she said Robert Hall wanted to see me, then she pointed to where his office was.

Robert Hall asked me what happened with Kelly Mancle. I explained just as is written above. He explained that the update meeting was to make transcribers aware of changes from one year to the next and to correct the manuals. I said that was understandable but did he think it was ok for me to continue being abused by Kelly Mancle, when I had already complained about her repeatedly. He said no. There was some talk about the complaints and that I had been to the OSC, TIGTA, Tax Commissioner, etc. with them, and was talking to an attorney. To this he grew very angry and yelled at me, saying, I had no right to go off the property to complain to anyone." At this point I suggested that because of the effects of the surgery that I go home for the rest of the evening and come back the next night. He agreed and I left from his office. I did not talk to anyone else that night.

Lines 3-31; in comparison to the above there can be seen differences in the two versions of events this February 20th. Reading while other things were going on was not a problem before so why would Kelly Mancle make an issue out of it ? At line 8-9, we did not get any passwords from Lisa Lee, we were not at any PC terminals, the meeting was in a conference room, there was no need for them. There was no "James Nisewonger" there either. These are lies, these never happened. This points to either Kelly Mancle embellishing or that this TIGTA file was thrown together at the last minute to make the TIGTA look like it is up to regulation, or whatever. It is suspicious. At lines 16-17, I never said that I did not need the refresher training, if Lisa Lee said this it had to be because of what I previously remarked about the EEOC. Lines 17-27; this is not how Kelly described what happened in the EOP file nor for MSPB, and for these three versions no two match. Lines 25-26; I did say she picked on me to Robert Hall but did not say she was a racist, just discriminatory towards me, as was the pattern. This version of that night is told from with some facts that she eventually was told, not what she

13

understood to be happening at the time. She had no idea I had surgery, made no acknowledgment of it's role, it shows how unobservant she was. Lines 28-31; again this points to sociopathic behavior because she claims no understanding as to why she would be blamed. In the EOP file she said I was a scary person, but there is no explanation as to why. Line 29; Pam Blackburn is suggested as protecting Kelly Mancle is somewhat of a contradiction because she gossiped about her as problematic for being a lesbian.

With the accusation that I called Kelly Mancle a racist combined with reporting what I was told about her being a lesbian, there is the questionable reasoning with this combination because the same combination was involved in making the NTEU/Treasury's document from Robert Hall/Lisa Porter/Angela Strong. In this false document there is an accusation of me making a racial and sexist call to the NTEU. But given the facts here it can be seen that this document can be vindictive revenge for these comment of Kelly Mancle. These things are demonstrations as to how documentation is falsely made or altered to make it say what some want it to say in the Treasury/NTEU to discredit and benefit accordingly. There is a pattern of this behavior.

One other issues with Kelly Mancle that is suspicious is that in her testimony for the EOP file, she used termination documentation of a Jennifer Smith without proper consent. Given that there were groupings of "Jennifers" in the repeated batches of work, this would suggest some reason for the grouping of "Jennifers" that Kelly Mancle was aware of, even though she was not the unit manager when I experienced this pattern. I am not sure what, if any, "Jennifer" has but the odds of these improper actions close together would suggest that they are not simple coincidences. This does contradict the TIGTA file where the names of employees are blackened but in the EOP file there is inclusion without consent.

To note: The manuals, these IRMs, that needed correcting during this update meeting is strange because why would they not make the corrections in proof reading the manuals before they printed them up. The excessive man-hours, with employees making from around $ 12.50 to $ 14.50 per hour to correct the manuals one at a time is a waste of work hours and cost when you consider the number of transcribers is up to 500.

## 6. What are the discrepancies with Winda Daniel's testimony on pages 7-9 ? Explain.

Kathleen Bushnell and Winda Daniel did not question or remark on the missing affidavits of Winda Daniel as previously mentioned. In Winda Daniel's unit the use of "time-off voucher" to cover the mistakes of previous document handlers was used extensively. However, during the MSPB hearing, Winda Daniel's testimony was to deny any use of such vouchers. These vouchers effected rating scores and, subsequent, rank.

14

**Page 8:**

Lines 1-2: this mimicking was from Angela in this unit.

Lines 4-5; this was not, specifically, that Winda Daniel read my personal postal mail. This part of the complaint was that she had knowledge of what was in the mail at a specific time around my birthday as per a card from my sister. However, during this period I did have my American Express bill statement taken somehow, in which someone opened an account under my account number. American Express confirmed that it was a fraudulent action in its investigation. These postal problems happened at the same time. The sabotaging of my mail has continued until the present day; it has affected many accounts; mail concerning the processing of any of these complaints; and personal mail.

Lines 6-12; I saw postal employees sitting at terminals working as transcriber. If they were not working for both places then the situation may be another issue as to postal employees being in the Conversion Branch. The social security numbers can be checked.

Lines 13- 26; these people did hit the back of my chair, intentionally. Winda never told me anything about propping my feet up and leaning in the aisle, because I never obstructed the aisle. There was room to move around most all desks and chairs. None of these transcribers complained about me hitting their chairs. During the MSPB hearing Winda tried to say that the aisle were close together, so I asked her how wide the aisle were, she replied, " 2 feet." Reminding her that 2 feet is shoulder width or less, the aisle had to be wider than that 2 feet. Here there is an attempt to diminish the harassment from those transcribers hitting my chair in her unit, thus she perpetuated the harassment.

Lines 27-30; this is an attempt to downplay the "gay" guy giving me the invitation as sexual harassment, by Winda saying that it was an open invitation. This contradicts this "gay" guy's reasoning, as reported previously, and in the EOP file, that he thought I was "gay," so it was ok. This means that he was only targeting certain people, and to my knowledge, I never heard of anyone else receiving the invitation. This demonstrates how problems occur and then they are trivialized or treated as minor. The combined effects are overlooked.

Lines 31-34; Winda did assign which carts to work from and who worked from them. I only did 1040EZs for most of the tax season, until the last month when I did 1040As. Never 1040s in this unit. The issues with the rating system meant that the rating score fluctuated, the range was from 1 to 4; a 2 would be average and acceptable according to the scale.

Lines 36 -37; I never was told or heard of this "610-action code."

15

**Page 9:**

Lines 1-6; The sabotaging of the equipment I think refers to the complaint that when I would initially adjust the work desk and chair for myself someone would change them; and someone screwed with my CD player till they broke it. There were other such behavior. But I did prop my legs across the rolling two drawer file cabinets under the desk. One drawer for day and one for night. The had combination locks to the drawers. Never was I told not to do this or that it was a problem, many people did because it was suggested that you try to keep your knees higher than your hip for sitting over long periods of time. It is the same principle if you stand for long periods. In the military, soldiers are told to bend their knees slightly which helps. The desk could also be raised so that you could stand, so I did that from time to time.

I did complain that Winda Daniel insinuated knowledge of what was in my postal mail because when I received a birthday card one afternoon from a sister living near Boston, she made a point of having a conversation with me that night where she referenced Boston. This was not some normal conversation that we would have had. During this period I did witness about three postal employees who were working as transcribers. This is prohibited. The agency often states, falsely, that I made connections between what Winda said for my postal mail and these workers. There would have to be a connection, somehow. The agency states has attempted to explain that these were workers that had to be on site for postal mailings, but the ones I saw, in postal uniforms, were sitting and working in the units as transcribers. This could be checked because their social security numbers would be on the payrolls for the IRS and post office. Since I worked at night the three I saw were two black females and one black male, the search could be narrowed down. Why this has not been done, I can not explain, even considering that it is the IRS and they would have their tax returns to check.

Lines 7-11: the particular here is that I never talked to Pam Blackburn.

Lines 12- 13; Winda Daniel did go over the mistakes, if any, that I made on the returns but this was mainly asking why I made the mistakes. Sometimes I could never really give an answer as to why, Winda would attribute these to "finger" mistakes. It was nothing intentional and they were random mistakes. However, I did ask about the PDB checking, and others markings that I reported later. She said to just enter whatever markings into the program. This was odd to me, but I never did that, and it is where I was charged errors. Winda missed shifts of the 1999 season because her mother was sick from cancer and later died, so there were only a few times when she questioned me about mistakes.

Lines 14- 25; this passage concerns the harassment of hitting the back of my chair. I did not have my chair in the aisle. The aisle where wide enough to walk thru without bumping someone's chair. Even if I had my legs propped up, I still had to have my body

16

close to the desk in order to enter in data, because then it is a measure of arms length, not legs. As a transcriber you had to have lateral movement, which would mean sitting so far as to be in the aisle was not possible. The explanation of Winda is for the purpose of down playing the harassment, which in turn, at the time, encouraged such behavior and trivializes it on review. The row was actually the last row, there was no need for anyone but those in the row to use that aisle. The ones at this period hitting the back of the chair where those transcribers to my left, Angela, Dina, Charles, and Nicole. Winda never said anything to me about propping up my legs, feet, or to stop doing it, as most people did the same. I could not lean back in the chair and be able to still do data entry, that would be relative to the lengths of a persons arms sort of floating in mid air. One other thing here is that you could not move to another desk as liberally as is stated because of the combination locked drawers assigned to you and desk were taken by other transcribers. I did move during the last few weeks in June before furlough and sat beside Susan Karimi, not a pole. There were support poles through the area because the room was like a wide atrium or barn. I did sit directly beside one of these 2'x 2' "poles" in Lisa Lee's unit.

Lines 26- 31; Winda Daniel missies the point that the solicitations occurred during working sessions, but they continued during the breaks as well. Some of these solicitations for money would be passed around repeatedly, with people watching the cash being added or to make sure no one took any. The same cash envelope for the same event or family crisis would be pass to employees until they gave money. One night they did this so many times I just place the cash envelope and memo with it, on the top shelf of my desk to stop it. It was not even 15 - 30 seconds two people came up on both sides to snatch that envelope. You would think that this would stop all other solicitations, but the memos of the events still circulated but the cash collection was to be assign to one person, for collection and safe keeping. This was the pattern. With the Angela, if she was told to turn down her music, she would sing and hum. When told to stop that she would dance in her seat, waving her arms about, even within about a foot of me. If it wasn't this particular Angela then other Angela-s, even after being employed with the Angela Strong of the NTEU making false claims of a racial call.

Thus for Angela, no matter what complaints, she was bound and determined to cause me trouble through harassment, from the work area, to the parking lot , then to Buford Highway. She was also very vocal during unit meetings to say that it was [me] who had always complained. Nothing was ever done to her for any of these things. Winda saying that Angela and I had some grudge match going is ridiculous. It is a means of trivializing what happened to me. I never did anything to anyone there to provoke or encourage such behavior. When I was first seated beside Angela I asked her one procedural question and she blew up at me angrily saying, " why do you always ask me questions." Angela acted as if it was the 1001st question I asked her because I had always asked her questions; she is "mental." This is one area where Winda was being discriminatory to me because she is saying that it is my fault for Angela's behavior and took no corrective action. This is the type of circumstances the caused me to go off the property to report such incidences and corrections.

17

Lines 36-41; I did not ask for time off for school while in Winda's unit, especially after the trouble with Kelly Mancle. The semester would have been over for half of the tax season. The reason I asked in Kelly Mancle's unit was because other were taking off for different reasons, the popular reason was that people had scheduled things before starting work at the center. Like school for me.

## 7. What are the discrepancies with Joyce Holmes's testimony on pages 10-11 ? Explain.

Joyce Holmes testimony here, with the exception of some clarifying, is a rehash or a generalization of what others have said. Joyce Holmes was more of a worker and the job was about the work. She says in instances, she did not know of some of my complaints and she is basically correct. This point to the fact of what others are saying because if they did not see for themselves what I experienced, it did not happen. The complaints were directed to Winda Daniel, so Joyce would have had little knowledge of most complaints. One evening when Angela was complaining to Joyce about me, Joyce said to her so that I heard, "I do not know why Steve is doing that, and stop bothering me with that." Whatever "that" was or is I do not know. I think like others there, Joyce, and like myself, this was a job, seasonal, so people just wanted to work, earn some extra money, or that the job fit their schedule in the evenings. There was or is some good people there, good workers.

### Page 10:

Lines 17-19; here Joyce states that there were the warnings of the issues in the complaints, at the very least for the first letter.

Lines 22-25; this makes the complaints of the loud music playing sound like a grudge match between Angela and myself, but was not. I would say something about it being to loud to Winda, since Angela went ballistic in the beginning, then Angela had to then complain about my as being to loud when it wasn't. To show that Angela was making it up, sometimes I would not even play my CD player, but she still said it was to loud.

Lines 28-34; Winda would assign to transcribers what programs to work with, so Joyce had no connection to batch selection for transcribers, or at least for me.

### Page 11:

Lines 11-16; here is a good explanation of how the job was to be done. It may sound anti-social but the job was organized that way. A transcriber was to be working on data entry, being logged into the program, with few interruptions except as needed for changing batch work or quick run to the bathroom. There were not opportunities for

18

extended socializing. This is why there has been confusion as to what constitutes a transcribers job, and what are the proper job functions. Some transcribers would take longer break times, more than the two assigned breaks. !5 minutes meant 30, 30 minutes meant 1 hour. Changing batch work took longer and was used to chat with others. The result is that if you figured the time from these extra breaks they would be padding the payroll, and, surprisingly, complain about those who did not do it. It was like advertising the problem. Different units had different rules about such practices, so that adds to what is proper, and how other transcriber were precieved.

## 8.  What are the discrepancies with Lisa Lee's testimony on pages 11-15 ? Explain.

Lisa Lee was the unit manager for the 2000 tax season. She assigned where each transcriber was to sit in the unit. Lisa Lee assigned me a seat where there was the 2' x 2' "pole" to my left. To fill the space from my desk to the next desk to the left was a printer that was not a wide as the desk so it fit the space. In facing this row was a unit of part time transcribers and, beyond that were offices along the wall, about three, then to the most right the conference room, mention previously in discussing Kelly Mancle.

The overall effects of Lisa Lee's behavior for any situation was to give the impression that she knew how other people were incompetent in job capacities. She seem to react as she knew how to resolve incidences rather than to simply just apply rules, as established. She tried to always avoid using the rules but would come off as if she followed proper procedure. In this testimony here she flips this trait of hers onto me. This was a repeated pattern with the agency.

There was a  black female transcriber to the extreme left of me that repeatedly hit the back of my chair, Lisa Lee said she talked to her, but that this transcriber said it was an accident. The positioning of my desk, the pole, and the printer meant that this transcriber had to go out of her way to hit my chair. Lisa Lee accepted this rationalization with the attitude that I needed to just get over it.

Lisa Lee one night a few weeks before the "gay" guy gave me the invitation in question, came over to me to talk. During this period, I carried a cheesecake picture of Cindy Crawford on my school binder. Lisa Lee had a similar shirt on, like the picture of Cindy, when she straddle a chair, and started tossing her hair about as being seductive. She was coming on to me. She tried to have some conversation along the lines of, " lets just all be friends." I guess she thought she could lure me into accepting harassment and interruptions during work, or whatever. It was so awkward; it was inappropriate. I listed this as sexual harassment during EEOC processing, but Kathleen Bushnell did not ask about this incident. Later I think that Lisa Lee's inaccuracies and failure to correct problems was due to the fact that I was not receptive to her come on. This was an attempt of Lisa Lee to try and be the "fix all" to problems and violations of others. I do believe she thought it should have worked; that she believed it a viable solution. During the

19

MSPB hearing, Lisa Lee denied knowing anything about the binder being on my desk, even though it was used to block the antics of the part timers being disruptive. Therefore, not wanting to recognize that she had "come on" to me.

About six of part timers facing me, would do all kinds of things like mimic my actions or movements; any sounds; try to stand in your line of sight; stand and stare till you noticed them, then laugh about it; talk loudly; or whatever. Lisa Lee did not fully realize this as a real problem; did not want to; or to take corrective action. She acted like it was business as usual. She expected me to just go along with it.

Lisa Lee had a disposition of what some would refer to in work situations as an opportunist, which would translate clinically to being a narcissist. This is where an employee decides how to put themselves in all situations. They try to drag people into the situations as well. As with the hitting the back of my chair, she thinks the best solution to me is to just accept it, thereby, resolving the repeated patern and compounding effects. The saves the day. It is not really about a person being a victim or the history of the problem. Same for the behavior of the part timers; more behavior I was suppose to overlook. Like with a narcissist, who only believe something happens if it happens to them, otherwise it is not legitimate. There was this effort of forcing me to accept this treatment, and if I didn't, I was wrong; bad. The sexual harassment from her was the same thing, that she could lure me to ignore the problems; like I would go into a sexual frenzy from her advances and forget everything. Then when it didn't work, she does not acknowledge the bad behavior in herself, just like not that of others. In the EOP file she stated that I did not like baby showers. What man does? Here again she is centering her assessment of what the problems are around what she prefers and how relative it is to her.

Much of her testimony for this TIGTA file is the same type of view. She thinks she can provide answers that will solve all the agency's conflict with me, with others, and "save the day." This is probably why the agency would favor her and her explanations while over looking the facts for the truth properly. The resulting circumstances is that she effects a knowledge of "all" things that happened, but when it comes to areas surrounding the violations to me she claims to not be aware of them. She demonstrates that all the issues actually revolve around her, so ask her really what happened, so she can resolve them. This means all the problems that I experienced prior to and after working in her unit. This produces actions of perjury that is rationalized away.

**Page 11:**

Lines 28-29; this statement here, "that there were just a few disruptive employees," trivializes the fact that it was about 6 and the behavior continued all night. I would take the IRM manuals and my school binder and build a a little "duck blind." There was a transcriber in that unit and, the interruptions were so bad, she took actual

20

partitions that were about 4 feet high to section herself away from those employees. The manager of that unit, Carlett Reese rivaled in this behavior. The transcriber next to me would say almost in pray like breath say she wish they would just stop. Lisa Lee failed to recognize these circumstances.

Lines 30-32; these part timers to which I gave initials in the second letter for identification, would mimic me if I coughed, if I move in one direction or the other, or just about anything but sit down, shut up, and do the work. All this was disruptive and harassing. Lisa Lee failed to see it that way.

**Page 12**:

Lines 2-3; for Lisa Lee to say that the audit codes are a rare occurance on returns is odd. If more are appiled to certain taxpayers returns in certain areas then it becomes very noticeable. It would also point to the fact that you would recognize that they would be more frequent to a specific part of a city or town or to a specific type of taxpayers. To a transcriber it is of particular interest because the more audit codes would mean more data entry if you saw or found them, if not more errors. Computer online returns were the worst for placement of these codes along this line.

Lines 8-12; not exactly the "luck of the draw" for selecting batch work because not all transcribers worked on the same programs. I started in this unit working on 1040As, then to 1040s . The last 6 weeks, approximately, I worked on the computer online returns. These had so many pages they went from a batch of 100 returns to 50. Each took longer to process, as well. But there was no adjustment to rating scale. This is where I would have received the lowest ratings, as would be understandable.

Lines 15-31; this passage concerns the "gay" invitation. This is not an accurate account of the incident. Regina Mayfield and Carlett Reese were contributors to the harassment. No other employees received an invitation, as is claimed, if so there has never been anyone named. Line 25; I handed the invitation to Regina Mayfield that night, I never saw it again. I was never told of what, if any, action was ever taken. This "gay" guy was in Kelly Mancle's unit but other than to state that later in EOP processing that he was talked to about it, noting was done. This contradicts, the warnings of no solicitations, even to the extent of being encouraged by Regina who gave the "gay" guy premission to interrupt me. When compared to the actions taken when Kelly Mancle said I was insubordinate on February 20, there was nothing close done with this situation. There was no report of the incident, however, with the accusation of Kelly Mancle of insubordination they pulled out all the stops. In that situation, it instigated termination proceedings; there were emails, memos flying around; improper involment of the NTEU; to numerous supervisors, all in less than two weeks. Actions such as these were absent from any other reported violations as well.

21

Lines 33-36; Lisa Lee never asked me if I wanted to move because she made the seating assignments and this was the seat I had for the whole season. I never asked her for any partitions. Besides this, the transcriber I mentioned above with the partitions, had then taken away.

Lines 37-40; I do not know what the reference to me having back problems concerns, it makes no sense to me.

**Page 13**:

Line 2: I did not sit at the end.

Lines 5-7; this demonstrates the managers were aware of the initial reported complaints as denied in MSPB proceedings.

Lines 26-29; I am not sure why Doug Van Buren was looking for some emotion, some guy looking at me in such a way. What was I suppose to do ? This begs the question as to the exact reason for terminating me, because it seems with this looking for emotion as a sign of possibly trying to provoke me. What was not mentioned here is that someone went into my combination locked drawer and took my notes written about what happened from February 20 to the March 5th meeting. The phone numbers and such information of other employees was also taken. Whoever it was, search thru the books that I had in the drawer as well.

Lines 30-32; Denise and Susan would stop in the unit before or after the shift; or at dinner. It would not have been to noticeable. But this was what the job was limited room for socialization that could be monitored.

Lines 33-34; this is where I think Lisa Lee acts as if she can infused herself into areas she has no right, and that the agency encourages such beahvior. This is an intrusion to my privacy. She has no reason to stating this, unless she wants to incriminate me somehow. It is not accurate either. This is what rasies suspicions for this TIGTA being thrown together. I shaved my head after furlough in 2000, not during, why is it that she backdated the event ? As for the go-tee, I grow and shave that periodically, there is no definitive schedule, it grows like a fan; I do not trim it to a point. Here again she misinterprets things because they are not specifically relative to her.

Lines 36-38, & p. 14, lines 1-2; this is not correct. Here is where Lisa Lee is trying to center any of the complaints around her, and the agency likes this, which in turn encourage her to do more of it. If I did not want to work at this center for whatever reason, I could leave. I did not have to work there. This would result in other job opportunities I had as before working at the center. These include computer operations, school related employment, restaurants (various positions, including management), and

22

construction, (from carpenter to electrician). The later would be particularly with males. When I returned home in March 2001, I did go to work as an electrician journeyman on the Outer Banks of NC, (OBX). This was with men and a great views of the Atlantic Ocean all day. Lisa Lee is making the management so paramount but compared to the failure to make corrective actions it seemed ineffective. This can be compared to terminating me, there was no concern to what or who was depending on me, but it was paramount that I contribute to any family crisis that was improperly solicited. This shows that similar to Lisa Lee, the IRS center was being like a narcissist.

**Page 14:**

Lines 15-21; I never talked to Lisa Lee about anything after I left from the conference room. She just told me to go to Robert Hall's office. That is it. Lisa Lee is embellishing or the agency is stating this for effect against me in the TIGTA file. In comparison to the EOP file, MSPB, and this TIGTA file there is no consistant story of how any rating was figured during this period. In the EOP file, in particular, the agency used a rating form that only had a "1" rating score but no signatures or date to verify the document. Lisa Lee said that Robert Hall did rating checks after February 20, so this statement here by her is a contradiction.

Lines 22- 26; I never talked with Lisa Lee about these issues. The fact that Lisa Lee states knowledge of my report of " someone following [me]" and "was being "tailed," " during the previous year, meaning 2000, shows that she knew of the contents of the second letter prior to my termination. This is because I only reported someone following me under such conditions in the second letter. Thus, how could she have know this prior to the TIGTA interview with Kathleen Bushnell in March 2001, after I had been terminated. The second letter was sent to the TIGTA in November 2000. This is very significant because it shows that she committed perjury during the MSPB hearing stating that she did not know of the contents of the second letter prior to termination. Otherwise, she is committing perjury here and/or the TIGTA file has been forged and backdated.

Lines 27-28; here this is most likely another black female either named or claiming to be name Angela, and was repeating the same type behavior as the Angela  of the prior year.

**Page 15:**

Lines 1-5; the padding of the payroll as I did report was not from this situation describe. It was from the prior year when the parties and loafing were done during the shifts, earlier than the leave time. However, the behavior of the part timers, did result in padding the payroll.  As mentioned previously, the extended times for breaks and the parties, and instigating disturbances , all combined with the overtime, is what I meant.

23

Lines 6-9; this is where Lisa Lee is taking something that happened in Winda Daniel's unit the prior year and positioning herself with it. This article was in a magazine I had, "Fast Company." The article was about, then Tax Commissioner, Charles Rositti, discussing the tax changes. This can be checked for date with the magazine. Why is she trying, like other things, to center it around her ? This is how narcissim plays a role. It is a lie that demonstrate part of a pattern of behavior.

## 9. Are there discrepancies in the Conclusion & Recommendations on pages 15-16 ? Explain.

Lines 10 -31; this is a rehash of much of what was in the testimonies; a one sided argument. It has problems and inaccuracies stemming from false evidence and perjury. Like the above, the TIGTA file does not take into consideration all aspects of the claims. Because this file was not given to me in March - May 2001, but was part of the FOIA/PA civil action in DC District in Decmeber 2005, I would have had no means for correcting these inaccuracies for any prior agency reviews; administrative decisions; and civil action proceedings before then.

Lines 32-34; Given the fact that what alerted my attention to the problems with the audit codes was that it was used excessively for particular taxpayers in specific areas. When repoting something such as this, the requirement is that an employee have only a reasonable belief that something is wrong. No employee need to have specific knowledge of the purpose of each audit code for the reported violation to be valid. If you add IRS + Audit together, what is a taxpayer's reaction ? This did not happen in just the Atlanta area. The puprpose of reporting this should be understood, even implied. Since I was terminated with the IRS on March 7, 2001, starting with my 2001 tax return, the IRS has changed and reconfigured my returns each year. In 2001, for tax return year 2000, the IRS from Chamblee, GA, sent me a corrections letter stating that I owned the IRS $ 250,000 in unpaid taxes for 2000. My reported income listed the IRS seasonal wages as the main bulk of income. But I owed the IRS this amount in taxes. The error centered on stocks I held and for short term trading. They were clearly itemized and if added all together they would not total $ 250,000, themselves. The following years have had other reconfigurations that are errors of the IRS. Presently, I have to report a problem in the difference between my 2005 v. 2006 returns because the IRS has contradicted itself in calculating the Earned Income Credit, (EIC), amount. These actions, under the circumstances, are a violation of the Restructuring and Reforma Act of 1998, (RRA98), which covers both employees and taxpayers. Considering this as happening to me, why is the targeting of audit codes not treated significantly., there is a pattern of behavior.

Lines 35-36; when you report violations to the TIGTA there is no specific guidelines given that you provide evidence at that time. The TIGTA did not even inform me of the determinations it made.

24

**Page 16:**

Lines 2-5; in the beginning of this file there is stated that only three employees, Judy Jordan, Winda Daniel, and Kelly Mancle, made affidavits concerning the first complaint letter. Now here it is stated that "all" had made affidavits; a contradiction. These affidavits have never been produced, upon request in my FOIA/PA civil action, the agency cliams that these affidavits are from the Treasury EOP file, 02-1135, which were not done until July -August 2002. To date these affidavits have not been provided. This questions the validity of the this TIGTA file as to it being backdated in order to give the appearance that proper procedure with the TIGTA for handling the complaints was followed. As listed above there are suspicious inaccuracies and false information in the testimonies.

Lines 7-9; Robert Hall acknowledges that he did know about the reported EEO violations and prohibited practices as said by me just prior to termination. He later denied any such awareness for the MSPB hearing; as did the others listed in the TIGTA file. In fact he stated that I told him that Kelly Mancle, in the Febraury 20 update meeting had "she picked on[me]." This is a protected disclosure given that I had reported complaints about Kelly Mancle, which he also knew, then she was instigating trouble. Accordingly, I was not to be terminated until these circumstances were resolved.

Lines 10-23; the common mistake in this recommendation is that the compounded effects of the repeated actions was not recognized for resolve. This applies to taxpayers, other employees, and myself.

**Executed on the** _28th_ **day of** _November_, **2007, in Orlando, FL.**

I have read the above questions and answers, also in addition to any required attachments, and testify that the information provided is true and complete to the best of my knowledge and belief. I declare under penalty of perjury that the foregoing is true and correct.

_11-28-07_
(Date)

_(Deponent's Signature)_

Steven Ivey
7611 S. OBT, # 278
Orlando, FL, 32809

25

## INTERROGATORIES OF STEVEN IVEY FOR EOP FILE 02-1135

I, Steven Ivey, the plaintiff, pro se, pursuant to the provisions of **28 U.S.C. § 1746**, declare in reference to the Treasury EOP file 02-1135 the following :

*(For the following questions it is suggested to read the passages referenced by the question then to review the answers as based on the numbered lines.)*

**1.  Are there any inaccuracies with the EOP file "EEO Investigative Summary" , pp. 1-4 ? Explain.**

**Page 1:**

The " Statement of the Claims"  does not include all the issues as filed.  The claims are discrimination based on gender and race; generalized harassment; sexual harassment; and retaliation for reported violations of both EEOC and OSC/MSPB in nature.  There are areas of Constitutional issues of First and Fifth Amendment Rights involved in the defense of the above claims and surrounding termination.

Under "Complaint Allegations" the EOP file, 02-1135, mis-states allegations as being merely the answer to one question, #4, in my affidavit, p. 170.  The answer briefly explains some of the events that occurred but not limited to these incidences.  The significance of the application of a double standard is trivialized in this section.  This paragraph contains mis-quotes in that what was projected towards me was a negative persona unlike who I am, and that it was this channeling of myself into such negative persona.  This generated a contradiction of the application of rules to myself compared to similarly situated females and blacks.

The last paragraph refers to question #3, p. 170, of my affidavit for the EOP file, but is an inaccurate statement because evaluations and reviews were included at different times, however,  it was never explained to me that a data transcriber could be terminated for "poor rating."  It was not a normal practice.  Significantly, the reported factors and circumstances that affected the rating system, were situations beyond the job function of a data transcriber, but resulted in negative performance scores/rank such as the following:

**A.**  There were Problems with the Program and Processing Systems as follows:

**(a)** Label verses handwritten meant the difference of entering a few code characters of the IRS printed label included with the 1040 mailings and that of retyping the complete name, address, and social security number of the taxpayer.  The grouping of the labels for faster processing was routed to preferred employees.

**(b)** Illegible tax returns wherein a data transcriber had to determine personal handwriting which varied in degree of clarity and accuracy.

1

*Attachment #14*

(c ) The hyphen of Hispanic and female last names added confusion to the searching of past records. For searching the record the first three letters of the taxpayers last name are used. With hyphened last names sometimes taxpayers leave the hyphen off so the second part of the last name not the first part was used. (example: if Garcia-Carlos was the name then the 3 letters as G-A-R, however, if the hyphen is not there, Garcia Carlos, then the 3 letters used were C-A-R).

(d) The mistaken program for spouses social security number (ss#). When a married couple enters the label identification if the man fills the form he puts his name and ss# first. If the woman does it she puts her name and ss# first. The information does not change the ID of the return from past years just the order. There can be other variations of this mistake as did happen. The fault here is in the program which did not have a "do-loop" written in the program.

(e) Mistakes made prior to a data transcriber in the assembly line process. Problems could result for a data transcriber and errors charge to him when the batches were formulated improperly such as:

(1)Mis-numbering of a batch of returns - meaning more than the normal 100 or less; such as 110 or 95 returns. This result in the serial numbers of the return not matching the program required 100 as automatically do as the returns are entered into the program. This assigned error to the data transcriber because the correction of these had to be done while longed into the system. The could mean that a rating of 100 / hr could be reduced to 40 / hr which is not the fault of a data transcriber.

(2) The unspecified number of attachments to a return were not established in the determination of the rating scale.

(3) Computer generated tax filing v. supplied 1040 forms. With returns sent via the mail the IRS tax forms are used as printed front and back. However, if a taxpayer filed online the return as printed by the IRS would be approximately 4 pages per side of a 1040. The print size was also much different for spacing. This meant more paperwork for a computer filing that resulted in 50 returns per batch of work instead of the usual 100. It, also, resulted in lengthy times for locating the codes to enter into the programs.

**B.**    Problems of Inappropriate and Illegal activities:

(a) Interruptions of work in progress to sign notices; review corrections of IRS manual mistakes; and improper solicitations from other employees. These affect time on program and was not regulated even after complaints of such as they affected rating / rank.

(b) Segregating the batches of work:

(1) For some unknown reason all the Jennifers in FL, GA, & SC were batch together.

2

(2) Bad documents for reading were routed to the newbies ? Probationary employees.

(3) Illegible returns to unflavored employees.

(c ) Changing of the Presidential Donation Box (PDB) on the returns was a prohibited practice which the plaintiff did not participate in, but was charged an error for each incident.

(d) Use of illegal vouchers to mis-appropriate funds to cover up favored employees in the prior areas of the assembly line process such as C & E.

(e) Failure to correct problems and prohibited practices so has to receive correct rating scale and more accurate ranking.

The idea to keep in mind with this list is that it is not all the circumstances that affect the rating system because you could ask other data transcribers and they would have their own list. Their list would be different from mine which signifies that rating score was not used as a the IRS/Treasury stipulates.

**Page 2:**

In ¶ 1, the reference is to p. 171, question #8, I only reference the March 5, 2001 letter, (P. 124) because the March 7, 2001 letter, (PP. 115-116), looks to be more of the Treasury's form letter. The March 5, 2001 letter if a false fabrication. It concerns First and Fifth Amendment Rights violations, and the improper involvement of the National Treasury Employees Union, NTEU, with these violations. It is part of the NTEU's pattern of improper involvement and failure to take proper action as assisted by the Treasury. When it was the NTEU's purpose to be involved it did not, and when it was not it's purpose it did involve itself.

In ¶ 2, P. 2, the assessment that I was terminated for whistle-blowing is inaccurate. I believe my termination was for not only for WPA activities of violations of taxpayers' rights, departmental violations, and prohibited practices, but for the "all" reported claims whether under EEO, OSC, or MSPB regulations. There was a misjudgment of the facts surrounding removal in that proper procedure was not followed which in turn demonstrates discrimination towards myself.

Under "Management's Testimony/Docket Evidence" the recounting of Robert Hall's testimony in the beginning, is lifted partly from the inaccuracies of the March 5, 2001 letter, P. 124. It is similar for the affidavit of Robert Hall, P. 178, question #1. The timing periods away from the February 20, 2001 meeting, ¶ 4, is inaccurately unfounded. Additionally, the reference in ¶ 6, of the alleged call to the NTEU, P. 122, is a false record. I did not make any such call which in turn demonstrates

3

part of the pattern of improper involvement of the NTEU, and the IRS/Treasury's improper inclusion of such false documents.

In ¶ 5, the assessment of the rating history is misleading. This particular unit manager would not have had "all" scoring evaluations.

**Page 3:**

¶ 1, I did not receive any such counseling or review to address rating issues as Robert Hall states between the period of February 20 and March 5, 2001. The remarks of what happened in the refresher course did not happen, and, during this period, I was not asked to give my testimony as to what did occur. The IRS wanted to railroad me into incriminating myself for it's benefit.

¶ 2, because the referenced document was incriminating to me and involved the improper involvement of the NTEU, I refused to sign the March 5, 2001, letter, P. 124, & P. 233, as indicated. For the February 20, 2001 meeting, the past complaints with Kelly Mancle and her behavior in the meeting were not included in the letter as part of why she made such false allegations.

¶ 3 & 4, this concerns the rating scores but not "all" rating documents. Given the above listed rating problems there were inaccurate ratings. The ratings would be good and bad, depending how and to what degree, the listed rating problems affected the entry of the data.

¶ 5, these six individuals listed, P. 256, as having been terminated from June 1999 thru July 2000, contradicts Cedric Swain's testimony for MSPB in which he stated that he routinely terminated 50 data transcribers for rating each year. Each of these are listed as "probation/separation" not as "terminated for rating." The OPM does not make any such termination distinction for records.

¶ 6, does not reference what the procedure is for an employee in the position of having reported departmental violations, EEO complaints, and /or prohibited practices. This is where this EOP fails to adequately address such circumstances in processing my claims or surrounding my termination.

**Page 4:**

The NTEU agreement as stated in ¶ 1, does not cover how prior complaint processing is to be included. It does demonstrate that the NTEU did not take proper action when told of IRS/Treasury violation of myself.

Under " Witness Testimony/Evidence,' ¶ 2, the role of Cedric Swain from Human Resources in March 2001 is discussed. Though stating that Cedric Swain did

4

not have any knowledge of me being an informant prior to termination, it is a requirement of the IRS/Treasury, under the Restructuring and Reform Act of 1998, (RRA98), for Human Resources to be made aware and updated of such activities. Esperanza Balandran did forward to the IRS center the complaints. However, there is no verification that this was done and/or maintained under requirement or from being forwarded.. Therefore, as ¶ 3 states, a contradiction exist in that if Cedric Swain followed normal procedure, then if true, considering my ranking score of around 370 of the 500 data transcribers, Cedric Swain would have had to terminate approximately 130 transcribers below 370. This did not happen. Additionally, Cedric Swain stated for his MSPB testimony that he routinely terminated 50 data transcribers per year, this contradicts the six as listed above. Cedric Swain's testimony is on Tab 5, pp. 173-174a, (174a is used because there is a missing page number).

¶ 4, titled " Other Evidence" recites excerpts of the job description of a data transcriber as listed on PP. 325-326. As stated in the last sentence, when errors in processing occurred one resolution was to report it to others for correction. When I did this in relation to the above list of rating problems little to nothing was done to correct. The EOP file does not contain any documentation of procedure to address any rating issues, even though it overstates my termination which was attributed to "poor rating." The formulation date for the transcribers duties as listed on P. 326 is August 15, 1996 which means there has not been an update since that time and August 2002 when the EOP file was compiled. Thus, any changes occurring in data processing for 2001 or 2002 when the EOP file was formulated would not be reflective in this job description.

From these 4 pages there is a question as to why only Robert Hall and Cedric Swain were utilized when there were others involved in the termination decision and the investigation file. The others are, Brent Brown, Betty Burris, Judy Jordan, Pam Blackburn, Bettye Reid, Linda Ferguson, Winda Daniels, Kelly Mancle, and Lisa Lee. Why did Nancy Dunford the EOP investigator who formulated the file exclude the women, choosing only to use the two males. One of my claims was that I was discriminated against by females, particularly black females, which was not sufficiently investigated in the file. Tab 1, P. 5 is a letter describing the complaint to the EEOC and P. 7, item #7, list the type of discrimination and matters causing complaints or issues for an EEOC complaint form. On these two pages are listed the complaints of discrimination based in gender and race along with the type issues of assignment of duties, classification, evaluation & merit pay, harassment, hostile work environment, ranking/rating, removal/separation, sexual harassment, and working conditions. Nancy Dunford in formulating this EOP investigation file, (IF), did not cover these areas of the complaint; she restricted the issues to mainly termination. Therefore, why didn't she ask questions and provide documentation as to these issues from the female perpetrators and witnesses and use them under the above categories?

5

**2. In Tab 1, PP. 1 - 88, titled "Formal Complaint" describe these attachments and list and explain any discrepancies .**

**Pages 1-10:**

Under this Tab 1 the attachments do not follow any discernible order as the dates of the attachments indicate, but does start with the Treasury complaint form dated March 18, 2002, PP. 1-2.   As part of the filing of the complaint form, I did enclosed correspondences concerning the claims such as PP. 3, 5, 27-32, 36-48,79, and 80-85, that are included in the Tab 1 section.

Attachment of P. 3, dated April 2, 2001, is the initial letter sent to the EEOC and as shown on P. 4 was needed to be sent to the specific agency generating the claims. (P. 5 is the same as the attachment of P. 3 except that it has the date filed in the Atlanta EEOC Division as April 23, 2001.)  To explain a couple of issues it should be noted that they are connected.  They are the double standard criteria, ¶ 2, and hazing, ¶ 3.  I raised the issue of hazing because according to the organizing criteria for hazing combined with the double standard there is an element of demanding unnecessary requirements before exercising some entitled  privilege or right afford an individual.  For me this  meant that certain unfair and improper requirements were being applied to me, different forms of harassment, gender/racial discrimination, party participation, and personal interaction, before I could be given or allowed what was freely given to others similarly situated, particularly of opposite gender or different race.

From page 3 , in ¶ 5, can be seen that I reported the mistrust that was generated at the IRS Center on  April 2, 2001.  Because of the lies that were told and perpetuated, there was a hostile work environment when it came to job functions and processing complaints.  From PP.

\* RH  scary  + SK comments as unverified
\* KM scary

PP. 7-8 is part of the initial complaint form for filing the EEO claims as required. It list the complaint categories on the check list and there are explanations given.

**Page 11:**

This letter dated February 9, 2000, is a response from the Tax Commissioner's Complaint Group, Esperanza Balandran to my first complaint letter, PP. 27-32, sent November 29, 1999.  I did eventually talk with Esperanza Balandran who suggested that I not remain anonymous so that the complaint could be processed faster.  I only had a couple conversations with her which ended when I told her that the same harassment that was present the year before was continuing again.  I did send the second letter, PP. 36-48,

dated November 1, 2000, to the same Commissioner's Complaint Groups, but did not received any response.

**Pages 12-13:**

This is the exit letter from the IRS that was given to me on March 7, 2001, the night I was terminated. Though it does not have a place for an employee to sign nor was it dated, Robert Hall asked me to sign it which I refused, because of the March 5, 2001 incriminating letter, P. 87.

**Pages 14-15:**

This is a computer generated rating score used in my termination. The meaning to all the values needs to be defined by the IRS in order to understand the resulting score. A computer only knows what it is told, therefore, if there is a problem in processing the data, (as listed above), it will reflected results, as in a "poor rating." The use of such inaccurate rating is improper for personnel actions; rank, pay incentives, call back & furlough, and termination.

**Pages 16-78:**

These pages concentrate on my correspondences with the Office of Special Counsel, OSC, for reporting and review of prohibited practices, file MA-01-1064. On P. 16, there is the list of agencies that were, also, informed of the prohibited practices. From P. 17, ¶ 2, thru P. 18, ¶ 2, are the listing and discussion of reported reasonable prohibited practices. Discrimination is rooted in these prohibited practices. In ¶ 3, P. 18, there is the reporting of how my termination was treated with speed but no such speed, or proper handling, in processing of any of my complaints and reported prohibited practices by the IRS/Treasury. This, as noted here, was that the termination and the way it was improperly processed, resulted in retaliation for reporting any violations, of EEOC in nature, of OCS prohibited practices, and/or to the any agencies listed on P. 16, (on P.79 & PP. 80-85, are the letters to the DOJ). More particularly, I told Robert Hall on February 20, 2001, ( as referenced in the March 5, 2001, letter, P. 87; and incidences explained on PP. 81-85, for letter of March 15, 2001), that I had informed such agencies, including the Treasury Inspector General of Tax Administration, (TIGTA), about what I experienced on the Chamblee, GA, IRS Center. To this Robert Hall told me that I had," no right to go anywhere off the site to report anything."

A significant problem in the processing through OSC was that the initial and final notice of decisions to close the file was not delivered to me timely. In ¶ 1, P. 16, I reported this improper delivery to the OSC and then, later, raised a question of it's impact to the investigation process. On P. 20 and P. 22 near the top right I wrote in the dates when the letters were received; P. 22 though dated January 14, 2002, never arrived until

7

January 30, 2002, and P. 20 the letter dated January 31, 2002, later arrived on February 7, 2002. This affected the proper adjudication of the prohibited practices. I did appeal to the Merit Systems Protection Board, MSPB, the OSC decision, which later remanded the case for further adjudication in September 2003.

On P. 35, as included in the OSC file, is the correspondence from the TIGTA to myself, December 20, 2000, acknowledging the complaint letters sent to that office. The IRS/Treasury in later appeals for both EEOC and OCS/MSPB denied any knowledge of my having reported prohibited practices. Therefore, it has not been resolved as to where blame lies for not informing Human Resources of the informant activities or if those responsible for termination did have knowledge of my reported claims prior to termination. Other responsible parties at the IRS Center were required to be aware of the complaints but none have stated that they followed proper procedure as sated form the Tax Commissioner's office. However, it has been determined that perjury was practiced by those testifying about any of the claims I have reported, which will be discussed below in regards to their testimony for this EOP file. This causes credibility issues with statement of not having any knowledge of reported violations or the forwarding of complaints from the Tax Commissioner's office.

**Pages 86:**

This is the "call back" notice sent to me for starting work for the 2001 tax season, dated February 1, 2001. In the upper righthand corner the scheduled return dated was for February 4, 2001. It should be noted that it differs from the return date of February 11, 2001 that I mentioned in my letter, P. 81, ¶ 1. The return date was changed a few times because of appendectomy surgery and the residual effects, so the actual date was February 20, 2001.

**Page 87:**

This is the letter written by Robert Hall concerning the meeting/course on February 20, 2001 for return to the IRS Processing Center. It is repeatedly referred to as the March 5, 2001 letter in various testimonies and documentation. Though not included in this copy the original did, improperly, contain my social security number. I think it was because Robert Hall wanted to make his letter look official. This is a proper form for reporting the incidences of February 20, 2001, as stipulated by the Restructuring and Reform Act of 1998, RRA98, and department rules, which do not require any social security number. Robert Hall and Kelly Mancle were both reported for violations in the two complaint letters, thus, giving reasons for why such lies were being passed as proper procedure. This explanation of what happened that night is inaccurate, therefore, I refused to sign, (P. 124 is the copy wherein Robert Hall filled in the fact that I refused to sign the letter.)

8

In ¶ 1 the "Refresher Course" on February 20, 2001 was initially said to me by unit manager Lisa Lee to be an EEOC meeting. So here the question is why did Lisa Lee tell me something that was wrong in relation to this meeting? In later testimonies to me Lisa Lee stated that when I left this "refresher meeting" she knew it was not over, so, therefore, she knew what the meeting was in the beginning.

For this "Refresher Course' by done by Kelly Mancle there was talking throughout the meeting and some people had to share the IRS manuals. It was not the atmosphere as stated in ¶ 2. Ever since training when Denise carried things to read, I often had material to read during any meeting, this was done even during the training classes when first hired at the IRS. I would even read IRS work materials, that were given to data transcribers to read. Reading during any down time was normal, others did it as well. One thing that would occur to expand the meeting duration is that some employees would deliberately go into great lengths of discussion about questions and issues. This practice is similar to grade school students who occupy the teacher with a barrage of questions on a Friday so that the teacher will forget to assignment homework for the weekend. At the IRS Center for this meeting, it was for the purpose of running down the clock so that they would not have to complete all the manual, or, alternatively, to extend the time to finish, because each meeting was given a specific time for it to be completed. Consequently, during these prolong discussions I would read, as others would. It, also, meant that I would read ahead in the task manuals or corrections, the reading was not restrictive to just personal material. Here is where Kelly Mancle just assumed whatever she wanted because I had reported violations about her, she was being vindictive. I had to leave the meeting to change the surgery bandages and to take medicine. I am not sure how long it took each time I left but I know it wasn't for 35 minutes at a time, nor was it as described in ¶ 3. Lisa Lee was the manager that told me to go to Robert Hall's office when I went to the unit to find where I was to sit, not as described.

Robert Hall's comment, "that you didn't feel the need to sit in the class" is a lie. I never said this. The second sentence of this paragraph is a protected disclosure. Robert Hall acknowledging that he was informed about problems with Kelly Mancle means that no personnel action was to have occurred without proper investigation into what Kelly Mancle had done. However, this did not happen. Prior to the February 20, 2001, return to work I reported that Robert Hall had said to other managers that my tax return only looked mathematically correct, P. 40, ¶ 2 thru P. 41, ¶ 1. What Robert Hall said to me on February 20, 2001, was that, "he could not believe that Kelly Mancle had done all the things that I reported, because she was a friend of his and knew her for a long time," instead of the simplified version of that comment in the last sentence. This demonstrates that Robert Hall and Kelly Mancle were playing off of one another rather than following proper complaint guidelines.

In ¶ 5 Robert Hall trivializes the surgery I had as, " not feeling well." He down played the surgery because Kelly Mancle missed this fact but instead said my actions

9

were insubordination. I just suggested that I go home because of the residual effects of being up and moving, which is acceptable because of sick leave regulations.

The first sentence of ¶ 6 references some explanation from Robert Hall in the previous week to March 5, 2001, but there was no meeting or discussion that week between Robert Hall and myself. Robert Hall is lying about such a conversation. The conduct mentioned is what Kelly Mancle projected on me for the February 20, 2001, "Refresher Course," which is not true. Kelly Mancle is part of nearly every EEOC violation reported, either directly or indirectly, so her comments are to distrack attention away from those issues of her involvement. In regard to the rating score listed, it is inaccurate, it refers to the P. 126 review document. This page labeled document as "Quarterly Review", P. 126, is misleading because the dates listed for review are given as from 01/01/00 to 12/31/00, a yearly period. This document is not signed by anyone for verification. The last two sentences state effectively that if I do not bring my rating up in the next two weeks I would be removed. Putting the pieces together of this "Quarterly Review" document of a <u>two</u> week period and the comment of the "Courtesy Review" of <u>last</u> week in ¶ 6, line 5, makes the timeline for this letter of Robert Hall to have occurred on March 11, 2001, at the earliest, not March 5, 2001. This is because the last week reference would mean that at the earliest the "Courtesy Review" could have happened was February 25, 2001, thus making the ending of the <u>two</u> week period, as stipulated in the supposed "Quarterly Review," to be March 11, 2001. This demonstrates that Robert Hall is lying because no such "Courtesy Review" occurred and the P. 126, "Quarterly Review" is fictitious. Should Robert Hall/IRS/Treasury say that the <u>two</u> week refers to when I started work in 2001, the two period would run from February 21 to March 7, but since I was off work March 6, the ending day would be March 8. This makes the proper date for this March 5, 2001, meeting March 11, 2001. Therefore either way it demonstrated that proper procedure was not followed, but does raise the question as to why there was a rush to terminate me. Why was March 6 picked as the day to terminate me ? Consequently, if following the supposed stipulations of Robert Hall the later termination date would be after March 11, 2001, which would have closely or completely ended the probationary period.

In the last paragraph, ¶ 7, Robert Hall states that my rating was always an unacceptable quality. From PP. 127 - 142 there can be seen some evaluations of ratings. As demonstrated by these, there are ups a downs in the scoring. Given the above listed problems with the rating systems, it can be understood that those problems translate to the rating score; the computer only knows what it is told. During this March 5, 2001 meeting Robert Hall, as stated in the last sentence, was recommending that I be terminated but during the meeting he grew angry with me when I would not sign. He told me that I, "may as well sign because I was going to be terminated anyway," therefore, why was he saying that it was a recommendation ? A purposed act. This is an incriminating document to myself, and, in signing, I would be signing away my Rights, and, diminish the reported violations to taxpayers' documents and departmental regulations to the point of voiding them entirely.

10

Because Doug Van Buren of the National Treasury Employees Union, NTEU, was assisting Robert Hall in coercing me to sign this letter, the NTEU's harm to me mirrors that of the IRS/Treasury.

I was not allowed an opportunity to respond to this letter. This is not proper procedure when removing a data transcriber under such circumstances, particularly, since there were reported violations involved, particularly against the employees involved. The NTEU, being aware of the circumstances, did nothing to assist in defense of my role; it even encouraged the IRS/Treasury's actions. Robert Hall told me, that the only reason I, " reported any of the violations was so that I could avoid being terminated for "poor rating," because I had no idea a transcriber could be terminated for such, and never saw or heard of any transcribers that were terminated as such.

**Page 88:**

This is one of the memos from the Tax Commissioner about the plans and effects to update the IRS. This one concerns the Whistleblower Protection Act of 1989, WPA. It was accompanied by a pamplet about OSC in relation to WPA reports. There were other similar memos concerning the efforts to improve the IRS system along with restructuring plans for the nine IRS processing centers.

**3. In Tab 2, PP. 89 - 154, titled "EEO Counseling Report" describe these attachments and list and explain any discrepancies or inaccuracies.**

**Pages 89-93:**

This is, as referenced previously above, the initial EEO report, Part I, sent in on Febrauary 12, 2002. It includes the, "Summary of EEO Complaint Process," notice form. P. 93 is the cover letter to Annette Curry, EEO Counselor, Doraville, GA.

**Pages 94- 97:**

This is Part II of the EEO Counseling Report, dated March 28, 2002, (item #27, P. 96). P. 94 refers to contacts of Annette Curry to some of the individuals involved with the complaints. On P. 95, item # 22 describes the Summary of the Complaint. The one sentence summation listed as "Issues" is vague; it does not mention areas of discrimination or specific harassment issues.

P. 97, ¶ 1, states an inaccurate brief description of the issues; AP refers to aggrieved person, myself. It overlaps departmental reasoning with some of the complaint issues. It attributes myself as having said what departmental rules were/are, some of which were not made know to me during employment. My view of the rating score is

11

that, 'if it is going to be usedd for personnel actions then it has to be fair, and reasonably without flaws.' When errors are charged to data transcribers for prior document processing, transcribers should not be held in error for those mistakes. The problems of rating issues, listed above under "Page 1," affected rating score. Considering these rating issues, it is not a matter of quality level, it is a matter of adherence to fair labor practices. Consequently, it was not a normal practice to terminate a data transcriber for "poor rating." This description fails to review discrimation claims of gender and race, nor those of acts of harassment that was done to me.

Under "Management Response" on P. 97, are comments of Lisa Lee, Robert Hall, Kelly Mancle, Linda Ferguson, and Rick Seaborn. In ¶ 2 Kelly Mancle states effectly that I did nothing but read a book, which as I have explained is not true. The comment that I left the room for two 30 minute periods contradict Robert Hall's March 5, 2001, letter, P. 87 (repeated for P. 124), where it is stated I left for a 35 minute period and then a 10 minute period. I did not leave the room for large periods of time; the longest would be to change the incesion, a towel, around or completely. What is not mention here is that I eventually left because, as in the past, Kelly Mancle was abusive towards me, practices "brow beating," and targeting me.

In ¶ 3, P. 97, are comments of Lisa Lee, unit manager. The statement that she said I, " should have been in the training session, " contradicts what she originally told me, has stated above, that the meeting was about EEOC regulations. Lisa Lee is not truthful by being manipulative. Selecting the next batch of work may be, by formulation, a randon process, but my experience was that I was assign certain batches of work from specific carts. The other listed violation, the chair hitting, "gay" party invitation, and party solicitations, did occur but little details are provided in collecting information or in questions.. It sates that I did not like any of these parties and they were solicited during breaks and lunch, however, this is not true. The solicitations were done at any time during work in progress, as logged into the various computer programs. The solicitation to parties were done when I was in Winda Daniels' and, Kelly Mancle's unit as well; periods where Lisa Lee was not involved. (The employee who gave the sexually solicited invitation was from Kelly mancle's unit while I was in Lisa Lee's unit.). The comment that Lisa Lee, " got the impression that [I] had a problem with women in authoritative positions," is bogus. There has been no such circumstance prior to working at the center. This is more of an effort for her to embellish herself. Another purpose of this comment is to deflect attention from the problems; to perpetuate lies; and put me on the defensive. Approximately, two weeks prior to me being solicited for the "gay" party, Lisa Lee "came on" to me in a sexually suggestive manner. Her comments here are vengeful because she felt rejected. Additionally, I have worked in building houses and commercial construction, so I could work mainly with men if working with women was such an issue.

During the February 20, 2001, "Refresher Course," Robert Hall on P. 97, ¶ 4, states that my response to leaving the course was because, "I did not need the training." I explained to him that leaving the room was surgery related. The meeting

12

documentation Robert Hall refers to is the P. 87, March 5, 2001, letter as in the above discussion. For P. 122, Robert Hall is referring to the memo where he reported what he was told by the NTEU, Lisa Porter nad Angela Strong. This alleged call has not been verified by the Robert Hall/IRS/Treasury and the EOP file does not contain affidavits from Lisa Porter and Angela Strong. This is improper involvement of the NTEU, as on P. 87, either the NTEU representatives or Robert Hall is lying; or both. ( The NTEU in related case in DC District, 05-1147, has denied any such involvement.)

Linda Ferguson, ¶ 5, states that there were "many complaints regarding [me], however, no such files or documentation of any such complaints were in the EOP file, except in a "supervisor's desk file," which was formulated primarily around the period of my termination. In an effort to retrieve records pretaining to me, that were generating or held, I filed a civil action under the FOIA/Privacy Act in DC District. In all the records that were delivered to me from this case there were no files of any complaints of me as Linda Ferguson states.

From ¶ 6 & 7, there is the clarification that Rick Seaborn approved of the actions of those involved in my termination. What is absence is an explanation of my past complaint processing of reported EEO violations or prohibited practices, and whether they were factored into the decision making, as required by the Restructuring and Reform Act of 1998, (RRA98).

**Pages 98 - 101**:

These pages mark the ending of the informal complaint process and give the "Notice of Right to File a Discrimination Complaint," dated March 7, 2002.

**Pages 102 - 154**:

These pages contian the documentation used in the informal processing and in subsequent reviews of my claims.

**Page 102** is an email from Robert Hall to Brent Brown concerning the night I was terminated, March 7, 2001. Robert Hall stating that I was, "still a scary type of person," however, does not explain why? Initially, because my intentions were to seek relief for the discrimination and harassment, in addition to the issues of reporting prohibited practices, Robert Hall knew that he would be under investigation, as he was part of the complaint. From the March 5, 2001, meeting P. 87, Robert Hall realized that his coersion was wrong, and similar to his prior year with intimidation comments as reported in my Novemmber 2000 letter, P. 40, ¶ 2, to P. 41, ¶ 1. This email does show the contradiction between the IRS/Treasury response to my reported violations to taxpayers' documents and EEO violations verses the swift action taken in my removal from the center and to damage my credibility. This fact is similar in that there is more

13

documentation provided for the six weeks from February 20, 2001 until March 30, 2001, surrounding my termination, than in the over two year period from February 1999 to March 2001 concerning the originating events of my complaints. More was done to prosecute me, in the last two weeks of employment and four weeks after employment, than during employment to correct any problems reported or to deter the discrimination and harassment.

**Pages 103- 104** is the form "Request For Personnel Action" citing Linda Ferguson and Bettye Reid as initiating the termination process.

**Pages 105-110** is the November 1999 compliant letter sent to the Tax Commissioner's office then forwarded to the IRS Processing Center.

**Pages 111- 113** these are employment statistics. Not sure what each item represents but there are general recognizable job identifiers and employment duration.

**Page 114** is a memo from Robert Hall to Linda Ferguson regarding the recommendation to terminate me. With Robert Hall stating in ¶ 1 that, "[I think] Kelly picks on [me] in from of the class," there is recognition of reporting a prohibited practicee that was presented to Linda Ferguson prior to my termination. Kelly Mancle did treat me differently than any others in the "Refresher Course" it was a pattern of behavior for her since I was first employed at the center. In ¶ 2 Robert Hall did not take into consideration the rating issues as discussed above for Page 1, nor was the review period, as stated for Page 87, ¶ 6 above, accurately exercised, demonstrating the biased treatment I received. In ¶ 3 the improper involvement of Doug VanBuren of the NTEU was solicited by the IRS to join in coercing me to sign away my Rights, discredit me, and incriminate me, because the statement is inaccurate as to the events in question. Though not mentioned here, Betty Burris was in Human Resources. The handwritten comment is false; it refers to the March 5, 2001 meeting, (P. 87). Additionally, considering that I had no idea or pre-knowledge of the arranged meeting, I could not have requested any NTEU rep. More significantly, Doug Van Buren came to the unit to tell me about the meeting, but the NTEU does not have any bargaining aauthority if a data transcriber is being terminated for rating. Robert Hall is lying with such a comment as scripted in the middle of the document; it, also, suggest that Robert Hall came to me prior to the March 5, 2001, meeting. I did not have any prior knowledge of what Robert Hall was doing until the March 5, 2001 meeting.

**Pages 115- 116** are the same as above in the Pages 12- 13 and therefore the explanation would be the same.

**Pages 117- 120** are the same as above Pages 111- 113 with the additional page of 117 containing the similar informational statistics.

14

**Page 121** is an email from Robert Hall to Brent Brown on April 2, 2001, involving Susan Karimi, wherein he states that I was a scary person, but did not offer any explanation as to why he or Susan Karimi made such a remarks.    Robert Hall/IRS did not supply any affidavit or testimony from Susan Karimi to justify such implications for the EOP file.    At no time does the IRS/Treasury make any reports of any incidences were I would have been scary to anyone. Susan Karimi would call me at my home, even late at night and talk till past 1 am on the weekends.    I did have a conversation with Susan Karimi over this weekend, however, she was reluctant to get involved.    What Robert Hall has reported is not what happened and only contains a grain of truth. That grain is the fact that I did ask Susan Karimi if she would speak with an attorney if he called her but we talked about other things as well.    Robert Hall is lying as in the above discussions.

As for other employees phone numbers, I had Susan's, who had started work there the year before me, and two others, Julie and Donna, both of which started working there when I did. Other than these three I had no prior knowledge of any other worker then or since, therefore, no phone numbers.    Besides, it seems improbable to me to even think Susan would have a list of other employees phone numbers so that she would just hand them over like a phone company.

Susan Karimi had a special schedule that allowed her to have a four day weekend twice monthly. She would work four ten hour shifts one week, so she could be off on a Sunday one week, then a Thursday the next week. This, when alternated, gave her the four day weekends. Winda Daniel allowed her to do this, which was against departmental rules for scheduling thus, demonstrates a bias when compared to circumstances for myself. I think this is why there is included the statement, " [Winda] always worked hard to do a good job," so that it covers up this violation, by whoever wrote the note.

**Page 122** is a memo where Robert Hall, along with the NTEU, participated in harmful actions towards me, even after I was employed at the IRS Center. Concentrating more to the contents of this memo, it should be noted that this alleged call by the NTEU occurred while I was a resident of NC, no longer an employee of the Treasury, at the end of March 2001, when this supposed call was to have been made. To date neither the Treasury nor the NTEU have responded to request from myself for verification or support from Lisa Porter or Angela Strong, NTEU reps, for this alleged call.

**Lines 1 & 2**: This represents hearsay on the part of Lisa Porter and Robert Hall which amounts to gossip in order to discredit myself.

**Line 3** : I did not make such a call to NTEU, therefore, no conversation with Angela Strong. If there was any such a call, there has not been any explanation as to how Angela Strong would have identified the caller as myself from that of a "crank" caller. I had no contact with either Lisa Porter or Angela Strong at any time before , during, or after employment with the IRS/Treasury.

15

**Line 4** : During the March 5, 2001, meeting in which Doug Van Buren was improperly present, I told him that the IRS/Treasury was trying to terminate him because of reporting the above violations and that I had done so to various agencies. With this in mind, why would I call the NTEU to say I was terminated for my beliefs ? This, also, occurred during a time when I was contacting the EEOC and OSC . The term "beliefs" is strange because it suggest a more religious reasoning of views and actions. There are such things as improbable character traits; for myself this would apply with the term "beliefs", equally so for talking to what would be a stranger about such "beliefs." I am more of a private person, this would not be natural.

**Lines 5 & 6** : The question and statement for me are usual because it evokes a role of Angela Strong , though a stranger to me, of being a more personal familiar role to me. It should be noted that I had come to the understanding that the NTEU was ineffective in resolving complaints before I was terminated and understood that Doug Van Buren was not suppose to be present as with the March 5, 2001, P. 87, meeting where he was coercing me to sign away my rights and credibility for being an informant. Consequently, this lends to a credibility issue of the NTEU in that approximately one month after my termination, I would have trusted any contact with the NTEU or think that the NTEU would do anything to assist myself. All this in light of the accusation of some personal conversation about "beliefs."

**Lines 6 & 7:** I would not think that the union president would be sitting around ready to take a phone call or more particularly to meet. I am sure these would have to be arranged for anyone. These may be possible events but not probable as a rule. As stated above I would not have contacted the NTEU since by this date the NTEU had established a behavior mistrust for me.

**Line 8** : This memo involves lies on the part of Robert Hall/IRS/Treasury and/or Lisa Porter/Angela Strong/NTEU. It demonstrates the lengths to which EEO violations were committed against me by the collective action. Along with the March 5, 2001 meeting, P. 87, the comments of a call with Susan Karimi, P. 121, and this NTEU memo, Robert Hall has demonstrated a pattern of lies in a campaign against myself.

**Page 123** is a "Recommendation For Corrective Action" form used by Lisa Lee dated March 5, 2001. In three of the areas in the middle of the form, for required information, there is the remark, "see attached," however there are no attachments nor reference to any. Therefore, there is a lack of verification for this form.

**Page 124** is the document of P. 87, about the March 5, 2001 meeting.

**Page 125** is the document of P. 114, the follow-up memo from Robert Hall to Linda Ferguson about the March 5, 2001 meeting.

16

**Pages 126- 152** are documents that concern the rating tabulations and computer generated statistics as used by the IRS/Treasury. Given the rating issues, as listed for P. 1 discussion above, there are contradictions and inconsistencies, to the accuracy of the rating scoring. In particular, P. 126 as used in discussion for P. 87, ¶ 6, above, is not verified and formulated for the specific purpose of removal.

**Pages 143 & 153;** these two documents are "Employee Expectations" signing sheets. The purpose of these was to acknowledge that a data transcriber had attended a meeting in which the expectations and job descriptions were discussed. P. 153 cites a date as having occurred March 30, 1999, however, this document contains my forged signature. The date suggest that this meeting occurred while in Winda Daniel's unit, but, data transcribers are required to have been informed of work expectations prior to the start of work, which for the group I was trained with, should have been done in the first of February 1999 by Kelly Mancle. When the signature on this P. 153 is compared to my other signatures such as on PP. 5, 7, 9, 10, 48, & 93, there can be seen a difference. The other name lettering and numbers are not my script either. What appears to have happen is that when this signature sheet was not in the files as required, it was added so that it could appear that proper procedure was followed to divert blame and mislead the facts.

On P. 143 there is an additional printing and signing of my name which were not what I wrote on this document, April 13, 2000. I have no explanation as to why this additional script is contained on this document.

**Page 154** is a listing for guidelines for the two week training class before starting work as a data transcriber, dated January 31, 1999. During the hiring process prospective employees were told that if they did not pass the training course, then they could work as clerks, instead. However, this option was not listed on this guidelines documentation. In the last item listed there is cited, "see attached criteria" but no attachment is included here for the EOP file. In the second to last item listed, there is a warning that if a trainee quits the class without resigning they will be listed as "terminated" in their record. However, this is false, because under OPM regulations it can only be recorded as "probation/seperation." No specific reason is to be recorded under such circumstances.

**4. In Tab 3, PP. 155 - 167, titled "Complaint Center's Letter " describe these letters and list and explain any discrepancies or inaccuracies.**

**Page 155- 156**:

This is a correspondence to the US Treasury Complaint Center after the completion of the formal complaint process.

17

**Page 157- 167:**

There are letters from the Treasury EOP Complaint Center in which my claims were filed on March 18, 2002. The recognized claims are listed on P. 157, and PP. 160-161, items # 1 & # 2. These state some of the circumstances of the claims but not as listed in the attachment to the complaints. Some of the identities of the employees generating the claims were not know to me, but I did provide information so that they could be identified. The same would be true for some of the witnesses. The IRS/ Treasury has been reluctant to resolve the identity of these employees during adjudication.

P. 167, dated June 19, 2002, assigned Nancy Dunford, investigator, for the Treasury EOP. It establishes an investigation under TD Case Number 02-1135, with onsite investigation for two week to begin July 15, 2002. There were correspondences between Nancy Dunford and myself in the form of letters, phone calls, and emails. Those are not attached in this section. Nancy Dunford did set up a conference hearing/meeting one day during this two week period so that I could ask questions of the witnesses. However, she did not call to complete this arranged conference call, but only gave me the run around of excuses as to what happened.

**5. In Tab 5, PP. 173 - 174a, the testimony of Cedric Swain, Human Resources, are there any discrepancies and/or inaccuracies, if so explain ?**

In the second set of questions, P. 173, # 1, Cedric Swain is improper here in that part of issuing the decisions on terminating an employee, he is required to review circumstances surrounding a request for removal.

For question # 3, P. 174, Cedric Swain should have some record of who was making the request for removal and who participated. This would be the same for witnesses for question # 4.

In question # 5 the normal procedure for an employee having been an informant was to have Human Resources made aware of such and for it to be taken into consideration before taking any personnel action. Additionally, it should be noted that the material from Robert Hall states that I reported that Kelly Mancle had, " picked on" me for the February 20, 2001, refresher class, which is a protected disclosure.

Cedric Swain is very vague for his answer to Q # 6. During his testimony for the MSPB hearing, December 15, 2003, and in question #5 for the first set of questions, P. 173, Cedric Swain stated that he was just "acting for the Processing Division Chief. However, for Q #6, he states that he was involved with other terminations, and, for the MSPB hearing, he states that he routinely terminated 50 data transcribers per year, which creates a contradiction in his testimony. For the EOP file, P. 256, there was listed only six data transcribers who were removed from the IRS Processing Center, but no specific reason given as to why. This contradicts Cedric Swain's testimony and OPM regulations.

Q #7 demonstrates the fact that I was not allowed to have input into the allegations against me by Robert Hall, Kelly Mancle, and the associated managers. It

18

further, shows that Cedric Swain did not make a complete assessment of the circumstances surrounding the request for removal.

For Q #8, Cedric Swain does not differentiate what normal procedure is compared to what that procedure is for an employee being an informant. He does not clarify as to the priority for termination of a data transcriber during the 12 month probation period. This points to the fact that there is no explanation as to how the IRS Center would terminate a 5 month transcriber verses a 10 month transcriber if they would both have a "poor" rating or the priority of reason for removal. Given such work in progress interruptions such as prohibited solicitations, listed above, there was no actions taken against them. This demonstrates a bias towards me.

Cedric Swain, further, claims no knowledge of employees involved in his procedure of termination, but contradicts this with professing an extensive knowledge of termination processing.

Because Cedric Swain did not follow all procedures in making the decision to terminate me, I do the issue of my race was a factor in the decision making, Q #11.

Significantly, in Q # 12, whether Cedric Swain had knowledge of "pre-complaint counseling," the prior complaints, then proper procedure was not followed to which he contributed.

## 6. In Tab 6, PP. 175 - 177, the testimony of Linda Ferguson, Supervisor, are there any discrepancies and/or inaccuracies, if so explain ?

In the first set of questions, Q # 5, Linda Ferguson states that she only knew me during the process of termination. However, this not true. She was informed of prior letter writing about the problems at the IRS Center. Additionally, prior to return for the 2001 tax season, I phoned Linda Ferguson to request a transfer from the Chamblee, GA, center because of the reported violations, as listed above to the agencies listed on P. 16. She said that transfer are only allowed if the is a military reason. This contradicts the fact that Dina Mingo was transferring to an IRS Center in Philadelphia, PA., at the end of working the first tax season.

In the second group of questions with answers to Q # 2 & # 3, there is a demonstration that Linda Ferguson was making decisions on a one sided basis. Given the comparison of answers to Q # 1 & # 4, there can be seen that there is at least one other witness, Kelly Mancle.

If Linda Ferguson bases a decision as she indicates in her answer to Q # 6 about behavior, what needed to happen was to have my response to the allegations, which she nor others, did not do. Both Robert Hall and Kelly Mancle were part of the complaints. These two individuals according to departmental rules and the RRA98 were to be excluded from any personnel decision towards myself. Considering Q # 7, it can be noted that if it was routine to terminate data transcribers as claimed, then why does Linda Ferguson not have "specific" names or situations? Therefore, with Q # 8, there was a difference in the treatment towards myself opposite of what Linda Ferguson claims.

19

The responded answer to Q # 9 is incomplete because it does not cite what policies and procedure apply to an employee involve in the complaints of EEO violations and prohibited practices. This demonstrates that the complaints to the tax commissioner were not processed properly or that Linda Ferguson ignored them. Though not specifically clear, the file referred to in Q # 11, is that which is under Tab 13 of this EOP file. This Tab 13 file contains those documents that have been previously discussed above for their inaccuracies.

Though vague, the answer to Q # 12 shows that Linda Ferguson was aware of the complaints I reported. This demonstrates a contradiction in her testimony, wherein one question she has no knowledge of the complaints, then, later states she does not. Consequently, Linda Ferguson would need to be re-questioned to clarify, because there appears to be reluctance with responses for the answers.

With Linda Ferguson's admission in Q # 13, it is clear that there was a violation in following proper procedure when considering my termination, because under that circumstance there should have be a thorough review with a hearing at the center or otherwise, for review of all circumstances surrounding termination and prohibited practices. This did not happen. Under such conditions, the circumstances of Robert Hall and Kelly Mancle harassing and discriminating against myself could have been fully realized; in addition, to how the reporting of prohibited practices influenced decision making and allegations.

Linda Ferguson's testimony is deficient because there are no questions about the different forms of harassment and discrimination that I reported in the claims. This demonstrates that when it came to harassment and discrimination of myself, that those responsible for correcting the circumstances did not properly process the complaints at any time, but did focused more swiftly to have me removed in a short amount of time.

**7. In Tab 7, PP. 178 - 180, the testimony of Robert Hall, Manager, are there any discrepancies and/or inaccuracies, if so explain ?**

Question # 1, in the second set of questions, Robert Hall merely resubmitted his March 5, 2001, letter P. 87, (as reviewed above).

The last two sentences refers to the alleged phone call to the NTEU, P. 122, (as reviewed above). Since Q #1 asked for the events leading up to issuing the termination letter, the inclusion of the NTEU allegations of this call which is dated to have occurred the end of March 2001, the 29th or 30th is misleading . The events for this question would be those that had occurred no later than the date of termination, March 7, 2001, not after as dated later in the month of March the 29th or 30th . Robert Hall using the P. 122 document, that contains issues of lying from him and/or the NTEU reps, is creating a diversion from the issue of the question. Robert Hall is attempting to justify my termination with character assassination after the fact to cover his tracks, to which the IRS/Treasury has supported and perpetuated improperly, because this alleged call was not verified or supported with related testimony. Robert Hall is perpetuating hate speech and

20

the IRS/Treasury has not resolved such issues with P. 122 document. The NTEU has later denied any involvement with this incident.

The explanation above for P. 87, ¶ 6, applies to Robert Hall's answer to Q #2. He did not have any meeting with me between February 20, 2001 and March 5, 2001, nor did anyone in the unit. The timeline is inaccurate for the events as Robert Hall has stated.

In Q # 7, when Robert Hall was asked if any other employees were in similar circumstances, he said he did not "remember any." This answer contradicts the claims that terminating me was a routine practice. If it were so routine, then why not some recollection ? With this Robert Hall demonstrates that it is not normal procedure to terminate a data transcriber under such circumstances. Given the fact that each transcriber was given a rating, then all other transcribers below my rank number of the approximately 500 would have to have been terminated as well. However, this did not happen. This, further, demonstrates that I was discriminated against and termination was not for the reason cited.

For Q # 8, Robert Hall did not fully answer this question about the difference in treatment of me than that with others. He wrongly states that I refused to go to the meeting. I did go to the meeting. The conflict was with Kelly Mancle, wherein Robert Hall refused to recognize that she generated problems, then and in the past.

Robert Hall even after being told of the complaints, particularly with Kelly Mancle, did not take those into consideration for proper processing of termination as ask for Q # 9. In his answer here, Robert Hall makes the statement that, " [I] left the class without permission." It was not a requirement of employees to ask for permission to leave any such class for bathroom, etc. Robert Hall is trying to make me look wrong for having left the class to attend to circumstances related to surgery. Employees never asked to go to the bathroom or anything; nor did they announce any reason for leaving as common practice.

For Q # 13 & # 14, Robert Hall was asked if he knew of any involvement of myself in any prior reporting of any violations. He answered "no", but this is not true. From the letters I wrote he knew of the EEO and MSPB type violations. This is because Robert Hall said to me on February 20, 2001, that, " [I] had no right to go off the property to report anything, " and that, "he did not believe all the things that [I] had said about Kelly Mancle, because she was a friend of his and that he knew her for a long time." These remarks contradict his answers here for Q # 13 & # 14, in addition, to contradicting his answer to Q # 1, where he stated that Kelly Mancle picked on me in the "refresher course," and ignored me explaining he had knowledge of past reported violations.

There is a failure of Nancy Dunford to ask Robert Hall questions about any reported harassment and discrimination. The questions focus primarily on termination. Robert Hall failed to acknowledge that I had surgery and left that night because of the effects of the surgery. Robert Hall failed to review all facts connected to the circumstances surrounding the complaints.

21

**8. In Tab 8, PP. 181 - 189, the testimony of Judy Jordan, Supervisor, are there any discrepancies and/or inaccuracies, if so explain ?**

P. 182, for Q # 2 Judy Jordan did not answer the question, and she did not have any discussion with me about the probationary period. The "processing and interview session" prior to starting as a data transcriber referred to by Judy Jordan was started in the Fall of 1998 in applying to the IRS. This process followed the steps of, (1) interviewing application giving information for a background check, (2) taking a series of battery test for placement, (3) making a choice to job options, and (4) taking the training of the position. During this process it was told to me that data transcribers had to pass a two week training session, however, if you could not pass this training then you could be a clerk. This meant that there was a 'wait and see approach' before an extensive explanation of the job duties or responsibilities of a data transcriber were given. I, as well as other transcribers, went from, the last night of training, Thursday; a phone call on Friday; then, to work on Sunday night; so there was no session to explain data transcriber duties as stipulated by Judy Jordan. From P. 153, as discussed above, is the "work expectations/practices" that Judy Jordan refers to in her answer, however, this document is dated March 30, 1999, after the my entry of tour of duty which was the first week of February 1999. The signature was forged for this document which I did not know about until it was delivered to me in January 2003, but I did mention some interest in the signing my signature by Winda Daniel as mentioned in my letter of November 1999, P. 30, ¶ 1. Therefore, for Judy Jordan to reply with a remark, that claims a manager did explain to me the job criteria prior to the start of work, is inaccurate and unfounded. Because a requirement under MSPB determinations was me having prior knowledge of transcribers being terminated for "poor" rating, even though I stated I had not been informed, results in suspicion with Judy Jordan's answer attempting to establish such requirement.

The fact sheet she references, Tab B, PP. 186-189, was not given to me as she stipulates. P. 186, item #1, states that it is "not a permanent position" but the job classification is listed as "permanent seasonal," which was how it was initially described. Further, item # 4, states that a transcriber would receive an Enter On Duty Letter which as discussed above did not occur. Item #5, in the last sentence, refers to the a post training class for on-the-job training which did not happen as previously described. Item #6, list the shifts schedules but this is not accurate, because for the night shift a transcriber could start at 6:00, 6:30, or 7:00, Sunday thru Thursday. Since I did not receive this fact sheet, # 8 was not a stipulation explained to me.

Q # 3, P. 182, Judy Jordan cites the fact sheets as mention for Q #1, and a memorandum to Linda Ferguson, dated March 6, 2000. Because the fact sheets have been discussed I will refer to only the memorandum, Tab A, PP. 184-185, which relates to my first letter sent to the Tax Commissioner in November 1999. In ¶ 1, P. 184, concerns the noise level in the units and data conversion section. Judy Jordan states that, " it is very difficult for there not to be talking," because of the number of transcribers,

22

389, on the night shift. However, a mirror image of the conversion section was the corrections division, but in the corrections division there was no such level of noise. Therefore, it is not as difficult as Judy Jordan cites, or could not be done. Even though in ¶ 2, Judy Jordan states she informed the managers but this was ineffective, Winda Daniels did little to nothing to reduce the excessive noise.

At the ending of ¶ 4, on P. 185, Judy Jordan states that the cafeteria meetings were not mandatory, however, I was told it was mandatory. When I, and others, wanted to continue working we were told we could not. In ¶ 2, P. 185, Judy Jordan attempts to justify the solicitation and conduction of parties which are against departmental rules by stating that these were done on breaks and lunch periods. This is not true because, I was solicited during work in progress; the food/drinks for the parties were distributed in the units; and the time restraints for completing them is not considered. Judy Jordan was not in the unit I worked in enough to be able to say this with any certainty.

In ¶ 3, P. 185, Judy Jordan cites issues listed in my November 1999 letter. This demonstrates that Linda Ferguson had knowledge of my reported complaints in March 2000. These issues were, therefore, discussed with managers. In proceedings with MSPB the associated managers denied any knowledge of such reported violations, thus, contradicting themselves.

P. 185, ¶ 4, remarks that Winda Daniel's unit achieved notable rates for " operator's terminal time statistics " but this does not explain all factors of rating. It is misleading. Judy Jordan was not in the unit with such frequency that she could affirm accurately Winda Daniel's interaction with all transcribers or what was being done to taxpayers' documents. In ¶ 5, Judy Jordan refers to my comment of the way she responded to the noise levels complaints as being complacent, which to me she was just as explained herein.

Q # 5, P. 182, in asking if Judy Jordan knew of my involvement in Whistle-blowing activities, she responded, "no'. However, given P. 185, ¶ 3, she in fact had knowledge of some reported prohibited practices because 'harassment in the parking lot' and 'improper documentation' are prohibited practices. This question, also, does not specify whether it refers to EEO or MSPB involvement. If EEO in nature then all listings in ¶ 3 would apply.

Q # 6, P. 182, since I do not know when Judy Jordan talked with Winda Daniel or Joyce Holmes, I can not say if this is accurate. I did call Judy Jordan in response but she failed to call be back. This contributed to my comment of her being complacent.

A deficient problem with Nancy Dunford asking question to Judy Jordan is that she limited the number of questions to 6 unlike the other witnesses where the number was 12 or more. The questions did not include the relevant issues as needed. Answers for Judy Jordan for the additional questions would provide a more accurate information.

23

**9. In Tab 9, PP. 190 - 195, the testimony of Kelly Mancle, Unit Manager, are there any discrepancies and/or inaccuracies, if so explain ?**

In the first set of questions, Kelly Mancle, for #5, inaccurately states that I was a returning transcriber in March 1999. I was with a group of newly hired and trained transcribers that were assigned to her unit the first week of February 1999.

Kelly Mancle continued to position herself to be near me in subsequent units as well as being involved in subsequent EEO complaints. In stating that I, "complet[ed] Basic Training and Post Training," Kelly Mancle contradicts her answer to Q # 5 in the first set of questions, because as mentioned above she stated that I had "returned to duty." To further, I did not have any post training as Kelly Mancle stipulates. The work expectations/practices referred to with documenting form, P. 153, should have been done by Kelly Mancle prior to entering taxpayers' documentation into the programs, but was not. This document, also, as previously mention contains my forged signature. Kelly Mancle did not review any job performance with me or as part of a group as she stipulates.

The ending of the answer to Q # 1, P. 191, cites the February 20, 2001, "refresher course" as previously discussed. Kelly Mancle from the beginning of employment with the IRS, February 1999, until the day I was terminated, made input directly and indirectly towards me; her harassment and discriminatory attitude follow the similar pattern. In the TIGTA file it was reported that she went to Pam Blackburn to state that she I was a "scary" person, however, she gave no explanation as to why.

Q # 2, P. 191, Kelly Mancle did not answer the question. This was the same practice when she was asked questions in the unit; she would reply with procedural statements, never providing a relative or resolving answer. On March 30, 1999, I was in Winda Daniel's unit, therefore, Kelly Mancle could not have conducted any work expectations/practices meeting with me. This further points to the fact that the document of P. 153 concerning such a meeting is contrived. Additionally, Kelly Mancle contradicts herself in stating that she did not have any contact with me after I left her unit at the end of February 1999, but then states that she discussed the listed topics with me. She, further, overlooked her role in the circumstances of sexual harassment towards me, in that she failed to process the incident, which in turn, contradicts her accusations and reports of me being insubordinate during the February 20, 2001, "refresher course."

In Q # 3, Kelly Mancle references the two complaint letters, written November 1999 and November 2000, because of interviewers referring to them being as sent to Congress. However, this contradicts her claim that she did not having any prior knowledge of me reporting any claims or violations off the IRS Service Center, prior to my termination, therefore other managers and supervisors would have equally known. The identity of the interviewers has not been done even when asked in the MSPB hearing.

24

For Q # 4, even though her testimony for this EOP file was made July 2002, Kelly Mancle still refuses to recognize that the reason for leaving the meeting on February 20, 2001, was related to surgery. In this question, she is asked to list witnesses but instead includes her comments of me reading a book. This demonstrates a pattern of what happened when I was in her unit with her being asked questions. Kelly Mancle then cites witnesses to these to allegations as opposed to listing witnesses to Q # 3.

Q # 5 ask if Kelly Mancle were the deciding manager for my termination. Even though she was not, and claims to not have had any input, she in fact continues to make false allegations and misses actual accuracies as just explained with her Q # 4 answer. These allegations, she claims, was to be insubordination on my part.

Considering Kelly Mancle's allegations as in her answer to Q # 4, she would be a contributor, contradictory to her answer to Q # 6.

For Q # 7, Kelly Mancle list three transcribers as having been terminated for "poor" rating as citing justification for my termination. Kelly Mancle improperly includes paperwork for Jennifer Smith, PP. 194-195. She nor the IRS provided consent from Jennifer Smith for the documents use. Part of the prohibited practices exercised on taxpayer's returns was that the "Jennifers" in the states of FL, GA, and SC were being grouped together. Why this was done I can not say, but it is suspicious that Kelly Mancle would include paperwork of a "Jennifer" without proper consent, and because the name Jennifer Smith is not on either list of data transcribers in Tab 16 & 17, but should be listed. For the other two transcribers, Kelly Mancle nor the IRS, does not list the dates of employment or paperwork for any verification, as done for the 6 data transcribers listed on P. 256.

Kelly Mancle did not answer Q # 8. However, the reference to "24 hours of post training" is not specifically "post training" but is time to familiarize the transcriber to a certain program. This is not the post training in which work expectations/practices was to have been explained, it is time to gain familiarity with specific programs.

For Q # 9, Kelly Mancle cites the criteria for determining rating and mentions that other factors can determine retention. However, the list in incomplete for my circumstances, because I made prior complaints of violations and reported prohibited practices. The procedure for such circumstances is different than that which determines the a more normal review for personnel action.

In Q # 10 Kelly Mancle references other documentation, but, only, attached Jennifer Smith's documentation. PP. 194- 195. Therefore, it is deficient.

In comparing Q # 11 to Q # 3, Kelly Mancle contradicts herself in being aware of prior complaint processing, because in this question she replied "no, " but for the previous question she gives more detailed background.

25

Q # 12 follows similarly with Q # 11 in that when compared to Q # 3, Kelly Mancle does contradict herself by replying to the negative. Kelly Mancle elaborates to states that she thinks that I am targeting her because of her race and gender, but doing so fails to be truthful about her discrimination and harassment towards me. She was directly or indirectly involved in many of the claims of EEO violations and MSPB prohibited practices, as I have previously stated. She is "targeted" as are others involved in the claims appropriately. A question to ask is that if she is not so involved then why does she contradict herself, thus, pointing to circumstances of lying. One example is that for the February 20, 2001, "refresher" meeting Kelly Mancle stated that the behavior of appendectomy surgery was insubordination, P. 124, however, contradicts herself considering that the "gay" sexual invitation, P. 97, ¶ 3, given by a data transcriber in her unit, in that it was not sufficient to file a charge or even report properly. Though there were complaints filed and meetings warning of improper solicitations, and the fact that the sexual invitation solicits immoral and illegal activity, Kelly Mancle did not view that as serious as the insubordination she falsely charged to me. Such a view of the comparison was perpetuated by the IRS/Treasury and this EOP file.

For Kelly Mancle there were no questions regarding the discrimination and harassment claims from her or other employees. She was not questioned as to the contradictions, in applying rules and regulations, and/ or, in her testimony. The reaction of others in the unit was not included for input, because she had a practiced not telling employees what they needed to know then blaming them because they did not know what was required. Other transcribers in her unit did complain about her. In relation to such complaints, Kelly Mancle, stated that, "she did not care how many people complained about her, because 'they' would just move her to the other side where she wanted to be, because she did not even wanted to be a unit manager."

**10. In Tab 10, PP. 196 - 199, the testimony of Winda Daniel, Unit Manager, are there any discrepancies and/or inaccuracies, if so explain ?**

Since the questions being asked are essentially the same and concentrate more on termination for all the witnesses, the claims of discrimination and harassment were not fully investigated. Because Winda Daniel was not the associated unit manager during my termination period, she had limited input for these questions. For Winda Daniel the questions should have been more specific to EEO violations that occurred while I was in her unit in 1999. She did not answer Q # 13, 15, and 17, which did ask about EEO complaints. These factors with Winda Daniel demonstrates that there should have been more questions of discrimination and harassment, particularly for her given the complaint letter, PP. 27- 32, concerned the action while I was employed in her.

In Q # 16, Winda Daniel responded that she was aware of the letter written to Congress. If meaning a single letter, it would be the one written in November 2000, PP. 36- 48. However, both letters were sent at this time. This does demonstrate that

26

Winda Daniel, as well, as others testifying at the December 15, 2003, MSPB hearing knew of me reporting prohibited practices, but she denied, as others, did of any knowledge of the activity. Given the visiting period of such an investigator as stated by Kelly Mancle, (preciously discussed), this would have occurred prior to my termination, though Winda Daniel does not specify a date, but could not have been afterwards.

In Q # 8, Winda Daniel states that she did conduct a work expectations meeting and an expectations packet was given to transcribers, however, the receipt for the package she refers to is the document of P. 153. This work expectations/practices document as discussed above contained my forged signature, as dated March 30, 1999. It stands to reason that this document was forged in order to make it appear that I had be informed of such work expectations, in proper manner; and my employee file made to look proper and up to date for any investigations such as the EOP file or TIGTA file. She gave no specific date, but since the document is forged, then the date is, equally, in question. I did not receive any packet of expectations information as Winda Daniel stipulates.

**11.  In Tab 11, PP. 200 - 203,  the testimony of Lisa Lee, Unit Manager, are there any discrepancies and/or inaccuracies, if so explain ?**

In the second set of questions, for Q # 1, Lisa Lee refers primarily to February 20, 2001, which is, also, referred to in the March 5, 2001, letter, P. 124, of Robert Hall.  On P. 200, Q #1, Lisa Lee states that one hour after the meeting had started, I left the meeting and could not be found.  However, when considering what has been testified to in the March 5, 2001 letter, P. 124, ¶ 2 & 3, in addition to Kelly Mancle's testimony, P. 191, Q # 4, it was reported that I left the meeting 30-35 and 10-15 minutes at a time. Accordingly, this implies that I was away from the meeting for approximately 40 to 50 minutes.  It would seem more reasonable that these witnesses would more likely to be questioned as to the fact that I had even attended the meeting.  These events did not happen in this manner, and contradicts the collective information concerning that evening.  The total period was closer to half the evening.

On P. 201, Lisa Lee continues with a supposed conversation we had. Lisa Lee did not talk to me about the "refresher class," nor did I say it was a "waste of time." I did go to Robert Hall's office as has been previously discussed, and left from there to go home, due to the effects of the surgery; not as Lisa Lee states as her stating I could leave. Lisa Lee, as falsely stated with P. 206, did not have first hand knowledge of the refresher course for the determinations used in termination, therefore only, second hand knowledge.

Q # 2, Lisa Lee cites that data transcribers are to be informed of work expectations/practices as a general rule.  Then she, further, states that she told me of such expectations when I returned to work in January 2000.  However, the document on P. 143, represents what is used to mark when the expectations was given and discussed,

27

but it is dated April 13, 2000, not in returning January 2000.  This P. 143 document contains a set of forged writing mimicking my script as originally signed.  I am not sure why it contains this second set of forged script.  Therefore, Lisa Lee's answer is contradictory and suspicious.

In Q # 6, Lisa Lee states she gave  Robert Hall some input in the decision to terminate me but did not list what she referred to as "facts."  If what she gave was facts, then why not list them for this question ?

Lisa Lee's response to Q # 8 is to quote general rules.  She does not specifically answer the question.  Lisa Lee would have to be more specific as to work assignments because the different forms require different criteria to complete.   The differences results in rating inaccuracies.

For Q # 9 , Lisa Lee is correct in that she did not have first hand knowledge.  As in Q # 7, here she restates the option to resign as opposed to being terminated, but she makes no reference to the reported violations and how they effected the decision process.

There is raised an issue with Q # 10 in that Labor Relations should have spoken to Lisa Lee considering the questionable circumstances.  Labor Relations is required to be informed and updated on any reported violations and such has to be reviewed prior to any personnel action.  The reported claims of the two letters were sent to the Tax Commissioner's complaint division, the employee handling the complaints was Esparanza Baladran.

Q # 12 is vague as to the specific "pre-complaint counseling activities"  that it is asking, therefore, the answer to this question would not be specific either, as a result.

In  Q # 13, Lisa Lee states that she was aware of reported complaints and violations, and since she states it concerned a letter to Congress, and was interviewed, therefore, she knew this before I was terminated.  She contradicts what the other witnesses have stated, in that they knew I had written the letters.

Questions concerning other discrimination and harassment issues were not presented to Lisa Lee for her testimony.  There are no questions for a detailed explanation of how rating was reviewed.  Lisa Lee and, the lead, Regina Mayfield, did not make detailed reviews of work done as they stipulate in other testimonies.

**12.  In Tab 12, PP. 204- 205,  the testimony of Brent Brown, Human Resources, are there any discrepancies and/or inaccuracies, if so explain ?**

In Q # 6, in the first set of questions, Brent Brown states effectively that he only became aware of my race, color, and sex for the present EOP affidavit, however, in Q # 1

28

and Q # 2, he said managers told him of issues of rating performance and insubordination, therefore, he had to be aware of my race, color, and sex at that point. This would not only have made him aware of these for me, but for the others involved.

For Q # 1, in the second set of questions, Brent Brown states that Robert Hall, "expressed the need to expedite the [termination]," of me, but he does not states, specifically, why there was such rush to process. The EOP file does not contain any questions along such line either. If terminating a transcriber for rating was a routine procedure, then why the need to rush the process ? If terminating for insubordination, then why not have input from me, as is required ? Because of these circumstances, why was Brent Brown not suspicious of such a request to him ? However, in Q # 2 Brent Brown did advise that I be terminated for rating instead of for insubordination, because of the need in conforming to "Form 7." This meant that he did not take proper consideration of all factors involved, when making and advising of the personnel action.

With Q # 4, Brent Brown would be partly responsible for my termination, because he states that management followed his advice. Additionally, this points to the fact that part of the problems surrounding my termination involved what was not done that should have been done, according to proper procedure.

Considering that Robert Hall and Kelly Mancle were employees committing reported violations as discussed in my two complaint letters, the accusation of insubordination as part of the reasoning for termination, would need to be reviewed by Brent Brown, however, it was not follow proper procedure. What Brent Brown approved and allowed was a rationalization that false rating can disguise false accusations of insubordination, made by employees involved in previous complaints, therefore, improper assessment of the rating system was not followed nor myself allowed to present questionable incidences.

For Q # 6, the EOP file listing referred to here by Brent Brown is P. 256. As for EEO activity there would need to have been included the EEO compliance reports of the IRS that are to be made each year, but were not included in this EOP file. I have requested such reports but the IRS/Treasury has not complied.

**13. In Tab 13 and Tab 14 , PP. 206- 255 , there is documentation for files reported to be maintained in the Supervisor's Desk and Data Conversion Branch for you, are there any discrepancies and/or inaccuracies, if so explain ?**

These files, though listed separately, are essentially the same and contain documentation, already discussed and used in the above testimonies and replies. Most of the rating evaluations as signed by managers, are not signed by me, even though reviews such as P. 228 were done when I was at the center, but states I was unavailable. The

29

evaluation used on P. 208 was not signed by anyone; it is not verified, thus, used improperly. There are different rating scores given, but these were not included in their entirety for review of the problems with the rating system. This EOP file and MSPB review, did not completely consider the factors affecting rating. Tab 20, PP. 334 and 335, includes two documents that are part of the files for Tab 13 and Tab 14, thus repeated use of them.

**14. In Tab 15, Tab 16, and Tab 17, PP. 256- 314, there are different categories listing the employees in the Data Conversion Branch, are there any discrepancies and/or inaccuracies, if so explain ?**

Tab 15, P. 256, is the list of reported data transcribers that were terminated during the period of January 1999 to March 2001, but these 6 contradict the 50 transcribers that Cedric Swain said he regularly terminated each year for his MSPB December 15, 2003, hearing testimony. I requested this list from Nancy Dunford prior to her taking the testimony from the witnesses. This listing of the 6 does not cite termination as the reason for the personnel action; it list "probation/separation".

Tab 16, PP. 257- 294, this is a list of all data transcribers who where on probation during the period January 1999 to March 2001. Based on the 49 names per page, with 35 pages, plus one page with 5 names, means the approximate total is 1720 data transcribers for the probationary period cited.

Tab 17, PP. 295- 314, is a list of all data conversion employees in the period dated May 2001. Based on the 49 names per page, with 18 pages, plus one page with 7, means the approximate total is 889 data transcribers.

From the comparison of the list in these three Tabs reveal that the difference between Tab 16 minus Tab 17 is 831, however, Tab 17 should be larger than Tab 16. Tab 16 is just those data transcribers on the probationary period, whereas Tab 17 is the total of all employees in the Data Conversion Branch and should be the larger number. Thus, there is a discrepancy of 831 data transcribers, or more accurately, 831 minus the 6 cited in Tab 15 for termination, resulting in 826 unaccounted data transcribers. These total represent discrepancies with supplying proper data.

**15. Included in Tab 18 , PP. 315-324; Tab 19, PP. 325-333; Tab 21, P. 336; and Tab 23, PP. 340- 345; are forms 52, 50-B, job listing, OPM statute, and organizational chart, are there any discrepancies and/or inaccuracies, if so explain ?** *(Tab 20, PP. 334- 335, has been previously discussed, and Tab 22, PP. 337- 339, is discussed in the next question.)*

Tab 18 , PP. 315-324, contains the Personnel Action Forms, 52 and 50-B. Form 52 is used to record the termination citing the statute 5 CFR 315.804, as authorized by

30

Bettye Reid. Though officially records the termination on 03/19/2001, Bettye Reid, used the form of PP. 115- 116, which was given to me by Robert Hall on 3/7/2001. The rest of the forms are 50-B but cite different reasons of furlough, pay adjustments, and realignments form their use.

Tab 19, PP. 325-333, is the Service Position Description, (SPD), for the data transcriber position of a GS-3.

Tab 21, P. 336, is the copy of the statute 5 CFR 315.804 as cited for the Personnel Action 52 form, P. 315, used in termination.

Tab 23, PP. 340- 345, is the organizational chart for data conversion branch.

**16. In Tab 22, PP. 337- 339, are a few pages from the NTEU manual for the listing Article 37 regarding Probationary employees, are there any discrepancies and/or inaccuracies, if so explain ?**

On P. 339, Article 37, Section 1(B) states that IRS/Treasury is to notify an employee of Appeal Rights but does not include that as a requirement for the NTEU when it participates as the IRS/Treasury in removal of the employee and EEO violations. If the NTEU contributes to the violations, then its should be required to make notice of the particular Appeal Rights associated with NTEU actions and decisions. The NTEU has cited the FLRA as the exclusive administrative remedy, but issues no notice of such as was required by the IRS/Treasury for EEOC and MSPB administrative remedies.

**Executed on the** _28th_ **day of** _November_, 2007, in Orlando, FL.

I have read the above questions and answers, also in addition to any required attachments, and testify that the information provided is true and complete to the best of my knowledge and belief. I declare under penalty of perjury that the foregoing is true and correct.

_11- 28-07_
(Date)

(Deponent's Signature)
Steven Ivey
7611 S. OBT, # 278
Orlando, FL, 32809

31